JUDGE NATHAN

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

12 CV 3412

| | |
|---|---|
| **LANDON ROTHSTEIN**, individually and on behalf of all others similarly situated, | Civil Action No.: _____ |
| Plaintiff, | RECEIVED |
| v. | APR 3 0 2012 |
| **GMAC MORTGAGE, LLC f/k/a GMAC MORTGAGE CORPORATION, GMAC INSURANCE MARKETING, INC. d/b/a GMAC AGENCY MARKETING, BALBOA INSURANCE COMPANY, MERITPLAN INSURANCE COMPANY,** and **JOHN DOES 1-20.** | U.S.D.C. S.D. N.Y. CASHIERS **CLASS ACTION COMPLAINT** |
| Defendants. | **Jury Trial Demanded** |

Plaintiff Landon Rothstein ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon the investigation made by and through his attorneys. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.      Plaintiff brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO") and applicable state law on behalf of himself and a nationwide putative class (the "Class"), as more specifically defined below, consisting of all residential mortgage borrowers who have been charged costs associated with force-placed hazard insurance in connection with loans serviced by defendant GMAC Mortgage, Inc. f/k/a GMAC

Mortgage Corporation (hereinafter "GM") at any time from March 6, 2003 to the present (the "Class Period").

2.      To protect the lenders' interest in secured property, mortgage loan contracts require the borrower to maintain specified levels of hazard insurance. If the borrower's coverage lapses, the lender is entitled to purchase coverage for the home, "force place" it, and be reimbursed by the borrower for the cost. GM, a servicer of mortgage loans, procures force-placed insurance coverage with respect to the loans in its servicing portfolio from defendant Balboa Insurance Company ("Balboa").

3.      This case is brought because, at all relevant times, GM has extracted kickbacks from Balboa which have artificially inflated the force-placed insurance premiums that GM has paid. This has enabled GM to demand inflated reimbursements from borrowers.

4.      Specifically, beginning in or about March 2003, GM, as a *quid pro quo* for awarding Balboa its force-placed insurance business, has required Balboa to pay GM kickbacks. These kickbacks have been in the form of bogus "commissions" paid to a GM affiliate, "GMAC Agency Marketing," an unincorporated division and/or fictitious "doing business as" name of defendant GMAC Insurance Marketing, Inc. ("GI"). Balboa agreed to label these payments as "commissions" – and to funnel them through GMAC Agency Marketing – to disguise their true nature as bribes or kickbacks.

5.      This kickback scheme has improperly inflated the reimbursements demanded from borrowers with respect to force-placed insurance on GM-serviced loans because, at all relevant times, the stated premiums have been fraudulently "grossed up" to include the kickbacks. The amounts of the kickbacks have then been repaid by Balboa to GM and/or GI in round-trip

2

transactions that have no legitimate business purpose. The net charge – *i.e.*, the stated premium minus the kickback – represents the true or actual price or cost of the insurance.

6.     This scheme has robbed not only borrowers, but also the owners of the loans being serviced by GM. All servicing agreements entitle servicers such as GM to recoup any advances they incur from loan proceeds "off the top" before any money is passed through to the owners of the loans. Premiums on force-placed insurance constitute reimbursable servicing advances under all such agreements.

7.     At all relevant times, GM in its capacity as loan servicer has reimbursed itself with respect to force-placed insurance based not on its actual costs but instead on the artificially inflated, fraudulently grossed-up premiums charged to borrowers. In other words, GM, in recouping its supposed servicing advances before passing money through to the owners of the loans, has not netted out the amounts of the kickbacks that it has received from Balboa, but has instead included the full amounts of the stated premiums, inflated by the kickbacks. As a result, to the extent borrowers have failed to pay, the owners of the loans have borne those fraudulently inflated costs in the form of reduced proceeds and higher loss severities at liquidation. In practice, this means that profits reaped by GM as a result of the scheme alleged herein have come from the pockets of the pension funds that invest in the mortgages in GM's servicing portfolio and – in the case of loans in the portfolio owned

by the Federal National Mortgage Association ("Fannie Mae") and other Government Sponsored Enterprises ("GSEs") – from the pockets of United States taxpayers.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a). This Court also has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1964(c).

9.      Personal jurisdiction is conferred by 18 U.S.C. § 1965(a), which allows a party to institute a civil RICO action in any district in which a defendant "resides, is found, has an agent, or transacts her affairs." Alternatively, 18 U.S.C. § 1965(b) provides that as long as one defendant is subject to service in a particular district, additional parties residing in other districts may be brought before the forum court, in the court's discretion, to the extent that "the ends of justice so require." 18 U.S.C. § 1965(b).

10.     Additionally, this Court also has personal jurisdiction over the defendants because each systematically and continually conducts business throughout the State of New York.

11.     This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). Plaintiff is a citizen of the State of Texas. Defendants are citizens of different states. The amount in controversy exceeds $5,000,000, and there are more than 100 members in the Class.

12.     This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     Venue is proper in this district under 28 U.S.C. § 1391(b), and 18 U.S.C. §§ 1965(b) and (d). Defendants regularly conduct business in this District.

4

## PARTIES

14.     Plaintiff Landon Rothstein is a resident of Humble, Texas.  Plaintiff has a mortgage loan serviced by GM on a property located at 97 County Road 3701, Splendora, Texas.  Plaintiff was charged $105.00 by GM purportedly to reimburse it for the cost of force-placed hazard insurance with respect to the period October 6, 2010 to January 4, 2011.  The force-placed coverage was obtained by GM from defendant Balboa through its wholly-owned subsidiary defendant Meritplan Insurance Company.

15.     Defendant GMAC Mortgage, LLC f/k/a GMAC Mortgage Corporation ("GM"), is a direct or indirect subsidiary of Residential Capital, LLC, which in turn is a direct or indirect subsidiary of bank holding company Ally Financial Inc. f/k/a GMAC, Inc. ("Ally Financial").  GM is a Delaware limited liability company headquartered in Fort Washington, Pennsylvania.  GM is a financial services company that engages in the servicing of residential mortgage loans.

16.     Defendant GMAC Insurance Marketing, Inc. d/b/a GMAC Agency Marketing ("GI") is a Missouri corporation and a wholly owned indirect subsidiary of Ally Financial.  GI is believed to have offices located at 59 Maiden Lane, 23rd Floor, New York, New York 10038.

17.     Defendants GM and GI are referred to collectively herein as the "GMAC Defendants."

18.     Defendants John Does 1-10 are direct or indirect subsidiaries and/or affiliates of Ally Financial which have at any time during the Class Period received payments from defendant Balboa in connection with residential force-placed insurance, regardless of how those payments have been characterized, whether as purported "commissions," reinsurance premiums or otherwise.

5

19.     Defendant Balboa Insurance Company ("Balboa") is a California corporation headquartered in Irvine, California. Balboa is a member of the Balboa Insurance Group, which was a subsidiary of Bank of America until June 2011, at which time it was sold to QBE Insurance Group, a publicly traded Australian corporation. Balboa maintains relationships with numerous lenders and provides both insurance tracking services and force-placed insurance policies nationwide directly and/or indirectly through its wholly-owned subsidiaries, including defendant Meritplan.

20.     Defendant Meritplan Insurance Company ("Meritplan") is a California corporation headquartered in Irvine, California. Meritplan is a wholly-owned subsidiary of Balboa. Meritplan is a provider of lender-placed insurance to financial institutions nationwide.

21.     Defendants John Does 11-20 are direct or indirect subsidiaries and/or affiliates of Balboa which have at any time during the Class Period provided force-placed insurance coverage in connection with residential mortgages serviced by GM.

22.     Defendants Balboa and Meritplan are referred to collectively herein as the "Balboa Defendants."

23.     GM, GI, Balboa, and Meritplan are referred to collectively herein as "Defendants."

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and (b)(3) on behalf of himself and a nationwide Class consisting of:

> All residential mortgage borrowers who have been charged costs associated with force-placed hazard insurance in connection with loans serviced by GM at any time from March 6, 2003 to the present.

25.     The Class excludes Defendants and any entity in which any defendant has a controlling interest, and their officers, directors, legal representatives, successors and assigns.

26.     The Class is so numerous that joinder of all members is impracticable.

27.     A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

28.     Plaintiff's claims are typical of the claims of the Class.

29.     There are questions of law and fact common to the Class, including but not limited to:

    a.     Whether Defendants engaged in a kickback scheme relating to force-placed insurance;

    b.     Whether GM and/or GI extracted kickbacks from the Balboa Defendants;

    c.     Whether Defendants' kickback scheme constituted mail or wire fraud;

    d.     Whether GM violated the covenants of good faith and fair dealing implied in the mortgage agreements of Plaintiff and the Class;

    e.     Whether GM breached the terms of the mortgage loan agreements of Plaintiff and the Class;

    f.     Whether Defendants have been unjustly enriched;

    g.     Whether Defendants are liable to Plaintiff and the Class for damages and, if so, the measure of such damages.

30.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

31.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

32.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

33.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

34.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

35.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

**Background on Force-Placed Insurance,**
**Securitization and Servicing**

36.     To protect the lender's interest in secured property, mortgage loan contracts require the borrower to maintain specified levels of hazard insurance.  If the borrower's coverage lapses or

is not obtained, the lender is entitled to purchase coverage for the home, "force place" it, and be

reimbursed by the borrower for the cost.

37.     Force-placed insurance policies generally are substantially more costly than borrower-

purchased policies, while providing less coverage.  Additionally, force-placed insurance policies are

purchased by the lender and are for the lender.  The lender is the sole insured and the only loss payee.

In the event of a casualty loss, the borrower has no right to collect any policy proceeds.  The

borrower's only involvement with force-placed insurance coverage is that the borrower is obligated,

by virtue of the mortgage loan agreement, to reimburse the lender for the cost. This obligation is,

in fact, secured by the lender's lien on the property.

38.     Plaintiff's mortgage loan contract is typical.  Section 5 thereof provides, in pertinent

part:

> Property Insurance.  Borrower shall keep the improvements now
> existing or hereafter erected on the Property insured against loss by
> fire, hazards included within the term "extended coverage," and any
> other hazards including, but not limited to, earthquakes and floods,
> for which Lender requires insurance.  This insurance shall be
> maintained in the amounts (including deductible levels) and for the
> periods that Lender requires.  What Lender requires pursuant to the
> preceding sentences can change during the term of the Loan.  The
> insurance carrier providing the insurance shall be chosen by Borrower
> subject to Lender's right to disapprove Borrower's choice, which
> right shall not be exercised unreasonably. . . .
>
> *If Borrower fails to maintain any of the coverages described above,
> Lender may obtain insurance coverage, at Lender's option and
> Borrower's expense.*  Lender is under no obligation to purchase any
> particular type or amount of coverage.  Therefore, such coverage shall
> cover Lender, but might or might not protect Borrower.  Borrower's
> equity in the Property, or the contents of the Property, against any
> risk, hazard or liability and might provide greater or lesser coverage
> than was previously in effect. . . . *Any amounts disbursed by Lender
> under this Section 5 shall become additional debt of Borrower*

> *secured by this Security Instrument.* These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

(emphasis added).

39.    Of course, the traditional lending relationship, where the lender makes a loan, retains it in its portfolio, and services it itself, has become the exception rather than the rule. Most residential mortgages in the United States are financed through securitization.

40.    Securitization is a financing method involving the issuance of securities against a dedicated cash flow stream such as mortgage payments. A financial institution (the "sponsor" or "seller") assembles a pool of mortgage loans made or "originated" by an affiliate or purchased from unaffiliated third-parties. The pool of loans is sold by the sponsor to a special-purpose subsidiary (the "depositor") that has no other assets or liabilities. The depositor sells the loans to a passive, specially created, special-purpose vehicle ("SPV"), typically a trust in the case of residential mortgages. The SPV issues certificated securities to raise the funds to pay the depositor for the loan. The securities are sold directly to investors by the SPV or, as is more common, they are issued directly to the depositor as payment for the loans. The depositor then resells the securities, usually through an underwriting affiliate that places them on the market. Because the certificated securities are collateralized by the residential mortgage loans owned by the trust, they are called residential mortgage-backed securities ("RMBS").

41.    A variety of reasons, *e.g.*, pass-through tax status, mandate that the SPV be passive; it is little more than a shell to hold the loans and put them beyond the reach of the creditors of the financial institution.

42.    Loans, however, need to be managed. Bills must be sent out and payments collected. Thus, a third-party must be brought in to manage the loans. This third party is the mortgage loan servicer. Every loan, irrespective of whether it is securitized, has a servicer.

43.    Servicers are hired by owners of whole loans, typically trustees of securitization trusts. Billions of dollars of mortgage loans are owned by GSEs, i.e., Fannie Mae, the Federal Home Loan Mortgage Corporation ("Freddie Mac"), or the Government National Mortgage Association.

44.    The specific duties of servicers are set forth in PSAs, Servicing Agreements, or similar contracts between the servicer and the owners of the loans which are in all respects material to this lawsuit uniform.  Pursuant to these agreements, servicers are obligated to manage the mortgages on behalf, and in the best interests of, their owners.  In fact, servicers are held to a high standard – they are required, at minimum, to use the same skill, care and practices in servicing loans for others as they customarily employ servicing loans for their own account.

45.    For example, on June 1, 2004, GM executed a PSA to become the servicer of an SPV trust with JPMorgan Chase Bank as the trustee (the "JPMorgan PSA").  Section 3.01 of the JPMorgan PSA provides, in pertinent part:

> THE SERVICER TO ACT AS SERVICER
>
> The Servicer shall service and administer the Mortgage Loans on behalf of the Trust and in the best interest of and for the benefit of the Certificateholders . . . in accordance with the terms of this Agreement and the Mortgage Loans and to the extent consistent with such terms and in accordance with and exercising the same care in performing those practices that the Servicer customarily employs and exercises in servicing and administering mortgage loans for its own account (including, compliance with all applicable federal, state and local laws).

46.     Servicers are responsible for performing the day-to-day tasks relating to the mortgages. These tasks include account maintenance activities such as sending monthly statements to mortgagors, collecting payments from mortgagors, keeping track of account balances, handling escrow accounts, calculating interest-rate adjustments on adjustable rate mortgages, reporting to national credit bureaus, and remitting funds collected from mortgagors to the trust. These tasks also include handling defaulted loans, prosecuting foreclosures and taking appropriate steps to mitigate losses.

47.     One of the most important responsibilities of mortgage loan servicers is to protect the owners of the mortgages from damages caused by casualty losses. All PSAs and other servicing agreements, including those with the GSEs, require the servicer to make sure that adequate hazard insurance is at all times maintained on the secured properties, including through force-placement if appropriate.

48.     Section 3.05 of the JPMorgan PSA, for example, provides in pertinent part:

MAINTENANCE OF HAZARD INSURANCE

The Servicer shall cause to be maintained for each Mortgage Loan hazard insurance with extended coverage on the Mortgaged Property in an amount which is at least equal to the lesser of (I) the Stated Principal Balance of such Mortgage Loan and (ii) the amount necessary to fully compensate for any damage or loss to the improvements that are a part of such property on a replacement cost basis, in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy. . . . The Servicer will comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any such hazard policies.

49.     Additionally, Section 3.07 thereof provides:

MAINTENANCE OF INSURANCE POLICIES

12

The Servicer shall not take any action that would result in noncoverage under any applicable Insurance Policy of any loss which, but for the actions of the Servicer would have been covered thereunder. The Servicer shall use its best efforts to keep in force and effect (to the extent that the related Mortgage Loan requires the Mortgagor to maintain such insurance), any applicable Insurance Policy. The Servicer shall not cancel or refuse to renew any Insurance Policy that is in effect at the date of the initial issuance of the Mortgage Note and is required to be kept in force hereunder.

50.     The servicing requirements applicable to loans owned and/or guaranteed by the GSEs are set forth in the Fannie Mae Servicing Guide. Part II, Chapter 6 thereof provides, in pertinent part:

Part of a servicer's responsibility for protecting our interest in the security property is to ensure that hazard insurance (including flood insurance), under the terms specified in our Guides, is in place at all times. If the servicer is unable to obtain evidence of acceptable hazard insurance for a property, the servicer should obtain alternative insurance coverage (so-called "force-placed" insurance or "lender-placed" insurance) to protect our interests. In this instance, there are several guidelines that servicers should apply, subject to the provisions of and in compliance with applicable law and the mortgage documents.

**GM's Mortgage Servicing Portfolio**

51.     GM is the fifth largest servicer of residential mortgages in the United States, servicing a portfolio of 2.5 million mortgage loans with an aggregate unpaid principal balance of approximately $389 billion. At all relevant times, all the loans in GM's servicing portfolio have been subject to servicing agreements with their owners and/or holders.

52.     At all relevant times, GM's mortgage servicing portfolio has been comprised of loans owned and/or held by (i) Ally Bank, f/k/a GMAC Bank, a Utah state-chartered commercial bank

13

which is also an indirect subsidiary of Ally Financial; (ii) Fannie Mae and other GSEs; and (iii)

various investors including securitization trusts pursuant to PSAs and similar agreements.

53.     The Ally Bank loans in GM's portfolio were originated by GM, then sold by GM to

Ally Bank. Ally Bank either still owns such loans or has resold them to secondary market investors

while retaining their servicing rights. Under the Servicing Agreements between Ally Bank and GM,

GM is required to service the loans in accordance with the servicing guidelines of Fannie Mae. The

servicing guidelines of Fannie Mae also govern GM's obligations with respect to the GSE loans

serviced by GM.

**GM's Outsourcing Deal with Balboa**

54.     In the first quarter of 2003, GM contracted with defendant Balboa to buy force-placed

insurance from Balboa in respect of GM-serviced loans.

55.     Several months later, in or about March 2003, GM expanded its relationship with

Balboa by entering into a new agreement. The new agreement between GM and Balboa provided

not only for GM to purchase force-placed insurance from Balboa, but for GM to outsource all of

GM's functions relating to force-placed insurance – *e.g.*, tracking borrowers' insurance policies –

to Balboa.

56.     According to a March 6, 2003 press release issued by GM relating to its deal with

Balboa, Balboa provides GM with "insurance tracking services that include data maintenance, EDI

processing, customer service and online claims service." The term "EDI" – electronic data

interchange – referred to Balboa's ability to access and interface with GM's borrower databases in

real-time without any active involvement on the part of GM.

14

57.     The GM agreement with Balboa tasks Balboa with, *inter alia*, monitoring the mortgages in GM's servicing portfolio to identify expired, cancelled or non-renewed borrower policies; issuing notices to borrowers regarding the opportunity to cure; and force-placing coverage when appropriate. Balboa is also required by the agreement to maintain and staff call centers should borrowers want to speak with someone.

58.     At all relevant times, pursuant to the agreement, Balboa has functioned in all relevant respects as GM's force-placed insurance back-office. Balboa has handled all aspects of GM's force-placed insurance activities. GM does not perform any such activities itself. Balboa even issues notices to borrowers on GM letterhead, signed "Insurance Department, GMAC Mortgage LLC." Balboa also has its call center personnel identify themselves as employees of GM. Additionally, Balboa's EDI system enables Balboa to manage billings in respect of force-placed insurance, *i.e.*, adding charges and issuing credits with respect to force-placed insurance on borrowers' monthly statements, without any active involvement by GM.

59.     The initial agreement between GM and Balboa had a term of three years. However, the arrangement between GM and Balboa has continued to the present. In fact, GM is today one of Balboa's largest accounts.

**The Kickback Scheme**

60.     There is nothing inherently wrong with GM's insurance and outsourcing arrangements with Balboa. PSAs and other servicing agreements authorize outsourcing. This case is brought, however, because since at least March 2003, the arrangement between GM and Balboa has involved a wrongful component.

61.     Specifically, GM and Balboa devised and at all relevant times have engaged in a kickback scheme designed to generate illicit profits for GM and its affiliates based on GM's dealings with Balboa. These profits have been made off the backs of mortgage borrowers and the owners of the loans being serviced.

62.     Pursuant to the scheme, GM has extracted kickbacks or bribes from Balboa based on a percentage of the gross force-placed insurance premiums that GM has paid. These bribes are in the form of bogus "commissions" paid by Balboa to GMAC Agency Marketing, the unincorporated division and/or fictitious "doing business as" name of defendant GI. GM and Balboa agreed to fraudulently label the payments as "commissions" – and to funnel them through GMAC Agency Marketing – to disguise their true nature as kickbacks. The pretense is that the "commissions" are being paid by Balboa in the ordinary course of business to the insurance agent or "producer" responsible for introducing the insurance customer – *i.e.*, GM – to Balboa.

63.     At all relevant times, however, this pretense has been false. GI is not, and has never been, a *bona fide* insurance agent of Balboa; has not provided and does not provide any *bona fide* insurance agency services to Balboa; and has never solicited or sold any insurance or insurance products on behalf of Balboa, in connection with the force-placed insurance purchased by GM or otherwise.

64.     Instead, at all relevant times, GI's sole role with respect to the force-placed insurance purchased by GM has been to collect kickbacks from Balboa fraudulently labeled as "commissions." The "commissions" have been paid pursuant to a *quid pro quo* agreement or understanding that GM will continue to do force-placed insurance business with Balboa. Furthermore, at all relevant times,

the kickbacks have inured directly or indirectly to the benefit of GM, through inter-affiliate transactions or otherwise.

65.     Notably, the March 2003 GM press release about the deal between GM and Balboa did not say anything about GMAC Agency Marketing, GI, or "commissions." There was no mention of any broker or agent, that purportedly introduced GM to Balboa or otherwise. Rather, the deal described in the press release was bilateral, involving GM and Balboa only.

66.     Nevertheless, at all relevant times, for every dollar in gross premiums paid by GM to Balboa, Balboa has "kicked back" an agreed percentage to GI and/or GM as so-called "commissions." Meanwhile, the stated premiums have been "grossed up" to include these kickbacks.

**The Kickback Scheme Has Harmed
Borrowers and the Owners of the Loans**

67.     Defendants' kickback scheme has unnecessarily inflated the costs of force-placed insurance with respect to GM-serviced loans, thereby damaging borrowers who have been forced to reimburse GM for such costs. The amount of the unnecessary inflation is, at minimum, reflected by the amount of the kickbacks. This is because, at all relevant times, the stated premiums have been fraudulently "grossed up" to include the kickbacks. Balboa then returns the amounts of the kickbacks to GI and/or GM in round-trip transactions that have no legitimate business purpose. The net charge – *i.e.*, the stated premium paid by GM minus the kickback returned directly or indirectly to GI and/or GM – represents the true or actual price or cost of the insurance.

68.     This scheme has not only robbed borrowers, but also improperly inflated force-placed insurance costs borne by the owners of the loans being serviced by GM.

17

69.     To be sure, the costs of force-placed insurance are initially incurred by the servicer, which is responsible for advancing the money to pay the premiums. Servicers such as GM, however, are functionally the senior-most creditors with respect to the loans they manage. This is because all servicing agreements entitle the servicer to recoup any costs, expenses or advances they incur "off the top" from the proceeds of collection or liquidation, before any money is passed through to the owners of the loans. This entitlement includes force-placed insurance premiums paid by the servicer, which are counted as reimbursable servicing advances under all servicing agreements. The right of the servicer to recover its servicing advances is senior even to the AAA RMBS securities issued by the securitization trusts. Furthermore, if loan-level proceeds are insufficient to enable the servicer to recoup its advances on a particular loan, the servicer is entitled to reimburse itself from the cash collected from all of the other loans covered by the servicing agreement.

70.     At all relevant times, GM in its capacity as servicer has reimbursed itself with respect to force-placed insurance based not on its actual costs, but instead on the artificially inflated, grossed-up premiums charged to borrowers. In other words, GM, in recouping its supposed servicing advances prior to passing money through the owners of the loans, has not netted out the amounts of the kickbacks that GM and/or GI have received from Balboa, but has instead included the full amounts of the stated premiums, inflated by the kickbacks. As a result, to the extent borrowers have failed to pay, the owners of GM-serviced loans have borne these fraudulently inflated costs in the form of reduced proceeds and higher loss severities at liquidation. In practice, this means that profits reaped by GM and/or GI from the kickback scheme alleged herein have come from the pockets of the pension funds that invest in the loans in GM's servicing portfolio and – in the case of the GSE loans in that portfolio – from the pockets of United States taxpayers.

71.    A number of commentators, including Professor Adam Levitin of Georgetown University Law Center, have observed that loan servicers' compensation structure creates serious principal-agent conflicts between servicers and mortgage investors. Servicers have no stake in the performance of mortgage loans and do not share mortgage investors' interest in maximizing the value of the loans. Rather, the interest of servicers is in maximizing the fee and expense charges they can recoup "off the top."

72.    This compensation structure incentivizes servicers to artificially and improperly inflate their fees and expenses. As a consequence, servicers frequently charge so-called "junk fees" either for unnecessary work or work that was simply never done. Servicers also engage in a variety of abusive practices, including force-placing insurance when not required, *see generally* Adam Levitin & Tara Twomey, *Mortgage Servicing*, 28 Yale J. on Reg. 1, 76 (2010); *Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing: Hearing Before the Subcommittee on Housing and Community Opportunity of the House Financial Services Committee*, 111th Cong., Nov. 18, 2010 (Statement of Associate Professor Adam J. Levitin, Geo. U. L. Center), or, as in this case, force-placing insurance that is fraudulently inflated in price.

73.    Servicers' compensation structure also incentivizes them to delay foreclosures. Delaying foreclosures keeps homeowners in a "sweatbox" of mounting servicer fees and expenses, according to Professor Levitin. Through this strategy, servicers disregard their contractual duty to maximize the value of defaulted loans for their owners and instead simply keep ramping up the charges as to each loan until they hit the "sweet spot" where the amount owed to the servicer is equal to the liquidation value. At that point, because there is no equity left to strip, the servicer just "want[s] to dump the property from portfolio as quickly as they can," Professor Levitin observes.

Servicers thus routinely drag out defaults for the purpose of piling up bogus and inflated fees and expenses, until there is no value left.

74.     Abusive servicer activities such as delayed foreclosures, "junk" fees and inflated force-placed insurance have enabled servicers to strip billions of dollars in equity from borrowers' homes at the expense of homeowners and the investors in the mortgages and RMBS. It has also exacerbated the housing crisis by pushing marginal borrowers prematurely or unnecessarily into foreclosure. As Professor Levitin describes it, the costs of these kinds of servicer abuses have been "externalized directly on homeowners and indirectly on communities and the housing market as a whole."

75.     Borrowers are not afforded any and have no choice with respect to the arrangements alleged herein. Borrowers have no legal ability or right to select their servicer or force-placed insurer. There is no mechanism for borrowers to select servicers that do not extract, or force-placed insurers that do not pay, kickbacks. When borrowers take their loans, they have no way to select their servicer, and no say whether the servicer is replaced with a new servicer, or what arrangements any servicer might have with its providers. Borrowers have no legal right or ability to opt-out with respect to the kickbacks or affiliate transactions described herein.

76.     Plaintiff does not challenge – and nothing in this complaint should be construed as challenging – the reasonableness or fairness of any force-placed insurance rates. Plaintiff challenges kickbacks and reimbursement charges fraudulently inflated by reason thereof.

77.     The kickback scheme in this case is similar to that conducted by the defendants in *Hofstetter v. Chase Home Finance, LLC*, NO. C 10-01313 WHA (N.D.Cal.), a class action that settled last year. In that case, Chase Home Finance, LLC ("Chase") allegedly extracted kickbacks

from force-placed flood insurer American Security Insurance Company ("ASIC"). ASIC did not, however, pay the kickbacks to Chase directly. Instead, the parties allegedly agreed to fraudulently label the kickbacks as "commissions" and route them through Chase's affiliate, Chase Insurance Agency, Inc. ("CIA"), according to settlement papers filed in the case.

78.     Discovery in *Hofstetter* revealed a system in which CIA collected "commissions" from ASIC yet rendered no *bona fide* insurance agency services in relation to the policies. "What function does Chase Insurance Agency, Inc. perform with respect to flood insurance?" the Plaintiffs' attorney asked in a deposition. "I would say no function," the Chase employee responded. *See* "Banks Face Thicket of Force-Placed Threats," *American Banker* (Jan. 18, 2012).

79.     According to papers filed with the court in the case, the defendants' misconduct in *Hofstetter* allegedly resulted in "commission damages" to the members of the class, with the amount thereof measured by the force-placed insurance premiums charged multiplied by the "commission percentage" paid thereon.

80.     The kickback scheme alleged in this case has operated in material respects like that alleged in *Hofstetter*.

**Government Response**

81.     Force-placed insurance kickback schemes are increasingly becoming a focus of attention for what they are – abusive and parasitic. Fannie Mae recently began fighting back. On March 6, 2012, Fannie Mae issued a *Lender Letter*, titled "Changes Ahead for Lender Placed Insurance," regarding the "costs to taxpayers" of kickback arrangements that improperly inflate the costs. The *Lender Letter* stated, in pertinent part:

> Fannie Mae will soon implement changes to its Lender-Placed Insurance (LPI) requirements to significantly reduce costs to homeowners, taxpayers, and Fannie Mae. The changes will lower barriers for borrowers who want to cure their delinquencies, while improving transparency and boosting competition in the LPI market.
>
> Fannie Mae requires hazard insurance on all properties for which it owns the mortgage. If a homeowner cannot provide evidence of coverage, the servicer must secure that coverage through the use of LPI. *Lender-placed policies, however, are significantly more expensive than voluntary coverage secured by the borrower and often include commissions and other administrative costs, further adding to the cost of LPI policies.* Two firms currently issue most LPI policies.
>
> An expensive LPI policy can often become an obstacle to a delinquent borrower seeking to avoid foreclosure. To bring their loan current, a borrower must reimburse the servicer for the cost of the LPI policy. *If the borrower defaults in mortgage loan payments and does not cure, Fannie Mae must reimburse the servicer for LPI premiums. Costs to Fannie Mae ultimately become costs to taxpayers.*

(emphasis added).

82.    On March 14, 2012, Fannie Mae followed up on its *Lender Letter* by issuing a *Servicing Guide Announcement*. The *Servicing Guide Announcement* "clarif[ied]" Fannie Mae's position that servicer requests for reimbursement of lender-placed insurance premiums must exclude "any lender-placed insurance commission earned . . . by the servicer or any related entity." Fannie Mae indicated that "any other costs beyond the actual cost of the lender-placed insurance policy premium" were unacceptable.

83.    The *Servicing Guide Announcement* stated, in pertinent part:

**Acceptable Lender-Placed Insurance Costs and Insurance Tracking Fees**

22

Fannie Mae is clarifying its requirement for reasonable reimbursable expenses for lender-placed insurance. Any servicer request for reimbursement of lender-placed insurance premiums must exclude:

- *any lender-placed insurance commission earned on that policy by the servicer or any related entity,*

- costs associated with insurance tracking or administration, or

- *any other costs beyond the actual cost of the lender-placed insurance policy premium.*

(emphasis added).

84. In other words, Fannie Mae forbids servicers from engaging in precisely the type of misconduct alleged herein.

85. Additionally, in or about January 10, 2012, Benjamin Lawsky, the Superintendent of the New York State Department of Financial Services ("NYDFS"), launched a probe into improper practices relating to force-placed insurance, including kickbacks. *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

86. On January 27, 2012, the financial services publication *American Banker* disclosed a list of entities subpoenaed by the NYDFS as part of its investigation. The list identified Balboa as among the force-placed insurance companies targeted by the NYDFS. The list also identified GMAC Agency Marketing as among the targeted "insurance producers," *i.e.*, bogus "agents" through which purported "commissions" (a/k/a kickbacks) have been paid.

87. On April 5, 2012, the NYDFS issued a press release announcing that it had expanded its probe into force-placed insurance and was scheduling public hearings on the matter to take place in May 2012. The NYDFS press release also disclosed that the NYDFS had issued formal document requests to a number of additional insurers, including Meritplan.

23

88.     Additionally, the NYDFS press release addressed the type of kickback arrangement alleged herein.  It stated that the NYDFS investigation had already uncovered evidence that force-placed insurance costs have been artificially inflated "due [to] relationships between and payments by insurers to banks and their affiliates. . . .  Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business." The NYDFS press release also discussed that, as alleged herein, kickback-inflated force-placed insurance costs harm not only borrowers but also "investors in mortgages or mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid."

89.     The full text of the NYDFS release states:

**Department Of Financial Services Expands Probe Into Force-Placed Insurance, Demanding Explanation For High Rates; Will Hold Public Hearings**

**Seeks basis for consistently high profits at homeowners' and investors' expense**

**Hearings to be held on whether rates are excessive and to probe payments between insurers, brokers, agents and mortgage servicers**

Benjamin M. Lawsky, Superintendent of Financial Services, today announced that he is intensifying the Department of Financial Services investigation into force-placed insurance by requiring the largest licensed force-placed insurers operating in New York to provide a detailed accounting of their expenses, claims payments and profits.

The Superintendent will hold public hearings in May to review whether rates for force-placed insurance are excessive and to examine the relationships between and payments to and from insurers, banks, mortgage servicers and insurance agents and brokers. Testimony will be taken from homeowners harmed by force-placed insurance and

from the banks, insurers, reinsurers and brokers who operate in the force-placed market. Information gained from the hearings will guide the Department in any action with respect to force-placed insurance.

In light of the concerns raised by the investigation's initial findings, the Department is requiring insurers to provide more extensive and detailed information and supporting documentation, including:
· An actuarial or statistical justification for force-placed insurance rates currently on file with the Department;
· A detailed explanation of how rates and expected loss ratios are calculated;
· A detailed explanation and itemized report of insurers' expenses relating to force-placed insurance; and
· A detailed explanation and itemized report of the payments insurers receive relating to force-placed insurance.

The Department has sent formal document requests, issued under Section 308 of the Insurance Law, requiring the following firms to provide information: *Balboa Insurance Company*, QBE Insurance Corporation, QBE Financial Institution Risk Services, Inc., American Security Insurance Company (Assurant), American Bankers Insurance Company of Florida (Assurant), *Meritplan Insurance Company*, American Modern Home Insurance Company, Empire Fire and Marine Insurance Company, and Fidelity and Deposit Company of Maryland.

"It appears that force-placed insurers charge very high premiums, but pay out only a very small percentage of those premiums on claims—as little as 20 cents on the dollar. In addition, questionable payments are made to various players in the force-placed business, further increasing the profits to insurers and banks," Superintendent Lawsky said. "We have asked insurers to provide a complete breakdown of how much they collect and where every penny goes so we can determine if the premiums are appropriate and the basis for these payments."

Since October 2011, the Department has been conducting a broad industry-wide investigation of force-placed insurance. The investigation has revealed that, for force-placed insurance, the percentage of premiums paid on claims, known as the loss ratio, is extremely low—in most cases, dramatically lower than the expected loss ratios insurers filed with the Department. For example, based on the investigation, while most insurers filed a loss ratio of 55%, one

major insurer's actual loss ratios for the last six years averaged 22% and another averaged less than 20%. This raises serious concerns about whether premiums for this insurance have been artificially inflated.

*The investigation thus far indicates that high rates for force-placed insurance appear to be due in part to relationships between and payments by insurers to banks and their affiliates, including mortgage servicers and insurance agents and brokers. Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business. Early findings of the investigation suggest that 15 percent or more of premiums collected by force-placed insurers flow to the banks through insurance agents affiliated with the banks.*

The insurers may also give banks a share of the profits by giving some of the insurance premium to a reinsurer owned by the bank. Since the claims payments are so low, the banks could be gaining a substantial portion of the profit without actually taking on a great deal of risk.

In addition, the investigation to date reveals that the banks now have a significant conflict of interest. Often, it is the banks' servicers who are supposed to file insurance claims, but have a strong reason not to do so. When the mortgage is owned by investors, filing a claim will benefit the investors, but reduce the profits of the servicers' owners, the banks.

Force-placed insurance is taken out by a bank or mortgage servicer when a borrower does not maintain the homeowners' insurance required by the mortgage documents. This can occur if the homeowner misses a mortgage payment, the homeowner allows the homeowners' policy to lapse, or if the bank or mortgage servicer determines that the borrower does not have a sufficient amount of coverage. Force-placed insurance is typically far more expensive than homeowners' coverage purchased by a homeowner—anywhere from two to ten times more costly—yet often provides less protection for the homeowner while protecting the lender's or investor's interest in the property.

"There appear to be a number of very significant problems with force-placed homeowners' insurance. The price is often extremely high—as much as ten times the normal rate for homeowners' insurance. And sometimes consumers have this high priced policy

26

forced on them when their own insurance is still in place. *At the hearings, we will explore whether banks are using force-placed insurance to increase their profits at the expense of homeowners and investors," Lawsky said.*

*The high cost of force-placed insurance adds to struggling homeowners' debt burden and makes it even more difficult for them to avoid foreclosure. The high cost also harms investors in mortgages or mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid.*

(emphasis added).

90. It is thus apparent that the NYDFS probe has confirmed the allegations of this complaint and is targeting the illicit arrangements alleged herein.

## DEFENDANTS' KICKBACK SCHEME CONSTITUTES "HONEST SERVICES" MAIL AND WIRE FRAUD

91. The scheme alleged herein violates the mail and/or wire fraud statutes, 18 U.S.C. §§ 1341, 1343. Specifically, Defendants conducted a fraudulent scheme to, *inter alia*, deprive the owners of GM-serviced loans of their "intangible rights" to GM's "honest services" through bribes and kickbacks in violation of 18 U.S.C. § 1346.

92. The wire fraud and mail fraud statutes make it a crime to, *inter alia*, devise a scheme to deprive another of "honest services."

93. The mail fraud statute reads in relevant part as follows:

Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises . . . [uses the mails in furtherance of the scheme shall be punished by imprisonment or fine or both].

18 U.S.C. § 1341.

94. The wire fraud statute is in relevant respects identical. *See* 18 U.S.C. § 1343.

27

95.     In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court interpreted this statutory language to apply only to deprivations of property and not to encompass "the right to have [one's] affairs conducted honestly." *Id.* at 352.

96.     In response to *McNally*, Congress broadened the scope of the mail and wire fraud statutes by enacting 18 U.S.C. § 1346. That section provides:

> For the purposes of this chapter [including § 1341 and § 1343], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right to honest services.

18 U.S.C. § 1346.

97.     Thus, through 18 U.S.C. § 1346, Congress brought schemes to deprive another of honest services within the scope of the mail and wire fraud statutes.

98.     In *Skilling v. United States*, 130 S.Ct. 2896 (2010), the Supreme Court addressed the scope and constitutionality of 18 U.S.C. § 1346, concluding that the statute criminalizes "fraudulent schemes to deprive another of honest services through bribes or kickbacks." 130 S.Ct. at 2928, 2931. In fact, the Court held that, for purposes of the mail and wire fraud statutes, the term "scheme or artifice to defraud" in 18 U.S.C. § 1346 (the "honest services" provision), applies to bribes and kickbacks. The Court stated that "there is no doubt that Congress intended § 1346 to reach at least bribes and kickbacks" because the "vast majority" of pre-*McNally* honest services cases involved bribery or kickback schemes. *Id.* at 2930–31.

99.     At all relevant times, GM owed legal duties to render services to the owners of the loans in GM's servicing portfolio under the PSAs, Servicing Agreements, GSE Servicing Guidelines and similar contracts governing their relationships. In all cases, those legal duties included the duty to protect the owners of the mortgages from damages caused by casualty loss by making sure that

adequate hazard insurance was at all times maintained on the secured properties, including through force-placement if necessary. The value of GM's services in fact depended on GM's rendering those services in an honest manner. Nevertheless, GM misused its position as the servicer of the loans to extract bribes and kickbacks from Balboa, thereby artificially inflating the costs of force-placed insurance at the expense of the loan owners. GM thereby breached its obligations to render "honest services" to those loan owners. Each Defendant, by virtue of the conduct as alleged herein, devised a scheme or artifice to defraud the owners of GM servicing portfolio loans by depriving those owners of their intangible rights to GM's honest services through kickbacks.

100.    Defendants' wire and mail fraud violations constitute predicate acts under RICO. Defendants' pattern of racketeering activity has proximately harmed Plaintiff and the Class.

## TOLLING OF THE STATUTES OF LIMITATIONS

101.    The claims of Plaintiff and the Class are subject to both equitable estoppel, stemming from Defendants' concealment of the facts alleged herein, and equitable tolling, stemming from Plaintiff's inability to obtain adequate information to plead the claims alleged herein. Defendants are estopped from relying on a statute of limitations defense because they purposefully concealed the misconduct alleged. At all relevant times Defendants maintained a shroud of secrecy around their illicit dealings. Separate and apart from Defendants' acts of concealment, any applicable statutes of limitations are properly tolled because Plaintiff and the Class did not know, and could not have learned, the facts underlying their claims until shortly before filing this complaint.

102.    Furthermore, at all relevant times Plaintiff and the Class were relieved of any duty to investigate because they reasonably and justifiably relied on GM to fulfill its contractual duties under the mortgage loan contracts of Plaintiff and the Class in good faith, and to similarly execute

its duties under the PSAs, Servicing Agreements and GSE Servicing Guidelines in good faith and in an honest manner. Even assuming there had been some indication of wrongdoing (which there was not), and Plaintiff and the Class had attempted to investigate, such investigation would have been futile because it would not, until recently, have been possible to uncover any specific information as to GM's involvement in the unlawful kickback scheme alleged herein.

103.   Due to the complex, undisclosed and self-concealing nature of the scheme alleged herein, neither Plaintiff, nor any other member of the putative Class whose claims would otherwise be time-barred, possessed or could have possessed sufficient information or the requisite expertise to discover the misconduct alleged. Plaintiff was able to discover the underlying basis for his claims only through the assistance of counsel.

104.   Issues relating to mortgages and mortgage servicing have been in the news since the 2008 financial crisis. Nevertheless, the news coverage has generally related to "robo-signing" and other improper foreclosure practices. It was not until January 2012 that any major national news outlets began publishing reports about improper kickbacks relating to the referral of force-placed insurance business.

105.   The first time the *The New York Times* published a news article about such kickbacks was on January 10, 2012. *The New York Times* broke the story that Benjamin Lawsky, the Superintendent of NYDFS, was investigating several large banks in connection with improper practices relating to force-placed insurance, including "kickbacks." *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

106.   Prior to such time, there was insufficient coverage of allegations of potential kickbacks relating to force-placed insurance to have put Plaintiff or the Class on inquiry notice of

Defendants' misconduct. Indeed, on January 18, 2012, *American Banker* (a self-described "financial services trade journal" with a readership of only approximately 31,000 that is "read by senior banking and financial services executives as well as consultants, lawyers, accountants and other professionals who serve the financial industry" and which previously published articles on force-placed insurance) observed that Superintendent Lawsky's New York probe had finally "brought national attention to banks' alleged self-dealing in the sale of force-placed insurance." "Banks Face Thicket of Force-Placed Threats," *American Banker* (Jan. 18, 2012).

107.    Furthermore, even had Plaintiff or members of the Class been on inquiry notice of misconduct relating to force-placed insurance in the mortgage servicing industry prior to January 10, 2012, despite diligent investigation they would have had no specific factual basis to allege – or even suspect – that GM was involved in any misconduct until, at the earliest, January 27, 2012.

108.    As alleged above, it was on that day that *American Banker* published a list of the entities subpoenaed as part of the NYDFS investigation. The list identified Balboa as among the force-placed insurance companies targeted by that investigation. The list also identified GMAC Agency Marketing (*i.e.*, GI) as among the targeted "insurance producers."

109.    Prior to January 27, 2012, there was simply no publicly available information that even a highly skilled investigator could have uncovered linking GM to potential kickbacks relating to force-placed insurance. Prior to such time, Plaintiff and the Class did not have an adequate factual basis to plead the claims alleged herein.

110.    Any applicable statutes of limitations should be equitably tolled inasmuch as, in the exercise of reasonable diligence, Plaintiff and the Class could not have known of Defendants' violations until, at the earliest, January 27, 2012. Furthermore, any delay by Plaintiff and the Class

in asserting the claims herein was excusable because they could not reasonably have discovered Defendants' misconduct absent specialized knowledge and/or assistance of counsel.

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968
### (Against all Defendants)

111.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein. This count is pled against all Defendants.

112.    Plaintiff, each Class member, and each Defendant are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

### The Enterprise

113.    For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of GM, GI, and the Balboa Defendants, including their respective officers, directors, employees, agents and direct and indirect subsidiaries (the "Enterprise"). The Enterprise was separate and distinct from the persons that constituted the Enterprise.

114.    The Enterprise was primarily managed by GM which organized the fraudulent scheme and procured the involvement of GI and the Balboa Defendants. GI and the Balboa Defendants carried out their part of the scheme under the direction of GM.

115.    The companies and individuals that constitute the Enterprise were associated for the common purpose of fraudulently inflating the stated premiums on force-placed insurance with respect to GM-serviced loans. The purpose thereof was to induce borrowers to pay, and the owners

of the loans to incur, fraudulently inflated charges in respect of such insurance. At all relevant times, the Enterprise was engaged in and its activities affected interstate commerce. The proceeds of the Enterprise were distributed to its participants, principally to GI and directly and/or indirectly to GM.

116.   The Enterprise operated from at least March 2003. Its operation is ongoing. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engage.

## Pattern of Racketeering Activity and Predicate Acts of Mail and Wire Fraud

117.   At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this complaint. Defendants have conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

    a.    GM entered into servicing agreements with owners and/or holders of whole loans which provide, *inter alia*, that GM is obligated to make sure that the secured properties are adequately insured, including through force-placement of insurance if necessary;

    b.    GM procures force-placed insurance with respect to the loans in its servicing portfolio from the Balboa Defendants;

    c.    GM demanded and the Balboa Defendants agreed to and do pay kickbacks to GM and/or its affiliates based on a percentage of the force-placed insurance premiums paid by GM;

    d.    GM and the Balboa Defendants agreed to and do gross-up the stated premiums on the force-placed insurance to include the amounts of the kickbacks;

    e.    GM and the Balboa Defendants agreed to and do disguise the kickbacks as "commissions" paid by the Balboa Defendants to GI or other GM affiliate(s);

33

f.    As a *quid pro quo* for the kickbacks, GM continues to procure force-placed insurance from and outsource its force-placed insurance functions to the Balboa Defendants;

g.    The Balboa Defendants, on GM's behalf, track the loans in GM's servicing portfolio and issue notices to borrowers relating to purported lapses in their insurance coverage and their obligation to reimburse GM for the costs of any force-placed insurance;

h.    GM bills borrowers in relation to force-placed insurance based on the stated, fraudulently inflated premiums, *i.e.*, incorporating the kickbacks;

i.    To the extent borrowers pay the inflated costs billed to them, GM and/or GI profit from the kickbacks at the borrower's expense;

j.    To the extent borrowers fail to pay the inflated costs billed to them, GM reimburses itself from the proceeds of loan collections and liquidations also based on the stated, fraudulently inflated premiums, thereby profiting from the kickbacks at the expense of the owners of the loans; and,

k.    GM provides regular remittance and other reports to loan owners reflecting and/or incorporating the fraudulently inflated premiums as reimbursable servicing advances.

118.    The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341, 1343. Specifically, Defendants engaged in an intentional scheme or artifice to defraud borrowers and the owners of GM-serviced loans and to obtain money or property from the borrowers and the owners of GM-serviced loans through false or fraudulent pretenses, representations and promises.

119.    At all relevant times, Defendants' conduct included a fraudulent scheme to, *inter alia*, deprive the owners of GM-serviced loans of their intangible right to GM's "honest services" through bribes and kickbacks in violation of 18 U.S.C. § 1346. At all relevant times, GM was contractually obligated to render services to the owners of the loans it serviced. GM owed a duty to render those services in an honest manner. The value of those services in fact depended on GM's rendering them

34

in an honest manner. Nevertheless, at all relevant times, GM misused its position to extract bribes and kickbacks from the Balboa Defendants, thereby artificially inflating the costs of force-placed insurance at the expense of the loan owners. GM thereby breached its obligations to render "honest services." GI and the Balboa Defendants intentionally and wilfully conspired and participated in said breach.

120.    Each such bribe or kickback extracted by GM constituted a predicate act of mail and/or wire fraud in that each furthered and executed the scheme to deprive the owners of the loans of their right to GM's "honest services."

121.    It was reasonably foreseeable to each defendant that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

122.    The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions. The precise dates of such transmissions cannot be alleged without access to Defendants' books and records. Nevertheless, Plaintiff can allege such transmissions generally.

123.    For the purpose of furthering and executing the scheme, Defendants regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data and funds, and also regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier. For example:

   a.    The Balboa Defendants, on GM's behalf, transmitted notices and correspondence to borrowers via mail;

   b.    GM issued monthly statements including force-placed insurance charges to borrowers via mail and/or wire;

35

c.  The Balboa Defendants, on GM's behalf, communicated with borrowers via telephone through call centers;

d.  GM received funds from borrowers via mail and/or wire;

e.  GM transmitted funds reflecting fraudulently inflated insurance premiums to the Balboa Defendants via mail and/or wire;

f.  The Balboa Defendants transmitted funds reflecting kickbacks to GI and/or GM via mail and/or wire; and,

g.  GM transmitted remittance and other reports to loan owners and/or holders via mail and/or wire that reflected and/or incorporated the fraudulently inflated force-placed insurance costs;

124.  As to Plaintiff, Defendants utilized the mails and/or wires in the following instances, among others, for the purpose of furthering and executing the scheme:

a.  The Balboa Defendants and/or GM transmitted notices to Plaintiff regarding force-placed insurance by mail dated October 27, 2010, December 12, 2010, September 6, 2011, and September 28, 2011;

b.  GM transmitted statements to Plaintiff reflecting charges in connection with force-placed insurance by mail dated February 14, 2011, March 16, 2011, April 11, 2011, May 9, 2011, June 6, 2011, July 4, 2011, August 8, 2011, September 17, 2011, and October 17, 2011; and

c.  The Balboa Defendants' call center representatives communicated with Plaintiff by wire regarding force-placed insurance on, among other dates, January 24, 2012;

125.  These are only examples of certain instances of the pattern of racketeering activity consisting of mail and/or wire fraud violations engaged in by Defendants. Each electronic and/or postal transmission was incident to an essential part of the scheme. As detailed above, Defendants engaged in similar activities with respect to each member of the Class.

126.    Each such electronic and/or postal transmission was incident to an essential part of the scheme.

127.    Additionally, each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud borrowers and the owners of the loans.

128.    Defendants each participated in the scheme to defraud knowingly, wilfully and with a specific intent to defraud borrowers and the owners of the loans into paying and/or incurring fraudulently inflated charges in connection with force-placed insurance.

129.    The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).  The predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding borrowers and the owners of the loans to pay and incur inflated charges in respect of force-placed insurance and thereby enable Defendants to reap illicit profits.

130.    Defendants were common participants in the predicate acts.   Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers and the owners of the loans.

### Injury to Plaintiff and the Class

131.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).  At all relevant times, Plaintiff and the Class paid charges in connection with force-placed insurance that were fraudulently inflated by reason, and as a direct, proximate and foreseeable result, of the scheme alleged.

132.   Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II

### CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)
### (Against all Defendants)

133.   Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein. This count is pled against all Defendants.

134.   RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

135.   Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

136.   As set forth in Count I, above, at all relevant times, Plaintiff and the Class were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

137.   As set forth in Count I, above, at all relevant times, Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

138.   Defendants formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently inflating the stated premiums on force-placed insurance with respect to GM-serviced loans. The purpose thereof was to induce borrowers and the owners of the loans to pay and incur fraudulently inflated charges in respect of such insurance.

139.    The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

140.    As set forth in Count I, above, Defendants associated with the Enterprise, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

141.    Defendants each were associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

142.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count I, above.

143.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and the Class have been and are continuing to be injured in their business and property in an amount to be determined at trial.  Such injuries include, but are not limited to, fraudulently inflated charges in respect of force-placed insurance, as a direct, proximate and foreseeable result, of the scheme alleged herein.

144.    Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT III

## BREACH OF CONTRACT
### (Against GM)

145.   Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.  This count is pled against GM.

146.   The mortgage loan contracts of Plaintiff and the Class require the borrower to maintain hazard insurance on their property.  All such contracts also authorize the lender to force-place insurance should the borrower fail to do so or there be any lapse in the borrower's insurance coverage.

147.   Nothing in the mortgage loan contracts of Plaintiff and the Class, however, authorizes or permits the lender to charge or bill borrowers for kickbacks, or to recoup from, or be reimbursed by, borrowers with respect to kickbacks or costs that have been grossed-up and/or inflated to include kickbacks.  Nothing in the mortgage loan contracts of Plaintiff and the Class authorizes or permits the lender to charge borrowers in excess of the actual cost of the force-placed insurance.

148.   As the servicer of the loans of Plaintiff and the Class, GM was bound by the terms of the mortgage loan contracts of Plaintiff and the Class.

149.   GM breached and acted in excess of its authority under the mortgage loan contracts of Plaintiff and the Class by charging borrowers for kickbacks fraudulently incorporated into force-placed insurance charges.  GM's charging Plaintiff and the Class for the cost of kickbacks constituted conduct not authorized and in breach of the terms of the mortgage loan contracts of Plaintiff and the Class.

150.   GM has thus breached its contracts with Plaintiff and the Class.

40

151.    As a direct, proximate, and legal result of the aforementioned breaches of contract, Plaintiff and the Class have suffered damages.

## COUNT IV

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against GM)

152.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.  This count is pled against GM.

153.    Every contract contains an implied covenant of good faith and fair dealing.

154.    The mortgage loan contracts of Plaintiff and the Class require the borrower to maintain hazard insurance on their property.  All such contracts also authorize the lender to force-place insurance should the borrower fail to do so or there be any lapse in the borrower's insurance coverage.

155.    Nothing in the mortgage loan contracts of Plaintiff and the Class, however, authorizes or permits the lender to charge or bill borrowers for kickbacks, or to recoup from, or be reimbursed by, borrowers with respect to kickbacks or costs that have been grossed-up and/or inflated to include kickbacks.  Nothing in the mortgage loan contracts of Plaintiff and the Class authorizes or permits the lender to charge borrowers in excess of the actual cost of the force-placed insurance.

156.    As the servicer of the loans of Plaintiff and the Class, GM was bound by the terms of the mortgage loan contracts of Plaintiff and the Class.

157.    Pursuant to the implied covenant of good faith and fair dealing, GM was obligated to perform its duties under the mortgage loan contracts in good faith and to deal fairly with Plaintiff and the Class.

158.    GM breached its duty of good faith and fair dealing by charging borrowers for kickbacks fraudulently incorporated into force-placed insurance charges.  By not netting out and instead incorporating the cost of the kickbacks in the force-placed insurance charges, GM engaged in bad faith conduct toward Plaintiff and the Class, dealt with Plaintiff and the Class unfairly, and contravened the reasonable expectations of Plaintiff and the Class.

159.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class have suffered damages.

## COUNT V

## COMMON LAW RESTITUTION/UNJUST ENRICHMENT/DISGORGEMENT
### (Against all Defendants)

160.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.  This count is pled against all Defendants.

161.    Plaintiff and the Class have conferred a substantial benefit upon Defendants derived from the force-placed insurance premiums.  These benefits came at the expense of Plaintiff and the Class.

162.    The circumstances are such that in equity and good conscious restitution should be made by Defendants to Plaintiff and the Class.

163.    As a result of Defendants' unjust enrichment, Plaintiff and the Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

164.    Plaintiff and the Class are entitled to restitution and/or disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the Class and award the following relief:

a.    For an order declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for an order certifying this case as a class action and appointing Plaintiff as representative of the Class;

b.    For an order awarding compensatory damages on behalf of Plaintiff and the Class in an amount to be proven at trial;

c.    For judgment for Plaintiff and the Class on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' unfair and/or deceptive practices; along with exemplary damages to each Class member for each violation;

d.    For judgment for Plaintiff and the Class on their RICO claims, in an amount to be proven at trial, for three times the amount of the force-placed insurance charges paid to Defendants by Plaintiff and the Class;

e.    For restitution of all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiff and the Class;

f.    For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

g.    For an order awarding Plaintiff and the Class their attorneys' fees and costs; and

h.    Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Federal Rules of Civil Procedure 38, Plaintiff demands a trial by jury of the claims alleged herein.

Dated: April 30, 2012

KIRBY McINERNEY LLP

By: _____

Mark A. Strauss (mstrauss@kmllp.com)
Edward M. Varga, III (evarga@kmllp.com)
J. Brandon Walker (bwalker@kmllp.com)
825 Third Avenue, 16th Floor
New York, New York 10022
Tel:  (212) 371-6600
Fax: (212) 751-2540

*Attorneys for Plaintiff*

44