UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **LANDON ROTHSTEIN**, **JENNIFER DAVIDSON, ROBERT DAVIDSON, and IHOR KOBRYN**, individually and on behalf of all others similarly situated, | Civil Action No.: 1:12-CV-3412 (AJN) |
| Plaintiffs, | **SECOND AMENDED <u>CLASS ACTION COMPLAINT</u>** |
| v. | **<u>JURY TRIAL DEMANDED</u>** |
| **ALLY FINANCIAL, INC. f/k/a GMAC INC., ALLY BANK f/k/a GMAC BANK, JOHN DOE CORPORATION, BALBOA INSURANCE COMPANY, MERITPLAN INSURANCE COMPANY, and NEWPORT MANAGEMENT CORPORATION,** | ECF CASE |
| Defendants. | |

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        A.      Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        B.      The Ally Financial Defendants And Related Non-Party Debtors. . . . . . . . . . . . . 7
        C.      The Balboa Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.     CLASS ACTION ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.      SUBSTANTIVE ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        A.      Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        B.      GMACM's Servicing Portfolio. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        C.      The Kickback Scheme. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        D.      The Scheme Defrauds Borrowers And Loan Owners. . . . . . . . . . . . . . . . . . . . 22
        E.      Fannie Mae Learns That It Is Being Overcharged For LPI. . . . . . . . . . . . . . . . 25
        F.      The Lawsky Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        G.      GMACM Servicing Client American Residential Equities Accuses
                GMACM and Balboa of Defrauding It Through a "Kickback Scheme"
                Involving Inflated LPI Charges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

VI.     THE KICKBACK SCHEME CONSTITUTES MAIL AND WIRE FRAUD. . . . . . . . . 40
        A.      The Erroneous Notices And Bills To Borrowers. . . . . . . . . . . . . . . . . . . . . . . . 40
        B.      The Erroneous Reports To Loan Owners. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
        C.      The Scheme Constitutes "Honest Services" Fraud. . . . . . . . . . . . . . . . . . . . . . 43

VII.    THE KICKBACK SCHEME VIOLATES RESPA'S ANTI-KICKBACK
        PROVISIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

VIII.   ALLY BANK'S LIABILITY FOR THE MISCONDUCT OF ITS AUTHORIZED
        AGENT, GMACM, AND OF ITS AUTHORIZED SUB-AGENT, NEWPORT. . . . . . . 48

IX.     ALLY FINANCIAL'S DOMINATION AND CONTROL OF ITS
        SUBSIDIARIES, INCLUDING RESCAP AND GMACM. . . . . . . . . . . . . . . . . . . . . 51
        A.      Ally Financial's Vertically Integrated Single Enterprise. . . . . . . . . . . . . . . . . . 52
        B.      Investigations And Lawsuits Relating To Securitization Activities. . . . . . . . . . 55
        C.      Investigations And Lawsuits Relating To Servicing Activities. . . . . . . . . . . . . . 59
        D.      Ally Financial Causes ResCap And GMACM To File For Bankruptcy. . . . . . . 64
        E.      Ally Financial's Pre-Petition "Harvesting" Of Subsidiary Assets. . . . . . . . . . . 66
        F.      Ally Financial's Domination Of ResCap And GMACM. . . . . . . . . . . . . . . . . . 69

i

      G.      Ally Financial's Disregard Of Corporate Formalities. . . . . . . . . . . . . . . . . . . . . . . 76

      H.      Ally Financial's Control of GMACM's Servicing Practices, Including Those Relating to LPI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

X.      TOLLING OF THE STATUTES OF LIMITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . 82

XI.      CLAIMS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

COUNT I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

COUNT II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

COUNT III. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

COUNT IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

COUNT V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

COUNT VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

COUNT VII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

JURY TRIAL DEMANDED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

Plaintiffs Landon Rothstein, Jennifer Davidson, Robert Davidson, and Ihor Kobryn ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon the investigation made by and through their attorneys, which included a review of public filings and statements made by defendants, court filings, media articles and other publicly available information. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    Plaintiffs bring this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.* ("RESPA"), and applicable state law, on behalf of themselves and a nationwide putative class consisting of residential mortgage borrowers who have been charged for lender-placed hazard insurance ("LPI"), in connection with loans serviced by GMAC Mortgage, LLC f/k/a GMAC Mortgage Corporation (hereinafter "GMACM") at any time from March 6, 2003 to the present (the "Class Period").

2.    To protect the lender's interest in secured property, standard mortgage loan contracts require the borrower to maintain specified levels of hazard insurance coverage. If the borrower's coverage lapses, the lender is entitled to purchase coverage for the home, "force place" it, and be "reimbursed" by the borrower for the "expense."

3.    Because most loans are sold and securitized after origination, LPI is generally purchased by a loan servicer acting on behalf of the securization trust that owns legal title to the loan. Any amounts paid by the servicer to buy LPI are included as "servicing advances" under the

agreement between the servicer and the trust, known as the "Pooling and Servicing Agreement" or "PSA." The servicer is entitled to recoup its advances from the proceeds of the loan, whether through borrower payments or foreclosure. The servicer has the right to reimbursement "off the top," before any money is passed through to the securitization trust or other loan owner.

4.     GMACM is the fifth largest residential mortgage loan servicer in the United States. As of March 31, 2012, GMACM serviced over 2.4 million mortgage loans with an unpaid principal balance of approximately $374 billion.

5.     Since at least March 2003, GMACM has obtained LPI for the loans it services from defendants Balboa Insurance Company ("Balboa") and its affiliate Meritplan Insurance Company ("Meritplan").

6.     Also since at least March 2003, GMACM has had a relationship with an affiliate of Balboa and Meritplan, defendant Newport Management Corporation ("Newport"). GMACM hires Newport as a subcontractor to perform GMACM's "insurance tracking" duties under GMACM's servicing agreements. Insurance tracking is a labor-intensive servicing responsibility related to LPI. It consists of monitoring the status of homeowners' voluntary insurance to confirm that it is in-force, notifying homeowners of any insurance deficiencies, and securing LPI when appropriate.

7.     This action is brought because GMACM, together with Balboa, Meritplan, and Newport (the "Balboa Defendants"), devised and carried out a scheme to defraud borrowers and loan owners by overcharging them for LPI. Pursuant to the scheme, Balboa and Meritplan pay GMACM secret rebates, *i.e.*, kickbacks, camouflaged through complex transactions using affiliates and related parties. GMACM pockets the rebates for itself, while fraudulently billing borrowers based on the full purported price of the LPI. In other words, the rebates reduce GMACM's LPI costs, but those

2

savings are not passed through to borrowers.  Because the amounts supposedly paid by GMACM

for LPI constitute servicing advances, loan owners bear the inflated charges through reduced loan

proceeds and higher loss severities to the extent borrowers fail to pay.

8.      As devised by the Balboa Defendants and GMACM, the scheme involves the payment

of rebates/kickbacks in two forms: (i) free tracking services and (ii) bogus "commissions."

9.      The free tracking services are provided by Newport.  More specifically, Balboa and

Meritplan pay Newport to render tracking services to GMACM for free.  GMACM pays nothing.

Payment is routed by Balboa and Meritplan to Newport via "intercompany expense allocations."

The free tracking services constitute rebates/kickbacks in kind.

10.     The bogus "commissions" are paid by Balboa and Meritplan to an affiliate of

GMACM, defendant John Doe Corporation ("John Doe").  As with the tracking services, the money

for the "commissions" is derived from the LPI premiums paid by GMACM.  The "commission"

payments are made on the pretense that John Doe is a third-party insurance agent that introduced the

insurance customer, *i.e.*, GMACM, to Balboa and Meritplan.  At all relevant times, however, this

pretense has been false, as John Doe is not and has never been a third-party insurance agent but is

a commonly-controlled affiliate of GMACM.  John Doe never introduced GMACM to Balboa or

Meritplan.

11.     Additionally, on information and belief, John Doe transfers the "commissions" that

it receives to GMACM.  Defendant Ally Financial, Inc. f/k/a GMAC Inc. ("Ally Financial") – the

parent corporation of John Doe and GMACM – facilitates such transfers through its "global cash

management system."   Ally Financial thereby also participated in devising, and participates in

carrying out, the scheme.

3

12.     Not just borrowers but also the owners of the loans serviced by GMACM – which include the taxpayer-backstopped Government Sponsored Enterprises ("GSEs") Fannie Mae, Freddie Mac, and Ginnie Mae, which own and/or guarantee more than two-thirds of the loans serviced by GMACM – have been grossly overcharged for LPI as a result of the scheme.

13.     On May 14, 2012, GMACM filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code.   Accordingly, GMACM is not named as a defendant herein.   Nevertheless, Plaintiffs allege that the Balboa Defendants, as participants and conspirators in the scheme, are jointly and severally liable under RICO and RESPA.   Moreover, Plaintiffs allege that Ally Financial, which has not filed for bankruptcy, is independently liable to Plaintiffs and the Class by virtue of its own improper conduct, as alleged in more detail below.   Further, Plaintiffs allege that Ally Financial is vicariously liable for the misconduct of GMACM because GMACM operated as a mere instrumentality or alter-ego of Ally Financial.

14.     Additionally, Plaintiffs name defendant Ally Bank f/k/a GMAC Bank ("Ally Bank"), a subsidiary of Ally Financial that is not in bankruptcy.   Ally Bank owns loans and/or the servicing rights to loans serviced by GMACM, including the loan of plaintiff Landon Rothstein and numerous other members of the Class.   GMACM services the Ally Bank loans pursuant to a servicing agreement between GMACM and Ally Bank.   Ally Bank is liable in this lawsuit under agency principles for the misconduct of its agent, GMACM, and for the misconduct of its sub-agent, Newport.   When GMACM engaged in the misconduct alleged herein, it was acting in the course and scope of its authority as an authorized agent of Ally Bank.   When Newport engaged in the misconduct alleged herein, it was acting in the course and scope of its authority as an authorized sub-agent of Ally Bank.

4

## II.      JURISDICTION AND VENUE

15.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a), and 12 U.S.C. § 2614.  This Court also has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1964(c).

16.      Personal jurisdiction is conferred by 18 U.S.C. § 1965(a), which allows a party to institute a civil RICO action in any district in which a defendant "resides, is found, has an agent, or transacts his affairs."  Alternatively, 18 U.S.C. § 1965(b) provides that as long as one defendant is subject to service in a particular district, additional parties residing in other districts may be brought before the forum court, in the court's discretion, to the extent that "the ends of justice require."

17.      Additionally, this Court has personal jurisdiction over the defendants because each systematically and continually conducts business throughout the State of New York.

18.      This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  Plaintiffs are citizens of Texas, New York, and New Hampshire.  Defendants are citizens of different states, the amount in controversy exceeds $5,000,000, and there are more than 100 members in the Class.

19.      This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

20.      Venue is proper in this district under 28 U.S.C. § 1391(b), 12 U.S.C. § 2614, and 18 U.S.C. §§ 1965(b) and (d).  Defendants regularly conduct business in this District.

III.     **PARTIES**

   A.     **Plaintiffs**

21.     Landon Rothstein ("Rothstein") is a resident of Texas.  Rothstein has a mortgage loan serviced by GMACM on property located at 97 County Road 3701, Splendora, Texas.  Rothstein was charged $105 by GMACM purportedly to reimburse it for the cost of LPI from October 6, 2010 to January 4, 2011.  The LPI coverage was obtained by GMACM from Meritplan.  Rothstein's mortgage loan was originated by Nations Reliable Lending, LLC ("Nations Reliable"), a correspondent lender of Ally Bank.  Ally Bank either owns Rothstein's loan or, after acquiring it from Nations Reliable, sold Rothstein's loan to investors while retaining the mortgage servicing rights thereto.  Rothstein's loan is among approximately 690,000 loans that GMACM has serviced on behalf of Ally Bank pursuant to a servicing agreement, as alleged in more detail below.

22.     Jennifer Davidson and Robert Davidson (collectively, the "Davidsons") are residents of New Hampshire.  The Davidsons have a mortgage loan serviced by GMACM on property located at 32 Dunbarton Estates, Nottingham, New Hampshire.  The Davidsons were charged $239 by GMACM purportedly to reimburse it for the costs of LPI from April 14, 2009 to July 4, 2009.  The LPI coverage was obtained by GMACM from Balboa.

23.     Ihor Kobryn ("Kobryn") is a resident of New York.  Kobryn has a mortgage loan serviced by GMACM on a property located at 29 Meredith Avenue, Staten Island, New York.  Kobryn was charged $1,260.78 by GMACM purportedly to reimburse it for the costs of LPI from January 19, 2012 to May 22, 2012.  The LPI coverage was obtained by GMACM from Meritplan.

**B.      The Ally Financial Defendants And Related Non-Party Debtors**

24.      Ally Financial is a leading, multi-national financial services firm with approximately $184 billion of assets and operations in 37 countries.  Ally Financial is a Delaware corporation headquartered in Detroit, Michigan.  Ally Financial received at least $17 billion in government bailouts during the financial crisis, and still owes the United States Treasury $11.2 billion.  Since the implementation of the Troubled Asset Relief Program in late 2008, Ally Financial has been owned by the U.S. Department of the Treasury, affiliates of Cerberus Capital Management, L.P. ("Cerberus"), affiliates of General Motors Company, and other investors.  Prior to that time, Ally Financial was owned 51% by a consortium of investors led by Cerberus and 49% by General Motors Company.  Ally Financial, was known as General Motors Acceptance Corporation until July 20, 2006, when it became a Delaware limited liability company under the name GMAC LLC.  On June 30, 2009, GMAC LLC was converted from a Delaware limited liability company to a Delaware corporation under the name GMAC Inc.  On May 7, 2010, GMAC Inc. changed its corporate name to Ally Financial.

25.      Ally Bank is an indirect wholly-owned subsidiary of Ally Financial.  Ally Bank was at all times relevant hereto a loan originator, directly and through a network of correspondent lenders and mortgage brokers.  Prior to May 2009, Ally Bank was known as GMAC Bank.  Ally Bank is an online bank chartered under Utah law.

26.      John Doe is a subsidiary of Ally Financial and an affiliate of GMACM.  As alleged herein, John Doe received kickbacks from Balboa and Meritplan fraudulently labeled as insurance "commissions."

27.    Ally Financial, Ally Bank, and John Doe are collectively referred to herein as the "Ally Financial Defendants."

28.    Non-party Residential Capital, LLC f/k/a Residential Capital Corporation ("ResCap"), is a Delaware limited liability corporation and a wholly-owned subsidiary of Ally Financial. At all relevant times, ResCap's business included originating and servicing mortgage loans through its wholly-owned subsidiary GMACM. ResCap is not named as a defendant herein because it filed for bankruptcy protection on May 14, 2012. *See In re: Residential Capital, LLC, et al., Debtors*, No. 12-12020-MG (S.D.N.Y. 2012).

29.    Non-party GMACM is a Delaware limited liability corporation with its principal place of business in Fort Washington, Pennsylvania. At all relevant times, GMACM was in the business of originating and servicing residential mortgage loans. Since 2005, GMACM has been a wholly-owned subsidiary of ResCap. Prior to that time, GMACM was a wholly-owned subsidiary of Ally Financial. GMACM is not named as a defendant in this lawsuit because it filed for bankruptcy protection on May 14, 2012.

### C.    The Balboa Defendants

30.    Balboa is a California corporation headquartered in Irvine, California. Balboa is a member of the Balboa Insurance Group, which was a subsidiary of Bank of America until June 2011, at which time it was sold to QBE Insurance Group, a publicly traded Australian corporation. Balboa is a provider of LPI and insurance tracking services, directly and through its affiliates, to mortgage loan servicers nationwide.

31.     Meritplan is a California corporation headquartered in Irvine, California.  Meritplan is a wholly-owned subsidiary of Balboa.  Meritplan is a provider of LPI to mortgage loan servicers nationwide.

32.     Newport is a California corporation headquartered in Irvine, California.  Prior to June 1, 2011, Newport was a wholly-owned subsidiary of Balboa.  Thereafter, Newport became a wholly-owned subsidiary of QBE Insurance Group.  Newport provides insurance tracking services to loan servicers as a subcontractor.

33.     Balboa, Meritplan and Newport are collectively referred to herein as the "Balboa Defendants."

## IV.     CLASS ACTION ALLEGATIONS

34.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and (b)(3) on behalf of themselves and a nationwide class consisting of:

> All residential mortgage loan borrowers who have been charged for LPI in connection with loans serviced by GMACM at any time from March 6, 2003 to the present (the "Class").

35.     The Class excludes Defendants and any entity in which any defendant has a controlling interest, and their officers, directors, legal representatives, successors and assigns.

36.     The Class is so numerous that joinder of all members is impracticable.

37.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

38.     Plaintiffs' claims are typical of the claims of the Class.

39.     There are questions of law and fact common to the Class, including but not limited to:

a.     Whether GMACM, the Balboa Defendants and the Ally Financial Defendants devised a scheme to defraud borrowers and loan owners by overcharging them for LPI;

b.     Whether the scheme alleged herein constitutes mail or wire fraud;

c.     Whether GMACM and Ally Bank breached borrowers' mortgage loan agreements and violated the covenants of good faith and fair dealing implied therein;

d.     Whether GMACM operated as an alter-ego of Ally Financial;

e.     Whether Defendants are liable to Plaintiffs and the Class for damages and, if so, the measure of such damages.

40.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

41.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have no claims antagonistic to those of the Class.  Plaintiffs have retained counsel experienced in complex nationwide class actions, including all aspects of litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

42.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

43.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of

the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

44.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

45.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background

46.     To protect the lender's interest in secured property, mortgage loan contracts require the borrower to maintain specified levels of hazard insurance.  If the borrower's coverage lapses, the lender is entitled to purchase coverage on the home, "force place" it, and be reimbursed by the borrower for the "expense."

47.     LPI is purchased by the lender, for the lender.  The lender is the sole insured and the only loss payee.  In the event of a casualty loss, the borrower has no right to collect any policy proceeds.  The borrower's only involvement with LPI is that the borrower is obligated, by virtue of the mortgage loan agreement, to reimburse the lender for the "expense."  Furthermore, the borrower has no choice, as the obligation to reimburse the lender is secured by the lender's lien on the property.

48.     All mortgage loan agreements contain substantively identical terms with respect to

LPI.  Rothstein's mortgage loan agreement, for example, provides, in pertinent part:

> <u>Property Insurance</u>.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. . . .
>
> ***If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense***.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. . . .  ***Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument***.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

(Emphasis added).

49.     The traditional lending relationship, where the lender makes a loan, retains it in its

portfolio, and services it itself, is today the exception rather than the rule.  Most residential

mortgages in the United States are financed through securitization.

50.     Securitization is a financing method involving the issuance of securities against a

dedicated cash flow stream such as mortgage payments.  A financial institution (the "sponsor" or

"seller") assembles a pool of mortgages made or "originated" by an affiliate or purchased from

unaffiliated third-parties.  The pool of loans is sold by the sponsor to a special-purpose subsidiary (the "depositor") that has no other assets or liabilities.  The depositor sells the loans to a passive, specially created special-purpose vehicle ("SPV"), typically a trust in the case of residential mortgages.  The SPV issues certificated securities to raise the funds to pay the depositor for the loans.  The securities are sold directly to investors by the SPV or, as is more common, they are issued directly to the depositor as payment for the loans.  The depositor then resells the securities, usually through an underwriting affiliate that places them on the market.  Because the certificated securities are collateralized by the residential mortgages owned by the trust, they are called residential mortgage-backed securities ("RMBS").

51.     A variety of reasons, *e.g.*, pass-through tax status, mandate that the SPV be passive; it is little more than a shell to hold the loans and put them beyond the reach of the creditors of the financial institution.

52.     Loans, however, need to be managed.  Bills must be sent out and payments collected. Thus, a third-party must manage the loans.  This third party is the mortgage loan servicer.  Every loan, irrespective of whether it is securitized, has a servicer.  Servicers are hired by owners of whole loans, typically trustees of mortgage securitization trusts.

53.     The specific duties of the servicer are set forth in the PSA or other agreement between the servicer and the owner of the loan.  The terms of such agreements are substantively identical in all respects relevant to this lawsuit.

54.     Specifically, servicing agreements include a broad grant or delegation of authority to the servicer, governed by the duty of the servicer to act in the best interests of the loan owner, combined with more specific delegations of authority relating to particular tasks.

13

55.     For example, on June 1, 2004, GMACM executed a PSA to become the servicer of a mortgage securitization trust with JPMorgan Chase Bank as the trustee (the "JPMorgan PSA"). Section 3.01 of the JPMorgan PSA provides, in pertinent part:

> THE SERVICER TO ACT AS SERVICER
>
> The Servicer shall service and administer the Mortgage Loans on behalf of the Trust and in the best interest of and for the benefit of the Certificateholders . . . in accordance with the terms of this Agreement and the Mortgage Loans and to the extent consistent with such terms and in accordance with and exercising the same care in performing those practices that the Servicer customarily employs and exercises in servicing and administering mortgage loans for its own account (including, compliance with all applicable federal, state and local laws).

56.     Section 3.01 of the JPMorgan PSA additionally delegates to GMACM "full power and authority, acting alone and/or through subservicers . . . to do or cause to be done any and all things that it may deem necessary or desirable in connection with such servicing and administration . . . ."

57.     The tasks of the servicer include account maintenance activities such as sending monthly statements to mortgagors, collecting payments from mortgagors, keeping track of account balances, handling escrow accounts, calculating interest-rate adjustments on adjustable rate mortgages, reporting to national credit bureaus, and remitting funds collected from mortgagors to the trust.

58.     Additionally, all PSAs and other servicing agreements require the servicer to make sure that adequate hazard insurance is continuously maintained on the secured properties. Section 3.05 of the JPMorgan PSA, for example, provides in pertinent part:

MAINTENANCE OF HAZARD INSURANCE

The Servicer shall cause to be maintained for each Mortgage Loan hazard insurance with extended coverage on the Mortgaged Property in an amount which is at least equal to the lesser of (i) the Stated Principal Balance of such Mortgage Loan and (ii) the amount necessary to fully compensate for any damage or loss to the improvements that are a part of such property on a replacement cost basis, in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy. . . .  The Servicer will comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any such hazard policies.

\*       \*       \*

In the event that the Servicer shall obtain and maintain a blanket policy with an insurer having a General Policy Rating of B:IV or better in Best's Key Rating  Guide (or such  other rating that is comparable to such rating)  insuring  against hazard losses on all of the Mortgage Loans, it shall conclusively be deemed to have satisfied its obligations as set forth in the first two sentences of this Section.

59.     Fulfilling the obligation to maintain continuous hazard insurance requires the servicer to monitor the status of homeowners' voluntary insurance to confirm that it is in-force, notify homeowners of any insurance lapse, and secure LPI when appropriate.  These activities constitute "insurance tracking," a labor-intensive servicing responsibility which many servicers, including GMACM, outsource to subcontractors.

60.     All PSAs and other servicing agreements allow servicers to subcontract their servicing responsibilities to outside contractors provided the fees of the subcontractor are paid by the servicers.

61.     Section 3.01 of the JPMorgan PSA provides, for example:

The Servicer shall perform all of its servicing responsibilities hereunder or may cause a subservicer to perform any such servicing

15

responsibilities on its behalf, but the use by the Servicer of a subservicer shall not release the Servicer from any of its obligations hereunder with respect to the related Mortgage Loans. The Servicer shall pay all fees of each of its subservicers from its own funds.

62.     Any amounts paid by the servicer to buy LPI count as "servicing advances" under the PSAs and other agreements between the servicer and the loan owner. The servicer is entitled to recoup such advances from the proceeds of the loan, whether through payments made by the borrower or, if the borrower defaults, through proceeds at foreclosure. Additionally, the servicer has the right to be reimbursed before any money is passed through to the securitization trust or other loan owner. In other words, the servicer gets paid "off the top." In this respect, servicers are functionally the senior-most creditors with respect to the loans they manage; their rights are senior even to those of the owners of the loans.

63.     Mortgage servicing is a highly lucrative business. Servicers receive a fee based on the unpaid principal balance of each trust's mortgage pool or, in some cases, for each loan serviced. These servicing fees are typically paid from the monthly payments made by the borrowers on the loans. Annual servicing fees generally range from 0.25-0.50% of the remaining principal balance of the mortgage and are collected monthly. In addition, servicers are entitled to keep certain borrower-contracted fees such as late charge fees, assignment transfer fees, insufficient funds bank fees, assumption fees, loss mitigation fees and other incidental fees and charges. Servicers also benefit from being able to invest and earn interest on borrowers' escrow payments as they are collected until they are paid out to taxing authorities and insurance companies. Servicers also earn "float" income with respect to borrowers' monthly payments, as the payments are generally collected on the first of the month but not passed through to the owners of the loans until the end of the month.

16

**B.      GMACM's Servicing Portfolio**

64.      GMACM is the fifth largest residential mortgage loan servicer in the United States. GMACM services over 2.4 million mortgage loans with an unpaid principal balance of approximately $374 billion.  GMACM performs servicing pursuant to PSAs and other servicing agreements with numerous loan owners, including private securitization trusts, GSEs, and Ally Bank.

65.      Approximately 68% of the mortgage loans (by unpaid principal balance) serviced by GMACM are owned, insured or guaranteed by Fannie Mae or another GSE.

66.      Approximately 690,000 mortgage loans with an unpaid principal balance of $140.8 billion are serviced by GMACM on behalf of Ally Bank.  The Ally Bank loans were originated by GMACM, then sold to Ally Bank, or were originated by Ally Bank through its network of correspondent lenders and mortgage brokers.  Ally Bank either still owns such loans or has resold them to private investors while retaining the servicing rights thereto.  GMACM services the Ally Bank loans pursuant to a sub-servicing agreement between GMACM and Ally Bank dated as of May 11, 2012.  Prior thereto, GMACM serviced the Ally Bank loans pursuant to predecessor agreements since 2001.

**C.      The Kickback Scheme**

67.      In March 2003, GMACM entered into an agreement to buy LPI from Balboa and Meritplan.  GMACM also hired Newport to perform insurance tracking on its behalf.  The initial agreements between GMACM and the Balboa Defendants had a term of three years.  Such agreements, however, were renewed and continue to the present.  Today, GMACM is one of the largest LPI accounts handled by the Balboa Defendants.

68.     The LPI policies purchased by GMACM from Balboa and Meritplan are for the exclusive benefit of GMACM.  GMACM is the sole named insured.  Borrowers are not parties to the policies.  Additionally, the policies do not cover the personal property of the borrower or provide other coverage commonly associated with homeowners' insurance.  Only the interests of GMACM are insured and protected.

69.     The kickback scheme was devised at the inception of the parties' relationship in 2003, and has been carried out continuously to the present.  Pursuant to the scheme, Balboa and Meritplan pay GMACM secret rebates, *i.e.*, kickbacks, camouflaged by complex transactions using affiliates and related parties.  GMACM pockets the rebates for itself, while fraudulently billing borrowers based on the full purported price of the LPI.  In other words, the rebates reduce GMACM's LPI costs, but those savings are not passed through to borrowers.  Meanwhile, the gross insurance charges are incorporated into GMACM's servicing advances, which, as alleged above, GMACM recoups "off the top."  To the extent borrowers fail to pay, loan owners bear the inflated charges through reduced loan proceeds and higher loss severities.

70.     As devised by the Balboa Defendants and GMACM, the scheme involves the payment of rebates/kickbacks in two forms: (i) free tracking services and (ii) bogus "commissions."

71.     The free tracking services are provided by Balboa and Meritplan through their affiliate and agent, Newport.  In particular, Balboa and Meritplan engaged Newport to provide GMACM with tracking services for free.  Balboa and Meritplan pay Newport for the provision of such services.  GMACM pays nothing.  Balboa and Meritplan route their payments to Newport via "intercompany expense allocations."  The money is derived from the gross premiums that GMACM pays to Balboa and Meritplan for the LPI.

72.     The free tracking services constitute rebates/kickbacks in kind.  As alleged herein, servicers are responsible for providing tracking services as part of their duty to make sure that adequate hazard insurance is continuously maintained.  Servicers are compensated to perform this responsibility through the servicing fees that they collect from loan owners.  Moreover, although servicers are entitled to hire subcontractors to perform their responsibilities, servicing agreements require the servicer, as alleged above, to pay any subcontractors out of the servicer's "own funds." Under GMACM's arrangement with the Balboa Defendants, however, GMACM does not pay Newport out of GMACM's "own funds."  Instead, GMACM pays nothing.  Borrowers and loan owners bear the cost to pay Newport through inflated LPI charges and servicing advances.

73.     GMACM and Balboa have admitted to the essential facts concerning this aspect of the scheme.  On May 21, 2012, a representative of GMACM, Michael Squillante, admitted in sworn testimony at a public hearing on LPI held by the New York State Department of Financial Services ("NYSDFS"), that Newport derives compensation through GMACM's LPI premiums and that GMACM pays nothing directly to Newport.  NYSDFS Deputy Director Nancy Ruskin and Executive Deputy Superintendent Joy Feigenbaum examined Squillante:

> DEP DIRECTOR RUSKIN:  .  .  .  Does – under the current arrangement, does GMAC pay QBE First [the parent of Balboa, Meritplan and Newport] for tracking services?
>
> MR. SQUILLANTE: No, we do not.
>
> DEP DIRECTOR RUSKIN: Why is that?
>
> MR. SQUILLANTE: Our motto is we are a fully-turnkey outsource relationship. . . . [w]e have wholly outsourced that business to QBE.

EXEC DEP SUPT FEIGENBAUM: If I may, I guess I don't quite understand because there is a cost for the tracking of the service, is there not?

MR. SQUILLANTE: You have to ask QBE that much. I assume that there is.  But they would – I don't have their financial information around that cost.

EXEC DEP SUPT FEIGENBAUM: Are you aware –

MR. SQUILLANTE: Again, they –

EXEC DEP SUPT FEIGENBAUM: Are you aware that other servicers provide, they pay for tracking services?

MR. SQUILLANTE: Yes. I'm aware some do and some don't; as some take commissions, and some don't.

EXEC DEP SUPT FEIGENBAUM: So . . . the consideration that might be given to GMAC is, you know, not having to pay for tracking services?

MR. SQUILLANTE: No. Our motto is simply to turnkey and outsource it, and have the insurance wholly done by Balboa . . . . Maybe I don't understand your question.

EXEC DEP SUPT FEIGENBAUM: . . . I think my understanding is that the servicers actually pay the – pay the insurance agent to do the tracking. So, I don't – I'm not asking whether you share.  I'm asking, you know, why you don't pay.

MR. SQUILLANTE: We do not pay tracking. Our motto is it's completely outsourced . . .

DEP DIRECTOR RUSKIN: So, QBE is basically tracking for free?

MR. SQUILLANTE: You'd have to ask QBE the economics of their business.  I'm not – we are not paying for tracking our portfolio.  But the economics of their business, you would have to ask them.

(669-671).

20

74.     In written testimony to the NYSDFS dated May 1, 2012, Balboa admitted the "intercompany expense allocations."  Specifically, Balboa stated:

> Balboa does not track insurance coverage.  For Balboa's lender-placed program, these services were provided by its affiliate, Newport Management Corporation ("NMC") and expenses incurred by NMC related to NMC's insurance tracking services, and/or the servicer's implementation of or conversion to such services, *were allocated to Balboa and other affiliated insurers on an intercompany expense allocation basis*.

(Emphasis added).

75.     As for the bogus "commissions," they are paid by Balboa and Meritplan to an affiliate of GMACM, defendant John Doe.  As with the tracking services, the money for the "commissions" is derived from the LPI premiums paid by GMACM.  The "commission" payments are made on the pretense that John Doe is a third-party insurance agent that introduced the insurance customer, *i.e.*, GMACM, to Balboa and Meritplan.

76.     At all relevant times, however, this pretense has been false.  John Doe is not and has never been a third-party insurance agent but is a commonly-controlled affiliate of GMACM.  John Doe has also never been a *bona fide* insurance agent of Balboa or Meritplan, has not provided and does not provide any *bona fide* insurance agency services to Balboa or Meritplan, and has never solicited or sold any insurance products on behalf of Balboa or Meritplan, in connection with LPI purchased by GMACM or otherwise.  John Doe does not perform and has never performed any insurance agency functions.

77.     A press release issued by GMACM at the inception of GMACM's relationship with the Balboa Defendants belies any suggestion that GMACM was introduced to Balboa or Meritplan

through any insurance agent.  The March 6, 2003 press release simply announced that GMACM had "selected" Balboa to meet its insurance needs.

78.     Additionally, on information and belief, John Doe transfers the "commissions" that it receives from Balboa and Meritplan to GMACM.  Ally Financial knowingly participates in the scheme by facilitating such transfers through the "global cash management system" that Ally Financial operates for itself and its subsidiaries.  *See* Affidavit of James Whitlinger at ¶¶ 121-122, *In re: Residential Capital* (filed May 14, 2012, ECF No. 6).  Ally Financial's cash management system facilitates intercompany transactions and tracks amounts paid to and from each affiliated participant in the system, including John Doe and GMACM.

### D.      The Scheme Defrauds Borrowers And Loan Owners

79.     The free tracking services and "commissions" alleged above constitute illegal kickbacks or bribes paid pursuant to a *quid pro quo* agreement or understanding that GMACM will continue to do LPI business with the Balboa Defendants.  The parties compute the rebates/kickbacks due GMACM as a percentage of the gross LPI premiums paid by GMACM.

80.     Furthermore, the rebates/kickbacks represent a substantial percentage of the gross LPI premiums paid by GMACM. Benjamin Lawsky, the Superintendent of the NYSDFS, found that "15 percent or more of premiums collected by force-placed insurers flow to the banks through insurance agents affiliated with the banks."  LPI insurers are also believed to use 30% or more of premiums to provide loan servicers with below-cost (or, in the case of GMACM, completely free) tracking

services.[1]  It is apparent based on industry data that the rebates/kickbacks received by GMACM from the Balboa Defendants total tens of millions of dollars per year.

81.     The scheme defrauds borrowers and loan owners.  Borrowers are fraudulently billed for LPI in excess of GMACM's true costs.  To the extent borrowers default, the inflated servicing advances reduce the loan proceeds paid to loan owners.  Moreover, loan owners are in effect double-billed for tracking services – first through servicing fees and then through excess LPI charges.  GMACM is improperly double-dipping, collecting compensation for insurance tracking twice.

82.     Although servicers supposedly work for the owners of the mortgages they service, a number of commentators, including Professor Adam Levitin of Georgetown University Law Center, have observed that loan servicers' compensation structure creates serious principal-agent conflicts.  Servicers have no stake in the performance of mortgage loans and do not share mortgage owners' interest in maximizing the value of the loans.  Rather, the interest of servicers is in maximizing whatever fee and expense charges they can recoup "off the top."

83.     This compensation structure incentivizes servicers to artificially and improperly inflate their fees and expenses.  As a consequence, servicers frequently charge so-called "junk fees" either for unnecessary work or work that was never done.  Servicers also engage in a variety of abusive practices, including force-placing insurance when not required, or, as in this case, failing to pass LPI rebates to borrowers and loan owners.  *See generally* Adam Levitin & Tara Twomey, *Mortgage Servicing*, 28 Yale J. on Reg. 1, 76 (2010); *Robo-Signing, Chain of Title, Loss Mitigation,*

---

[1]     *See Hearing Regarding a Rate Filing for Force-Placed Insurance by Praetorian Insurance Company*, Before the Florida Office of Insurance Regulation, Birny Birnbaum, the Center for Economic Justice (July 3, 2012), at 8, 12, 13 & 15; *Hearing in the Matter of Forced-Placed Insurance*, Before the New York State Department of Financial Services, J. Robert Hunter, Director of Insurance, Consumer Federation of America (May 17, 2012), at 5.

*and Other Issues in Mortgage Servicing: Hearing Before the Subcommittee on Housing and Community Opportunity of the House Financial Services Committee*, 111th Cong., Nov. 18, 2010 (Statement of Associate Professor Adam J. Levitin, Georgetown Univ. L. Center).

84.     Servicers' compensation structures also incentivize them to delay foreclosures. Delaying foreclosures keeps homeowners in a "sweatbox" of mounting servicer fees and expenses, according to Professor Levitin.  Through this strategy, servicers disregard their contractual duty to maximize the value of defaulted loans for their owners and instead simply keep ramping up the charges as to each loan until they hit the "sweet spot" where the amount owed to the servicer is equal to the liquidation value.  At that point, because there is no equity left to strip, the servicer just "want[s] to dump the property from [the] portfolio as quickly as they can," Professor Levitin observes.  Servicers thus routinely drag out defaults for the purpose of piling up bogus and inflated fees and expenses until there is no value left.

85.     Abusive servicer activities such as delayed foreclosures, "junk" fees and inflated LPI charges have enabled servicers to strip billions of dollars in equity from borrowers' homes at the expense of homeowners and investors.  It has also exacerbated the housing crisis by pushing marginal borrowers prematurely or unnecessarily into foreclosure.  As Professor Levitin describes it, the costs of these kinds of servicer abuses have been "externalized directly on homeowners and indirectly on communities and the housing market as a whole."

86.     Borrowers have no say in the selection of servicer.  The standard mortgage loan agreement provides:

> The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the

> "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.

87.     Accordingly, no mechanism exists for borrowers to select servicers that do not receive kickbacks from LPI insurers.  Nor is there any mechanism for borrowers to opt-out with respect to the kickbacks, bribes or affiliate transactions described herein.

88.     Additionally, once charged for LPI, borrowers have no choice but to pay or lose their homes through foreclosure.  The payment of improperly inflated LPI charges is not voluntary.  As alleged above, whatever LPI charges the servicer imposes "become additional debt of Borrower," secured by the lender's lien.  Furthermore, the servicer recoups LPI charges "off the top," before applying payments to loan principal.

### E.     Fannie Mae Learns That It Is Being Overcharged For LPI

89.     Fannie Mae purchases mortgages originated by private lenders, and is the largest single owner of mortgages in the United States.  Fannie Mae has contracted with numerous servicers across the country to service tens of millions of mortgage loans.  One of those servicers is GMACM.  A significant percentage of the loans serviced by GMACM are owned by Fannie Mae.

90.     On March 6, 2012, Fannie Mae issued a *Lender Letter*, titled "Changes Ahead for Lender Placed Insurance," regarding the "costs to taxpayers" of kickback arrangements that result in overcharges relating to LPI.  The *Lender Letter* stated, in pertinent part:

> Fannie Mae will soon implement changes to its Lender-Placed Insurance (LPI) requirements to significantly reduce costs to homeowners, taxpayers, and Fannie Mae.  The changes will lower barriers for borrowers who want to cure their delinquencies, while improving transparency and boosting competition in the LPI market.

Fannie Mae requires hazard insurance on all properties for which it owns the mortgage. If a homeowner cannot provide evidence of coverage, the servicer must secure that coverage through the use of LPI. *Lender-placed policies, however, are significantly more expensive than voluntary coverage secured by the borrower and often include commissions and other administrative costs, further adding to the cost of LPI policies*. Two firms currently issue most LPI policies.

An expensive LPI policy can often become an obstacle to a delinquent borrower seeking to avoid foreclosure. To bring their loan current, a borrower must reimburse the servicer for the cost of the LPI policy. *If the borrower defaults in mortgage loan payments and does not cure, Fannie Mae must reimburse the servicer for LPI premiums. Costs to Fannie Mae ultimately become costs to taxpayers*.

(Emphasis added).

91.     On March 14, 2012, Fannie Mae followed up on its *Lender Letter* by issuing a *Servicing Guide Announcement*. "With this Announcement, Fannie Mae is amending and clarifying its policies regarding the . . . allowable reimbursable expenses for lender-placed insurance," the Servicing Guide Announcement stated. Specifically, Fannie Mae stated that requests for LPI reimbursement must exclude "any lender-placed insurance commission earned . . . by the servicer or any related entity." "Any costs associated with insurance tracking" must also be excluded.

92.     The *Servicing Guide Announcement* stated, in pertinent part:

**Acceptable Lender-Placed Insurance Costs and Insurance Tracking Fees**

Fannie Mae is clarifying its requirement for reasonable reimbursable expenses for lender-placed insurance. Any servicer request for reimbursement of lender-placed insurance premiums must exclude:

- *any lender-placed insurance commission earned on that policy by the servicer or any related entity*,

- ***costs associated with insurance tracking*** or administration, or

- ***any other costs beyond the actual cost of the lender-placed insurance policy premium***.

(Emphasis added).

93.     On March 6, 2012, Fannie Mae issued a request for proposals relating to LPI (the "RFP").[2] "Much of the current Lender Placed Insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner," the RFP states.  "This RFP is designed to change this situation."

94.     Specifically, the RFP requests that insurers submit independent bids for LPI and tracking services.  Approved applicants are to be put on lists of "Preferred Providers" from which servicers hired by Fannie Mae loans will be required to choose.  The stated goal of the RFP is the elimination of the "existing system" of secret rebates paid in the form of "subsidized" tracking services and related-party "commissions," *i.e.*, the improper kickbacks complained of herein.

95.     As the RFP states, Fannie Mae conducted a "review" from which it learned that LPI insurers pay "commissions/fees to Servicers for placing business with them" and, further, that such commissions/fees are "recovered in part or in whole by the Lender Placed Insurer from the premiums, which the Servicers pass on to Fannie Mae."

96.     Additionally, Fannie Mae learned that "Fannie Mae is often paying twice for Insurance Tracking services; once via the servicing fee that Fannie Mae pays to Servicers, and again

---

[2]     Fannie Mae acknowledged the existence of the RFP in March 2012, but declined to make the document public.  Nevertheless, on July 3, 2012, Birney Birnbaum, on behalf of the Center for Economic Justice, annexed a copy of the RFP as exhibit B to written testimony submitted in connection with a Public Hearing before the Florida Office of Insurance Regulation Regarding a Rate Filing for Force-Placed Insurance by Praetorian Insurance Company.

via the Lender Placed Insurance premiums, since those premiums may include or subsidize the costs

of tracking services."

97.     The RFP proposes a "new business model" eliminating such secret rebates.  The

"executive summary" of the RFP states:

> As a best practice Fannie Mae seeks to reduce expenses while
> improving service quality. After extensive internal review, Fannie
> Mae believes that current Lender Placed Insurance costs are not
> market competitive and can be improved through unit price
> reductions and fee transparency to the benefit of both the taxpayers
> and homeowners. Therefore, Fannie Mae is undertaking this
> competitive procurement process to improve the pricing and fee
> transparency for Lender Placed Insurance while maintaining coverage
> and service quality.

> **Current Situation**

> Fannie Mae's current Lender Placed Insurance situation is as follows:

> 1.     Homeowners are required to maintain voluntary hazard
>        insurance on Fannie Mae insured properties.

> 2.     Lender Placed Insurance must be acquired by mortgage
>        Servicers when a property is no longer eligible for Voluntary
>        Insurance, or when the Servicer cannot obtain proof of
>        adequate Voluntary Insurance from the homeowner,
>        irrespective of whether or not that homeowner is current or
>        delinquent on the loan.

> 3.     The cost of Lender Placed Insurance is higher than the cost of
>        voluntary hazard insurance. Homeowners are billed for the
>        Lender Placed Insurance premiums. However, if the
>        homeowner does not pay the premium (for example, if the
>        property has already been vacated), then Servicers pass on the
>        premium costs to Fannie Mae.

> 4.     Servicers are responsible for providing tracking services, per
>        Fannie Mae Guidelines.  Many large Servicers have chosen to
>        outsource   the   Insurance   Tracking   and   associated

administrative process to third parties, the largest of which are affiliated with Lender Placed Insurers.

5. *Lender Placed insurers often pay commissions/fees to Servicers for placing business with them. The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums, which the Servicers pass on to Fannie Mae.*

6. *The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms to Fannie Mae.* Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down. In addition, *Fannie Mae is often paying twice for Insurance Tracking services; once via the servicing fee that Fannie Mae pays to Servicers, and again via the Lender Placed Insurance premiums, since those premiums may include or subsidize the costs of tracking services (to the extent that insurers are providing such services).*

In appropriate circumstances, Lender Placed Insurance is necessary and important to the preservation of Fannie Mae assets. However, much of the current Lender Placed Insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner. This RFP is designed to change this situation.

**Expected Outcome**

The expected outcome of this procurement is for Servicers and Fannie Mae to obtain competitively-priced Lender Placed Insurance that incorporates price transparency and collaboration with Lender Placed Insurers. Fannie Mae expects to achieve the following:

1. *Eliminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae.*

2. *Eliminate the ability of Servicers to pass on the cost of Insurance Tracking services to Fannie Mae, since the cost for such services is reimbursed to the Servicer in the form of current servicing fees.*

29

3.  ***Separate the commissions and fees for Insurance Tracking services from the fees for Lender Placed Insurance to ensure transparency and accountability.***

4.  Require Servicers to order Lender Placed Insurance policies based on competitive pricing negotiated by Fannie Mae; Fannie Mae will choose one or more Providers based on the responses received during the RFP process. The chosen Providers will be placed on a Preferred Provider List.

5.  Restructure the business model to align Servicer incentives with the best interests of Fannie Mae and homeowners.

6.  Enforce best practices that encourage the use of voluntary insurance and reduce the demand for lender placed insurance.

Fannie Mae recognizes that the current system developed over a period of years. However, Fannie Mae is prepared to restructure the current Lender Placed Insurance business model to operate as a market driven service that efficiently meets the best interests of Fannie Mae, its partner insurers, taxpayers, and homeowners.

Fannie Mae is confident that the business model proposed herein is fair to all parties, allows market-based pricing, ***eliminates subsidies***, and allows Fannie Mae to best meet its federal charter to facilitate home ownership, provide liquidity to the housing market, and protect taxpayers. Fannie Mae also believes that this new model is sustainable over time and robust enough to adjust to changing conditions as the housing market recovers. The attributes of the new business model will be as follows:

1.  The premiums to be charged for Lender Placed Insurance will be negotiated between Fannie Mae and the Lender Placed Insurer(s). These premiums will be communicated to Fannie Mae's Servicer community.

2.  The Lender Placed Insurer(s) will continue to invoice the Servicers for insurance provided. ***Fannie Mae will then reimburse the Servicers, but will not pay more than the rate negotiated by Fannie Mae. The rate negotiated between Fannie Mae and the Lender Placed Insurer(s) will exclude any commissions paid by the Lender Placed Insurer(s) to Fannie Mae Servicers to place their insurance on Fannie Mae properties. In addition the rate will exclude the cost of***

30

> *providing Insurance Tracking services or any other costs beyond the cost of the policy premium to the Servicer*.

3. Servicers may contract for Insurance Tracking and associated administrative services from a Lender Placed Insurer on the Preferred Provider List, perform tracking services in-house, or outsource tracking to a Provider not on the list since the Servicer is fully liable for tracking costs. ***However, the full cost of such services must be billed independent of, and never embedded in, the insurance premiums charged for Lender Placed Insurance. Fannie Mae will not reimburse Servicers for these tracking and administrative services***.

4. Fannie Mae will reevaluate the Preferred Provider List from time to time as appropriate to ensure Fannie Mae is receiving competitive pricing.

This new business model will come into effect at the close of this procurement process.

(Emphasis added).

98. As to tracking services, the RFP additionally states:

The scope of the tracking and administrative services to be provided will include at least the following activities:

- Monitor status of homeowner's Voluntary Insurance to confirm that it is in-force and in accordance with Fannie Mae Guidelines
- Request and confirm homeowner certificates of insurance
- Notify homeowners of any Voluntary Insurance deficiencies and attempt to correct
- Secure the placement of Lender Placed Insurance in accordance with Fannie Mae Guidelines
- Work with homeowners to avoid placement of Lender Placed Insurance or to secure Voluntary Insurance even after Lender Placed Insurance has been placed
- Provide Insurance Tracking and verification customer service to homeowners, Servicers and Fannie Mae to include state-of-the-art call center operations
- Perform in compliance with Performance and Reporting requirements . . .

31

> • Maintain books of record necessary to manage the scope of services covered in this RFP to include issuing accurate reports to Fannie Mae and its Servicers as described below
>
> ***The Insurance Tracker may be an affiliate of a Lender Placed Insurance company but must bid the price of Lender Placed Insurance separately from Insurance Tracking services. Under the terms of this procurement, the prices submitted for neither line of business (i.e., Lender Placed Insurance or Insurance Tracking) may subsidize the other***.

(Emphasis added).

99.     In July 2012, Fannie Mae stated that the goal of the RFP was to "lower costs for homeowners, taxpayers, and Fannie Mae" and that Fannie Mae was still in the process of evaluating bids.

### F.     The Lawsky Investigation

100.     On or about January 10, 2012, Benjamin Lawsky, the Superintendent of the NYSDFS, launched a probe into improper practices relating to LPI, including kickbacks.  *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

101.     On April 5, 2012, Superintendent Lawsky issued a press release announcing that the NYSDFS had expanded its LPI probe and was scheduling public hearings on the matter to take place in May 2012.  The press release stated that the investigation had already uncovered evidence that borrowers had been overcharged for LPI "due [to] relationships between and payments by insurers to banks and their affiliates. . . .  Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business."  The press release also discussed that, as alleged herein, the LPI overcharges harmed not only borrowers but also "investors in mortgages or mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid."

102.   The full text of the NYSDFS release stated:

**Department Of Financial Services Expands Probe Into Force-Placed Insurance, Demanding Explanation For High Rates; Will Hold Public Hearings**

**Seeks basis for consistently high profits at homeowners' and investors' expense**

**Hearings to be held on whether rates are excessive and to probe payments between insurers, brokers, agents and mortgage servicers**

Benjamin M. Lawsky, Superintendent of Financial Services, today announced that he is intensifying the Department of Financial Services investigation into force-placed insurance by requiring the largest licensed force-placed insurers operating in New York to provide a detailed accounting of their expenses, claims payments and profits.

The Superintendent will hold public hearings in May to review whether rates for force-placed insurance are excessive and to examine the relationships between and payments to and from insurers, banks, mortgage servicers and insurance agents and brokers. Testimony will be taken from homeowners harmed by force-placed insurance and from the banks, insurers, reinsurers and brokers who operate in the force-placed market. Information gained from the hearings will guide the Department in any action with respect to force-placed insurance.

In light of the concerns raised by the investigation's initial findings, the Department is requiring insurers to provide more extensive and detailed information and supporting documentation, including:
· An actuarial or statistical justification for force-placed insurance rates currently on file with the Department;
· A detailed explanation of how rates and expected loss ratios are calculated;
· A detailed explanation and itemized report of insurers' expenses relating to force-placed insurance; and
· A detailed explanation and itemized report of the payments insurers receive relating to force-placed insurance.

The Department has sent formal document requests, issued under Section 308 of the Insurance Law, requiring the following firms to

33

provide information: Balboa Insurance Company, QBE Insurance Corporation, QBE Financial Institution Risk Services, Inc., American Security Insurance Company (Assurant), American Bankers Insurance Company of Florida (Assurant), Meritplan Insurance Company, American Modern Home Insurance Company, Empire Fire and Marine Insurance Company, and Fidelity and Deposit Company of Maryland.

"It appears that force-placed insurers charge very high premiums, but pay out only a very small percentage of those premiums on claims—as little as 20 cents on the dollar.  In addition, questionable payments are made to various players in the force-placed business, further increasing the profits to insurers and banks," Superintendent Lawsky said.   "We have asked insurers to provide a complete breakdown of how much they collect and where every penny goes so we can determine if the premiums are appropriate and the basis for these payments."

Since October 2011, the Department has been conducting a broad industry-wide investigation of force-placed insurance.   The investigation has revealed that, for force-placed insurance, the percentage of premiums paid on claims, known as the loss ratio, is extremely low—in most cases, dramatically lower than the expected loss ratios insurers filed with the Department.  For example, based on the investigation, while most insurers filed a loss ratio of 55%, one major insurer's actual loss ratios for the last six years averaged 22% and another averaged less than 20%.  This raises serious concerns about whether premiums for this insurance have been artificially inflated.

*The investigation thus far indicates that high rates for force-placed insurance appear to be due in part to relationships between and payments by insurers to banks and their affiliates, including mortgage servicers and insurance agents and brokers.  Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business.  Early findings of the investigation suggest that 15 percent or more of premiums collected by force-placed insurers flow to the banks through insurance agents affiliated with the banks.*

The insurers may also give banks a share of the profits by giving some of the insurance premium to a reinsurer owned by the bank. Since the claims payments are so low, the banks could be gaining a

substantial portion of the profit without actually taking on a great deal of risk.

In addition, the investigation to date reveals that the banks now have a significant conflict of interest.  Often, it is the banks' servicers who are supposed to file insurance claims, but have a strong reason not to do so.  When the mortgage is owned by investors, filing a claim will benefit the investors, but reduce the profits of the servicers' owners, the banks.

Force-placed insurance is taken out by a bank or mortgage servicer when a borrower does not maintain the homeowners' insurance required by the mortgage documents.   This can occur if the homeowner misses a mortgage payment, the homeowner allows the homeowners' policy to lapse, or if the bank or mortgage servicer determines that the borrower does not have a sufficient amount of coverage.  Force-placed insurance is typically far more expensive than homeowners' coverage purchased by a homeowner—anywhere from two to ten times more costly—yet often provides less protection for the homeowner while protecting the lender's or investor's interest in the property.

"There appear to be a number of very significant problems with force-placed homeowners' insurance.  The price is often extremely high—as much as ten times the normal rate for homeowners' insurance.  And sometimes consumers have this high priced policy forced on them when their own insurance is still in place.  *At the hearings, we will explore whether banks are using force-placed insurance to increase their profits at the expense of homeowners and investors," Lawsky said*.

*The high cost of force-placed insurance adds to struggling homeowners' debt burden and makes it even more difficult for them to avoid foreclosure.   The high cost also harms investors in mortgages or mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid*.

(Emphasis added).

103.    The NYSDFS held three days of hearings on LPI in May as scheduled, the transcripts of which the NYSDFS published on its website together with written testimony.  As alleged above,

35

GMACM and Balboa admitted the essential facts regarding the rebates/kickbacks paid in the form of free tracking services at the hearings.

> **G.      GMACM Servicing Client American Residential Equities Accuses GMACM and Balboa of Defrauding It Through a "Kickback Scheme" Involving Inflated LPI Charges**

104.   As alleged above, GMACM performs servicing pursuant to PSAs and other servicing agreements with numerous loan owners, including the trustees of private securitization trusts.  One such trustee is American Residential Equities, LLC ("ARE").  GMACM services approximately 2,600 mortgage loans on behalf of ARE through a series of servicing agreements with ARE.

105.   On November 9, 2012, ARE commenced an adversary proceeding against GMACM and Balboa in connection with GMACM's bankruptcy.  *See American Residential Equities, LLC, v. GMACM Mortgage, LLC, et al.*, Adv. Case No. 12-01934 (MG) (S.D.N.Y. filed Nov. 9, 2012). ARE's adversary complaint (the "ARE Complaint") alleges claims against GMACM in connection with numerous alleged breaches of GMACM's servicing obligations to ARE.  Additionally, it alleges claims against GMACM and Balboa in connection with "a secret deal whereby GMAC placed insurance for certain of the Mortgaged Properties with Balboa at artificially inflated prices, with GMAC receiving undisclosed 'commissions.'" According to the ARE complaint, GMACM and Balboa defrauded ARE through a secret "kickback scheme."  Specifically, GMACM received kickbacks in connection with the LPI from Balboa, but improperly failed to pass those savings to ARE in the form of reduced LPI reimbursement charges.  The ARE Complaint alleges, in relevant part:

> 54. As part of the Servicers' Duties, GMAC was authorized to purchase property insurance to insure each Mortgaged Property

36

subject to the Loans, if the owners of the Mortgaged Property failed to adequately maintain insurance on such Mortgaged Property.

55. The costs of force-placed insurance are initially incurred by the servicer, GMAC, which is responsible for advancing the money to pay the insurance premiums. GMAC, however, recoups any of its costs, expenses or advances it incurs "off the top" from ARE's proceeds of collection or liquidation of the loan collateral, before any money is passed through to ARE, the owner of the loans. This entitlement includes force-placed insurance premiums paid by GMAC, which are counted as reimbursable servicing advances under GMAC's agreement with ARE. Furthermore, if proceeds of a particular loan are insufficient to enable GMAC to recoup its advances on a particular loan, GMAC reimburses itself from the cash collected from Plaintiff's other loans covered by the Servicing Agreement.

56. GMAC utilized Balboa as its source for its force-placed insurance coverage with respect to Mortgaged Properties and the Loans. When GMAC force-placed coverage for the Loans with Balboa, GMAC then charged ARE for the cost incurred to Balboa.

57. However, GMAC and Balboa, acting in concert, had an arrangement which was secret as to ARE, pursuant to which Balboa "kicked back" to GMAC, directly or indirectly, sums of money labeled as "commissions." The kickbacks improperly inflated the cost of the insurance, as the premiums charged by Balboa to GMAC were intentionally increased to include the amount of the "kickback."

58. GMAC and Balboa entered into this scheme in 2003, prior to ARE entering into its contract with GMAC in 2004, and unbeknownst to ARE. Had ARE been aware of this kickback arrangement between the parties, ARE would never have entered into a contractual relationship with GMAC. ARE, on the contrary, relied on GMAC's high rating as an industry servicer, and its stated intention and ability to conduct the servicing of ARE's portfolio in the best interests of ARE and in transparent compliance with the Servicing Agreement.

59. ARE, through the duration of its relationship with GMAC and beyond, continued to rely on the premise that GMAC and Balboa had conducted their business fairly with ARE, and that there was no reason to question the authenticity or nature of their charges.

60. ARE has since discovered that GMAC reimbursed itself out of ARE's monies for artificially inflated costs of the forced placed insurance, made unnecessarily more expensive so that GMAC could make a profit at the expense of ARE, all the while hidden from ARE.

61. GMAC, aided and abetted by Balboa, grossly violated its duties owed to ARE by making a secret profit on the forced placed insurance with Balboa.

62. The above-described kickback scheme (the "Kickback Scheme") was carried out by GMAC with malice and knowledge that it had not disclosed to ARE the existence and nature of the scheme.

63. GMAC concealed the Kickback Scheme so as to induce ARE to rely upon the appearance that proper force-placed insurance coverage had been obtained on ARE's behalf and that nothing exceeding appropriate payment of premiums for that insurance coverage had been suffered.

64. Balboa, with malice, intentionally inflated its insurance premiums so that it could offer a kickback to loan servicers such as GMAC, undisclosed and to the detriment of the loan owners (i.e., ARE).

65. ARE believes that the nature of this illicit relationship, with its inherent conflict between servicer and its own clients, constitutes a breach of duty in of itself and led to further acts of betrayal where GMAC chose to elevate its own and Balboas' interests over those of its clients.  Specific frauds committed by GMAC in pursuit and furtherance of the kickback scheme, included but are not limited to GMAC's intentional failure to submit insurable claims of ARE to Balboa, failure of GMAC to adequately pursue submitted claims of ARE to Balboa, GMAC causing ARE to obtain insurance from Balboa for higher value policies than necessary or reasonable, and/or for causing ARE to obtain policies from Balboa where forced-placed insurance was not warranted or was placed at inflated prices. ARE believes and alleges that GMAC and Balboa acted in concert, and GMAC had incentive to protect Balboa's financial interest, and often did so by failing to pursue ARE's insurable claims, and causing ARE to obtain unnecessary or inflated policies, to ARE's significant detriment.

66. In furtherance of the scheme to defraud Plaintiffs, GMAC and Balboa acted as co-conspirators, and agents, of the other. GMAC

allowed Balboa to take over its own servicing functions in all aspects of evaluating insurance needs, a clear conflict, as Balboa would financially benefit from the "finding" of need for its services. Balboa employees acted as agents of GMAC, contacting borrowers, identifying themselves as GMAC employees, and discussing the insurance status and needs of Borrowers. Notices from GMAC in regard to insurance issues, although allegedly issued from GMAC's Insurance Department, per their letterhead, were in fact, issued by Balboa employees. Additionally, Balboa was permitted to manage the billing of force-placed insurance to borrowers, . . . .

67. GMAC has wrongfully collected commissions for providing insurance services that it has never provided to Plaintiffs.

68. The continuing nature of these fees, for as long as the force-placed insurance remains in place, often for as long as it takes to foreclose the property, also gave incentive to GMAC to improperly delay foreclosures for as long as possible. Once a foreclosure occurred, much cheaper insurance without profitable kickbacks to the servicer, now owner of the real estate. Therefore, it became a conflict of interest that GMAC seized upon, to intentionally delay Plaintiffs' foreclosures for as long as possible to maximize their own profits, both through kickbacks and all servicing fees, and to the great financial detriment of Plaintiffs.

69. As a proximate result of the fraudulent concealment by GMAC and Balboa, ARE has been damaged. Additionally, the actions of GMAC and Balboa in regard to the above-described scheme are so willfully in violation of the rights of ARE as to warrant the imposition of substantial punitive damages against GMAC and Balboa so as to deter similar conduct in the future by GMAC and Balboa and others in the community.

*       *       *

72. Pursuant to the Servicing Agreement, GMAC was to act as ARE's agent to obtain insurance coverage on properties securing the ARE loans in the event the borrower(s) failed to keep property insurance in place.

73. GMAC utilized its position as ARE's servicing agent, thus controlling in excess of 2,600 loan files, to negotiate with GMAC's contracted provider of such insurance, Balboa, a secret benefit for GMAC in the nature of a "commission" or "kickback" related to

placing business with Balboa for procuring insurance coverage on the properties which secured the ARE loans being serviced by GMAC.

74. The secret profit taken by GMAC as described above was not authorized by ARE nor permitted by the Servicing Agreement. Any such savings should have been passed on by GMAC (as agent) to its principal, ARE. GMAC did not pass on to ARE the savings generated by the above-described commission arrangement, was wrongfully and fraudulently collected . . . .

106.   GMACM and Balboa are scheduled to respond to the ARE Complaint by January 25, 2013.

## VI.   THE KICKBACK SCHEME CONSTITUTES MAIL AND WIRE FRAUD

107.   The kickback scheme alleged herein constitutes mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

### A.   The Erroneous Notices And Bills To Borrowers

108.   As GMACM's insurance tracking subcontractor, Newport issues standardized notices to borrowers.  Prior to the placement of LPI, Newport issues notices titled "Request for Property Insurance" demanding evidence of insurance and warning that LPI will be imposed if such evidence is not forthcoming.  Once LPI is imposed, Newport issues Notices of Placement.  For example, Newport issued a Request for Property Insurance to the Davidsons on June 14, 2009, and to Rothstein on December 12, 2010.  Newport issued a Notice of Placement to the Davidsons on August 2, 2009, and to Kobryn on May 13, 2012.  Borrowers also receive standardized monthly billing statements from GMACM.

109.   The notices and billing statements are false, fraudulent, and reasonably calculated to deceive persons of ordinary prudence and comprehension.

110.    Specifically, the notices do not disclose the rebates/kickbacks.  The notices set forth the balances owed for LPI based on the full cost of the premiums without subtracting the rebates/kickbacks.  Additionally, the notices falsely describe those balances as reflecting the "cost of the coverage" and the amounts necessary to "reimburse" GMACM for the money that GMACM "advanced."

111.    The Requests for Property Insurance state, "Since we have not received evidence of hazard insurance, we will secure hazard insurance coverage also known as lender-placed insurance. . . .  You are responsible for *reimbursing* us for *the cost of this coverage*, in the amount of $[xx,xxx.xx], ('insurance charges')." (Emphasis added).

112.    The Notices of Placement state, "We have obtained lender-placed insurance coverage . . . under the terms of your mortgage. . . .   The *cost of the insurance* in the amount of $[xx,xxx.xx] was *advanced* for the period [xx/xx/20xx] to [xx/xx/20xx]."  The Notices of Placement demand that borrowers "*Reimburse us* in full for the insurance."  (Emphasis added).

113.    These statements are materially false and misleading and omit facts necessary to make the statements not misleading.  Because the rebates/kickbacks reduce GMACM's "costs" for the LPI coverage, the balances set forth in the notices exceed the amounts actually "advanced" by GMACM or necessary to "reimburse" GMACM because the rebates/kickbacks are not subtracted from the balances.  The monthly statements to borrowers incorporate the same falsely inflated LPI charges.

114.    The notices and statements issued to borrowers are fraudulent in themselves and also designed to lull borrowers into believing that no fraudulent scheme is occurring and that GMACM and Defendants are simply exercising GMACM's rights under borrowers' mortgage loan agreements.  By lulling Plaintiffs and the Class into a false sense of security, the notices and statements are

designed to make it less likely that borrowers will object to the improper charges, complain to the authorities, or bring lawsuits.  GMACM then subtracts the inflated LPI amounts off the top of borrowers' mortgage payments before applying any balance to principal, interest or other charges.

### B.   The Erroneous Reports To Loan Owners

115.   GMACM is required to provide financial reports to loan owners at least monthly documenting GMACM's payment activities with respect to each loan.  The monthly financial reports are required to include information regarding any compensation received by GMACM, any advances made by GMACM, and any expenses reimbursed to GMACM.

116.   Additionally, GMACM is required to deliver certificates of compliance to each loan owner annually attesting that GMACM's activities for the year complied with the terms of the applicable PSA or other servicing agreement.

117.   All servicing agreements include such monthly and annual reporting requirements. For example, the JPMorgan PSA sets forth GMACM's monthly reporting requirement in Section 4.03, and GMACM's annual certification requirements in Section 3.13.

118.   GMACM's reports and certifications to loan owners are false, fraudulent, and reasonably calculated to deceive persons of ordinary prudence and comprehension.   On information and belief, the reports and certifications do not disclose the rebates/kickbacks.   Instead, the reports and certifications set forth balances for advances and reimbursements based fraudulently on the full cost of the LPI premiums without subtracting the rebates/kickbacks.  The reports and certifications also set forth balances for GMACM's compensation that fraudulently exclude the additional, undisclosed compensation derived by GMACM from the rebates/kickbacks.

119.     Moreover, on information and belief, the reports do not disclose GMACM's "double-dipping" with respect to tracking services, *i.e.*, the fact that GMACM charges loan owners for tracking services twice, first through servicing fees and then for a second time through excess LPI charges.   As alleged above, GMACM's servicing agreements obligate GMACM to pay any subcontractors "from its own funds."   The payment of Newport via excess LPI charges characterized as servicing advances, instead of from GMACM's "own funds," breaches this obligation. GMACM's certificates of compliance to loan owners fraudulently omit disclosure of such breach.

120.      The reports issued to loan owners are fraudulent in themselves and also designed to lull loan owners into believing that no fraudulent scheme is occurring and that GMACM is simply exercising its rights under their servicing agreements.   By lulling loan owners into a false sense of security, the reports issued to loan owners are designed to make it less likely that loan owners will object to the improper charges, complain to the authorities, or bring lawsuits.

## C.     The Scheme Constitutes "Honest Services" Fraud

121.     The scheme alleged herein constitutes "honest services" fraud in violation of 18 U.S.C. § 1346.

122.     The wire fraud and mail fraud statutes make it a crime to, *inter alia*, devise a scheme to deprive another of "honest services."

123.     The mail fraud statute reads in relevant part as follows:

> Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises . . . [uses the mails in furtherance of the scheme shall be punished by imprisonment or fine or both].

18 U.S.C. § 1341.

124.     The wire fraud statute is in relevant respects identical.  *See* 18 U.S.C. § 1343.

125.     In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court interpreted this statutory language to apply only to deprivations of property and not to encompass "the right to have [one's] affairs conducted honestly."  *Id.* at 352.

126.     In response to *McNally*, Congress broadened the scope of the mail and wire fraud statutes by enacting 18 U.S.C. § 1346.  That section provides:

> For the purposes of this chapter [including § 1341 and § 1343], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right to honest services.

18 U.S.C. § 1346.

127.     Through 18 U.S.C. § 1346, Congress brought schemes to deprive another of honest services within the scope of the mail and wire fraud statutes.

128.     In *Skilling v. United States*, 130 S. Ct. 2896 (2010), the Supreme Court addressed the scope and constitutionality of 18 U.S.C. § 1346, concluding that the statute criminalizes "fraudulent schemes to deprive another of honest services through bribes or kickbacks."  *Id.* at 2928, 2931.  In fact, the Court held that, for purposes of the mail and wire fraud statutes, the term "scheme or artifice to defraud" in 18 U.S.C. § 1346 (the "honest services" provision), applies to bribes and kickbacks. The Court stated that "there is no doubt that Congress intended § 1346 to reach *at least* bribes and kickbacks" because the "vast majority" of pre-*McNally* honest services cases involved bribery or kickback schemes.  *Id.* at 2930-31.

129.     At all relevant times, GMACM owed legal duties to render services to loan owners. In all cases, those duties included maintenance of continuous hazard insurance coverage on the secured properties.  The value of GMACM's services depended on GMACM's rendering those

services in an honest manner. Nevertheless, GMACM misused its position as the servicer of the loans to extract bribes and kickbacks from the Balboa Defendants. GMACM thereby breached its obligation to render "honest services" to loan owners. GMACM, the Ally Financial Defendants, and the Balboa Defendants devised a scheme or artifice to defraud loan owners of their intangible right to GMACM's honest services through kickbacks.

130.    The wire and mail fraud violations of GMACM, the Ally Financial Defendants, and the Balboa Defendants, including "honest services" fraud, constitute predicate acts under RICO. The pattern of racketeering activity alleged herein has proximately harmed Plaintiffs and the Class.

## VII.    THE    KICKBACK    SCHEME    VIOLATES    RESPA'S    ANTI-KICKBACK PROVISIONS

131.    The "commissions" and free tracking services provided by the Balboa Defendants to GMACM constitute unlawful kickbacks in violation of Section 8(a) of RESPA.

132.    Congress enacted RESPA to protect homeowners "from unnecessarily high settlement charges caused by certain abusive practices." 12 U.S.C. § 2601(a). The intent of Congress was to eliminate "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b)(2).

133.    Toward that end, RESPA prohibits referral fees and kickbacks. In particular, Section 8(a) of RESPA prohibits both the giving and acceptance of "any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service . . . shall be referred to any person." 12 U.S.C. § 2607(a).

134.    RESPA confers on the Secretary of the Department of Housing and Urban Development ("HUD") the authority to prescribe rules and regulations to achieve the statute's

purposes.  *See* 12 U.S.C. § 2617(a).  The relevant regulation adopted by HUD is known as Regulation X and sets forth in relevant part:

> § 3500.14 Prohibition against kickbacks and unearned fees.
>
> (a) Section 8 violation. Any violation of this section is a violation of section 8 of RESPA (12 U.S.C. 2607) and is subject to enforcement as such under § 3500.19.  (b) No referral fees.  No person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise that business incident to or part of a settlement service involving a federally related mortgage loan shall be referred to any person. Any referral of a settlement service is not a compensable service, except as set forth in § 3500.15(g)(1).  A business entity (whether or not in an affiliate relationship) may not pay any other business entity or the employees of any other business entity for the referral of settlement service business.

24 C.F.R. §3500.14(a).

135.    The penalty for violating Section 8(a) is joint and several liability by the violators "to the person or persons charged for the settlement services involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service." 12 U.S.C. § 2607(d)(2).

136.    Thus, 12 U.S.C. § 2607(a) prohibits kickbacks to refer business incident to or a part of real estate settlement services to them.  If a party violates 12 U.S.C.§ 2607(a), the borrower is entitled to a statutory penalty equal to three times the amount paid by the borrower for the settlement service.  *See* 12 U.S.C. § 2607(d)(2).

137.    RESPA and Regulation X define the term "settlement service" liberally.  The word "settlement" is defined as "the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan."  24 C.F.R. § 3500.2(b).  A "settlement

service" is defined as "any service provided in connection with a prospective or actual settlement," and in this definition HUD specifies that settlement services include the "provision of services involving hazard, flood, or other casualty insurance."  *See id.*

138.    The placement of LPI constitutes a "settlement service" within the meaning of RESPA.  At minimum, the placement of LPI constitutes business "incident to" if not "a part of" real estate settlement services under 12 U.S.C. § 2607.  Transactions placing LPI "regard" a "lien" on property subject to a federally related mortgage because, as alleged above, any amounts disbursed for LPI "become additional debt of Borrower secured by" the lender's lien on the property.  Hence, transactions placing LPI fall squarely within the definition of a "settlement."

139.    Regulation X defines a "fee, kickback, or thing of value" as including, without limitation:

> monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity . . . .  The term payment is used throughout §§3500.14 and 3500.15 as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

24. C.F.R. § 3500.14(d).

140.    The "commissions" and free tracking services provided by the Balboa Defendants to GMACM thus violate Section 8(a) of RESPA.  The loans of Plaintiffs and the Class are "federally related" within the meaning of RESPA.  The "commissions" and free tracking services constitute unlawful kickbacks within the meaning of Section 8(a).

## VIII.   ALLY BANK'S LIABILITY FOR THE MISCONDUCT OF ITS AUTHORIZED AGENT, GMACM, AND OF ITS AUTHORIZED SUB-AGENT, NEWPORT

141.    Ally Bank is one of GMACM's largest servicing clients.  Approximately 690,000 mortgage loans with an unpaid principal balance of $140.8 billion are serviced by GMACM on behalf of Ally Bank.  The Ally Bank loans serviced by GMACM consist of loans (i) owned by Ally Bank and (ii) loans that Ally Bank sold but as to which Ally Bank retained the servicing rights.  The Ally Bank loans serviced by GMACM include the loan of Rothstein.  Rothstein's loan was originated by Nations Reliable, an Ally Bank correspondent lender.  At all relevant times, GMACM serviced the Ally Bank loans pursuant to servicing agreements between GMACM and Ally Bank.

142.    Ally Bank is liable under agency principles for the misconduct of its authorized agent, GMACM.  GMACM possessed actual authority to service the loans of Plaintiffs and the Class by virtue of the sub-servicing agreements between Ally Bank and GMACM.  When GMACM engaged in the misconduct alleged herein, it was acting in the course and scope of its authority as an authorized agent of Ally Bank.  Moreover, Ally Bank selected GMACM as its agent, and placed GMACM in a position, and gave GMACM the means, to injure Plaintiffs and the Class.

143.    Ally Bank is additionally liable under agency principles for the misconduct of its authorized sub-agent, Newport.  Newport possessed actual authority to render insurance tracking services on behalf of Ally Bank as an authorized subcontractor of GMACM, Ally Bank's authorized agent.  Ally Bank's sub-servicing agreements with GMACM gave GMACM the authority to retain outside vendors and subcontractors; GMACM retained Newport pursuant to such authority.  When Newport engaged in the misconduct alleged herein, it was acting in the course and scope of its actual authority as a sub-agent of Ally Bank.  Moreover, at all relevant times, Ally Bank was fully aware

of Newport's role as an insurance tracking sub-agent. The agreements between Ally Bank and GMACM required the disclosure of all of GMACM's vendor and subcontractor agreements to Ally Bank. Furthermore, Ally Bank regularly received (i) reports relating to insurance tracking and (ii) certifications attesting to compliance with the insurance requirements of the servicing agreements, from Newport.

144.    Furthermore, with knowledge and/or reckless disregard of the facts, Ally Bank ratified the unlawful and improper acts and transactions at issue. Ally Bank also derived, retained – and continues to derive and retain – at least some of the fruits of the fraud. Ally Bank never disclaimed the unlawful and improper acts and transactions at issue, which were committed by its authorized agent and sub-agent, and never sought to make restitution to or otherwise compensate Plaintiffs and the Class or loan owners for their losses.

145.    An inference that at all times during the Class Period Ally Bank knew and/or recklessly disregarded the facts with respect to the unlawful and improper acts and transactions alleged herein is raised by, *inter alia*:

> a.    The disclosure obligations in the agreements between Ally Bank and GMACM. Such agreements obligated GMACM to provide Ally Bank with periodic detailed "management reports" and "electronic data" in connection with the administration of the loans.
>
> b.    The fact that GMACM's internal books and records were also maintained in a single "integrated system" with those of its affiliates, and were accessible to, and regularly accessed by, multiple employees of Ally Bank, as admitted in the debtors' bankruptcy filings.

49

c. The fact that Ally Bank and GMACM share officers, directors, and personnel with each other, and the fact that each is ultimately controlled by a common parent, Ally Financial.  For example, Matthew Detwiler, a senior vice president of GMACM, is responsible for contract negotiations, administration and client management activities with respect to GMACM's "subservicing operations," which includes GMACM's dealings with Ally Bank.  Mr. Detwiler is also a senior vice president of Ally Financial, which is Ally Bank's direct parent.  Similarly, Thomas Marano, Chief Executive Officer of Ally Financial's Mortgage operations, is responsible for overall leadership and management of, *inter alia*, GMACM.  Mr. Marano's 2011 Performance Objectives included the maximization of revenues at, *inter alia*, Ally Bank.

d. Pursuant to a consent order that Ally Bank executed with the Federal Reserve Board ("FRB") and the Federal Deposit Insurance Corporation ("FDIC"), Ally Bank has been obligated to oversee, supervise, and monitor the mortgage servicing operations that GMACM performs on behalf of Ally Bank – including GMACM's dealings with outside vendors such as the Balboa Defendants – to make sure that those operations comply with all legal requirements.  *See* Consent Order, FRB Docket No. 11020-B-HC (April 13, 2011) (the "Consent Order").  Furthermore, Ally Financial appointed Mark H. Weintraub, a top Ally Financial risk manager, as executive vice president of mortgage servicing remediation oversight to oversee compliance with the

Consent Order and to coordinate the efforts of, *inter alia*, Ally Bank and GMACM.  In a press release dated April 13, 2011, Ally Financial stated:

> Ally has placed the highest priority on meeting the requirements of the Order.  In this regard, the company has designated an internal executive team, with senior management from Ally Financial, ***GMAC Mortgage and Ally Bank***, which will have oversight for the timely and high-quality compliance with the Order.   Given the importance of this effort, Ally has also reassigned its general auditor, Mark Weintraub, to lead these initiatives at the Ally Financial level, working closely with the businesses. Weintraub will have day-to-day responsibility for ensuring that all areas of the company are meeting the requirements of the Order on a timely basis.

(Emphasis added).

146.    An inference that Ally Bank benefitted from, and accepted the fruits of, the unlawful and improper acts and transactions alleged herein is raised in that, *inter alia*, until recently Ally Bank paid below-market prices for GMACM's loan administration services.  Last year, GMACM applied to the bankruptcy court for authority to continue to service the Ally Bank loans.  In order to convince the court to approve this related-party transaction, the debtors and Ally Bank presented a renegotiated servicing agreement – alleged to have been reached at arms-length – which included "materially higher," market rate servicing charges.

## IX.    ALLY FINANCIAL'S DOMINATION AND CONTROL OF ITS SUBSIDIARIES, INCLUDING RESCAP AND GMACM

147.    At all relevant times, defendant Ally Financial exercised complete domination and control over the affairs, activities, and operations of its subsidiaries – including, specifically, those of ResCap and GMACM – such that those subsidiaries operated as mere instrumentalities or alter-egos of Ally Financial.  Moreover, Ally Financial, through GMACM, engaged in inequitable conduct

toward Plaintiffs and the Class such that the circumstances justify piercing the corporate veils of GMACM and ResCap to hold Ally Financial vicariously liable for GMACM's misconduct.  Ally Financial caused GMACM to engage in the misconduct alleged herein, and used GMACM's corporate form to accomplish the fraudulent and extortionate objectives alleged herein to injure Plaintiffs and the Class.

> **A.**   **Ally Financial's Vertically Integrated Single Enterprise**

148.   As alleged above, Ally Financial owns ResCap, which owns GMACM.  At all times relevant to this lawsuit, Ally Financial conducted mortgage loan securitization and servicing activities primarily through ResCap and GMACM.  Ally Financial's business model depended on mortgage loan securitizations to fund ongoing mortgage loan originations and acquisitions and to earn significant fees.  GMACM earned additional fees by servicing loans.

149.   Ally Financial consolidated and held out its residential mortgage loan origination, acquisition, distribution, servicing, and securitization businesses under the ResCap banner as a single integrated corporate enterprise.  Ally Financial's operation was a vertically integrated business with Ally Financial's hand in nearly every stage of the mortgage securitization business, including originating, purchasing and selling residential mortgage loans, bundling mortgages into RMBS and selling them to investors, and then servicing the loans it had securitized.  This enterprise consisted of, *inter alia*, Ally Financial, ResCap and GMACM.  At all relevant times, the day-to-day business operations of ResCap and GMACM were run at the direction of and controlled by Ally Financial through its direct ownership of ResCap and indirect ownership of GMACM, and through its contribution and use of personnel and financial resources that ResCap and GMACM depended on to remain in business.  Ally Financial operated its consolidated subsidiaries as a collective enterprise,

whereby it made significant strategic decisions, monitored enterprise-wide risk, and maximized profit for Ally Financial's executives and itself.   In the ResCap/GMACM bankruptcy proceedings, ResCap's Chief Financial Officer recently admitted that "the mortgage loan origination, servicing and related securitization operation of [Ally Financial] are an integrated business involving the Debtors and Ally Bank."   Transactions between Ally Financial, ResCap, GMACM, and other subsidiaries were not arms-length, as Ally Financial ultimately controlled every aspect of the mortgage securitization and servicing process.   Ally Financial maintained a high level of day-to-day scrutiny and control over its subsidiaries, including GMACM.

150.    In its SEC filings, Ally Financial discussed its practice of acting through its subsidiaries.   For example, Ally Financial's 2005 Form10-K states:   "We operate directly and through our subsidiaries and affiliates in which we or GM have equity investments. . . .   We originate, purchase, service, sell and securitize residential and commercial mortgage loans and mortgage related products."

151.    In addition, Ally Financial's Chief Executive Officer Michael Carpenter has signed a consent order with the FRB and FDIC on behalf of Ally, admitting that:

> • "Ally Financial Inc., . . . a registered bank holding company, indirectly owns and controls Ally Bank (f/k/a GMAC Bank), . . . and numerous direct and indirect nonbank subsidiaries, including Residential Capital, LLC, Minneapolis, Minnesota ("ResCap"), and its direct and indirect subsidiaries, including GMAC Mortgage, LLC . . . and its subsidiaries."   Consent Order at 1.

> • "Ally Financial engages in the business of servicing residential mortgage loans through various indirect subsidiaries, including GMAC Mortgage and its subsidiaries." *Id*. at 2.

- "[I]t is the common goal of the FDIC and Ally Bank to ensure that the residential mortgages owned or serviced by Ally Bank are serviced or subserviced in a safe and sound manner and in compliance with all Legal Requirements." *Id*. at 5.

152.    Pursuant to the Consent Order, Ally Financial agreed, along with ResCap and their institution-affiliated parties, to "cease and desist and take affirmative action" to, *inter alia*, (1) provide additional oversight from the board of directors over the mortgage servicing companies, including oversight of risk management, internal audit, and compliance programs, *id*. at 7; (2) take steps to "improve the information and reports that will be regularly reviewed by the board of directors or authorized committee of the board of directors of Ally Financial regarding residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations," *id*. at 8; (3) and ensure that GMACM has "adequate levels and types of officers and staff to carry out residential mortgage loan servicing, Loss Mitigation, and foreclosure activities in compliance with Legal Requirements," *id*. at 9; and (4) take steps to better assess and manage the risk associated with servicing mortgage loans, *id*. at 27-30.

153.    Additionally, as alleged above, Ally Financial appointed Mr. Weintraub, a top risk manager, as executive vice president of mortgage servicing remediation oversight, to oversee compliance with the Consent Order and to coordinate the efforts of, *inter alia*, GMACM.

154.    The deep and integral involvement of Ally Financial in GMACM's day-to-day operations is also demonstrated by Ally Financial's involvement in the transfer of GMACM's servicing operations to new ownership. On November 21, 2012, the Bankruptcy Court approved the sale of ResCap's mortgage servicing platform – *i.e.*, the operations of GMACM – to Ocwen Loan Servicing LLC and Walter Investment Corporation ("Ocwen"). As a part of the $3 billion

transaction, Ally Financial entered into a "Transition Services Agreement" with Ocwen requiring Ally Financial to provide Ocwen with a wide array of "transitions services," before and after closing, relating to the conduct and management of the former GMACM servicing operations.  The services to be provided by Ally Financial, for which Ally Financial is to receive substantial fees, include, *inter alia*, functions relating to compliance, audit, legal, information technology, treasury, communications, and risk management.

### B.   Investigations And Lawsuits Relating To Securitization Activities

155.    Ally Financial, ResCap, and GMACM, as well as other affiliates of Ally Financial, face numerous investigations and lawsuits relating to their securitization and servicing operations.

156.    GMACM is currently being investigated by the U.S. Department of Justice (the "DOJ") for fraud related to the origination and underwriting of mortgage loans.  On June 29, 2011, Ally Financial disclosed that the DOJ had served GMACM with a subpoena in June 2011, which "includes a broad request for documentation and other information in connection with its investigation of potential fraud related to the origination and/or underwriting of mortgage loans." Ally Fin. Inc., Amendment No. 3 to Form S-1 Registration Statement (Form S-1/A), at 23 (June 29, 2011).

157.    Additionally, on September 2, 2011, the Federal Housing Finance Authority ("FHFA"), as conservator for Freddie Mac, filed suit in New York State Supreme Court alleging that Ally Financial and several of its subsidiaries issued and filed offering documents containing false and misleading statements.  These claims arise from Freddie Mac's purchase of over $6 billion in certificates issued through twenty-one transactions similar to the transactions at issue here.  Among other claims, FHFA brought suit for common law fraud against various Ally Financial subsidiaries

and aiding and abetting fraud against Ally Financial for its intentional and substantial assistance in rendering material misrepresentations to Freddie Mac in connection with the sale of the subject certificates.

158.     The FHFA also alleges violations of state and federal securities laws by Ally Financial and several of its subsidiaries stemming from false and misleading statements contained in publicly filed prospectuses, prospectus supplements, registration statements, and other offering documents.  Additionally, FHFA alleges aiding and abetting fraud against Ally Financial and certain of its affiliates for their intentional and substantial assistance in rendering material misrepresentations to Freddie Mac in connection with the sale of the certificates.  The FHFA action seeks relief in the form of rescission and recovery of the $6 billion purchase price of the certificates, including lost principal and interest, as well as punitive damages and attorneys' fees and costs.  In October 2011, Ally Financial and its co-defendants removed the FHFA action to the United States District Court for the Southern District of New York.

159.     In addition, GMACM currently is facing a lawsuit brought by monoline insurer MBIA Insurance Corporation ("MBIA") in New York State Supreme Court in which MBIA alleges that, in connection with certain mortgage insurance transactions with MBIA, GMACM affirmatively misrepresented the credit quality of tens of thousands of mortgage loans, with an original principal balance of more than $4 billion, as a means of unfairly shifting to investors and MBIA risks that GMACM should have borne itself.  On December 15, 2010, the New York State Supreme Court issued a ruling denying GMACM's motion to dismiss, which allowed both the breach of representations and warranties and fraud claims, among others, to proceed to trial.

160.     Additionally, according to Ally Financial's third quarter 2011 Form 10-Q, as of November 4, 2011, there were twenty-two suits in various jurisdictions pending against its mortgage-related business units and subsidiaries arising from numerous RMBS offerings.  The plaintiffs in those suits have alleged, among other things, that Ally Financial's various mortgage subsidiaries made misstatements and omissions in registration statements, prospectuses, prospectus supplements, and other documents related to RMBS offerings.  The alleged misstatements typically concern underwriting standards.  *See* Ally Fin. Inc., Quarterly Report (Form 10-Q), at 159 (Nov. 4, 2011).  Further, in its 2011 Annual Report, Ally Financial stated that it expects additional similar claims to be brought against Ally Financial and/or its subsidiaries in the future.  *See* Ally Fin. Inc., Annual Report (Form 10-K), at 20 (Feb. 25, 2011).

161.     Since the filing of its third quarter 2011 Form 10-Q, moreover, Ally Financial and its subsidiaries have been sued by additional plaintiffs, including HSH Nordbank AG, which have alleged, *inter alia*, material misrepresentations and omissions about the loans backing RMBS securities issued by Ally Financial's affiliates.

162.     Ally Financial and several of its subsidiaries, including GMACM, are also currently facing several lawsuits brought by monoline insurer Financial Guaranty Insurance Company ("FGIC") in which FGIC alleges that in connection with certain mortgage insurance transactions, the defendants, acting as alter egos of each other, affirmatively misrepresented the credit quality of tens of thousands of mortgage loans, with a total original principal balance of approximately $1.87 billion, as a means of unfairly shifting to investors and FGIC risks which the defendants should have borne.

163.   Moreover, Ally Financial has disclosed that it expects additional RMBS lawsuits from monoline insurers like MBIA and FGIC given that Ally Financial and its subsidiaries sold $42.7 billion of loans into monoline-wrapped securitizations from 2004 to 2007.   During 2011, Ally Financial and its subsidiaries received repurchase claims from monoline insurers for $265 million worth of mortgages related to securitizations it consummated between 2004 and 2007.   Ally Financial clearly recognizes its exposure because, according to its CEO, Michael Carpenter, ResCap has already reserved $829 million for misrepresentation and warranties claims and, according to its SEC filings, Ally Financial confirms that "litigation with . . . monolines is likely."  Ally Fin. Inc., Annual Report (Form 10-K), at 98 (Feb. 28, 2012).

164.   Indeed, according to Ally Financial's 2012 annual report, the company also believes that "[t]he total exposure . . . to mortgage representation and warranty claims is most significant for loans originated and sold from 2004 through 2008, specifically the 2006 and 2007 vintages that were originated and sold prior to enhanced underwriting standards and risk-mitigation actions implemented in 2008 and forward." Ally Fin. Inc., Annual Report (Form 10-K), at 224 (Feb. 28, 2012).

165.   Additionally, Ally Financial disclosed that the SEC served a subpoena in June 2011 requesting documentation regarding certain "bulk settlements" relating to securitized mortgage loans as well as a request for materials provided to investors and prospective investors in RMBS.  *See* Ally Fin. Inc., Amendment No. 3 to Form S-1 Registration Statement (Form S-1/A), at 23 (June 29, 2011).

### C.   Investigations And Lawsuits Relating To Servicing Activities

166.   On February 9, 2012, the FRB announced that Ally Financial, its subsidiaries, including GMACM, and several other mortgage loan servicers would be required to pay $766.5 million in monetary sanctions for "unsafe and unsound processes and practices in residential mortgage loans servicing and foreclosure processing." Press Release, FRB, February 9, 2012.  On February 12, 2012, the FRB imposed well over $200 million of this fine against Ally Financial, ResCap, and GMACM pursuant to an Assessment Order, which requires that the sanctions be paid to various borrower assistance programs and nonprofit programs established to help victims of improper servicing and foreclosure practices.  *See* Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, FRB Docket No. 12-006-CMP-HC (February 12, 2012) (the "Assessment Order").  According to the FRB, the sanction "takes into account the maximum amount prescribed for unsafe and unsound practices under the applicable statutory limits, the comparative severity of the institutions' misconduct, and the comparative sizes of the institutions' foreclosure activities."  *See* Press Release, FRB, February 9, 2011.

167.   Also on February 9, 2012, the US Attorney General announced that Ally Financial, ResCap, and GMACM would take part in the $25 billion nationwide mortgage settlement to resolve claims brought by the government in response to the abusive mortgage loan servicing practices of Ally Financial and four other banks.  *See* Eric Holder, U.S. Attorney General, Remarks at the Mortgage Servicers Settlement Press Conference (Feb. 9, 2012). Although the settlement releases Ally Financial, ResCap, and GMACM from certain civil claims brought by the DOJ and multiple

state attorneys general, the settlement does not resolve or release any other liabilities that Ally Financial, ResCap and GMACM have incurred through their improper servicing practices. *See id.*

168.   According to the U.S. Attorney General, the $25 billion settlement and $766.5 million sanction are just "the latest step forward" in holding the settling banks, including Ally Financial, ResCap, GMACM and others, accountable for "egregious mortgage loan servicing abuses."

169.   In addition to these recent settlements and the Assessment Order, the FRB and the Federal Deposit Insurance Corporation (the "FDIC") previously ordered Ally Financial, ResCap and GMACM to adopt new procedures and practices in relation to mortgage loan servicing. *See* Consent Order, FRB Docket No. 11020-B-HC (April 13, 2011) (the "Consent Order").

170.   The Consent Order notes that Ally Financial and its mortgage servicing subsidiaries, including ResCap and GMACM, have been accused, *inter alia*, of (1) failing to properly increase financial, staffing, and managerial resources in order to meet an increasing number of foreclosures; (2) failing to properly put in place "adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and oversight of the foreclosure process"; (3) filing false affidavits in foreclosure actions; and (4) litigating foreclosure proceedings without "confirming that the promissory note and mortgage document were properly endorsed or assigned." *Id.* at 3-4.

171.   Furthermore, under the Consent Order, Ally Financial as the parent corporation is obligated to direct ResCap and GMACM to take certain remedial action to ensure that they operate in a "safe and sound manner" in the future. *Id.* at 4. Specifically, among other things, the Consent Order requires Ally Financial to take "steps to improve the information and reports that will be regularly reviewed by [Ally Financial's] board of directors . . . [to assess the performance of]

residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations." *Id.* at 8.

172.    The Consent Order further requires GMACM to conduct a review of certain past residential mortgage foreclosure actions to determine whether borrowers were financially harmed. *See* Press Release, FRB (November 1, 2011). If the foreclosure process is found to have caused financial injury to the borrower, GMACM is required to provide full compensation to the borrower. *See id*.

173.    Additionally, Ally Financial is required to adhere to new, heightened servicing standards. *See* Press Release, FRB (February 9, 2011). The FRB ordered Ally Financial to remedy its servicing practices by, *inter alia*, "strengthen[ing] the coordination of communications with borrowers by providing borrowers the name of the person at the servicer who is their primary point of contact, establish[ing] limits on foreclosures where loan modifications have been approved, establish[ing] robust third party vendor controls, strengthen[ing] compliance programs, and provid[ing] appropriate remediation to borrowers who suffered financial injury as a result of errors by the servicers." *See id*.

174.    The servicing and foreclosure improprieties of Ally Financial and its subsidiaries, including GMACM, are a matter of public record. According to the sworn testimony of a GMACM employee, Ally Financial's mortgage servicing subsidiaries routinely filed false affidavits in thousands of foreclosure actions across the country. *See Jeffrey Stephan Dep. Fed. Nat'l Mortg. Ass'n v. Bradbury*, BR1-RE-09-65 (Me. Dist. Ct., Dist. Nine, June 7, 2010). Indeed, according to the Financial Crisis Inquiry Commission ("FCIC") Report:

> [L]enders have relied on "robo-signers" who substituted speed for accuracy by signing, and sometimes backdating, hundreds of affidavits claiming personal knowledge of facts about mortgages that they did not actually know to be true. One such "robosigner," Jeffrey Stephan of GMAC, said that he signed 10,000 affidavits in a month–roughly 1 per minute, in a 40-hour workweek–making it highly unlikely that he verified payment histories in each individual case of foreclosure.

FCIC Report at 407.

175.     Stephan also testified that, when executing summary judgment affidavits to be used in judicial foreclosure actions, he was acting in accordance with policies and procedures, and never in fact inspected any of the exhibits to the affidavits or even ensured that the exhibits were attached, despite swearing that he had done so in the affidavits themselves.  Stephan Dep. Tr. at 54:12-25. Such exhibits would generally include (or at least should have included), among other things, the mortgage note and documents relating to the assignment of the mortgage. *See id.* at 51:15-23. Stephan further testified that when he signed an affidavit affirming that the foreclosure was proper, all he knew was the borrower's name and whether he had signing authority for the Ally Financial entity foreclosing on the property. *Id.* at 62:23-25, 63:2-6. Stephan testified that the process he followed in signing summary judgment affidavits was in accordance with the policies and procedures required by GMACM.  *Id.* at 64:8-14.

176.     Additionally, in October 2010, the Ohio Attorney General filed suit against GMACM and Ally Financial, alleging, *inter alia*, that employees of GMACM had executed thousands of false affidavits in connection with foreclosures on properties in that state. *See State of Ohio v. GMAC Mortgage LLC*, No. CI0201006984, (Ohio Ct. of Common Pleas filed Aug. 6, 2010).  Although

some of the claims brought by the Ohio Attorney General have been resolved by the $25 billion nationwide mortgage settlement, many additional claims have survived.

177.    Similarly, in December 2011, the Massachusetts Attorney General filed suit against GMACM for, among other things, engaging in unfair and deceptive foreclosure practices.  *See Commonwealth of Massachusetts v. Bank of America N.A.*, No. 11-4363 (Suffolk Cnty. Superior Ct. filed Dec. 1, 2011).  Days after filing suit, the Massachusetts Attorney General sent a letter to the United States Senate Committee on Banking, Housing and Urban Affairs and the United States House Committee on Financial Services asking that the federal government investigate Ally Financial and GMACM for allegedly carrying out illegal foreclosures and submitting false documents related to property seizures.  *See* Boston Globe, Attorney General Martha Coakley Urges Congress to Investigate Ally Financial's GMAC Over Foreclosure Practices, Dec. 6, 2011. Specifically, the Massachusetts Attorney General's letter to the Senate and House Committees stated:

> In light of Ally [Financial]'s alleged deceptive and illegal actions against homeowners in Massachusetts and across the country, I respectfully request that your committees investigate Ally [Financial]'s serious misconduct and consider what actions the federal government can take to ensure that Ally [Financial] adheres to the law.

*Id.*

178.    While the $25 billion nationwide mortgage settlement ultimately resolved certain claims brought by the Massachusetts Attorney General, other claims survived and will continue to be prosecuted.

**D.      Ally Financial Causes ResCap And GMACM To File For Bankruptcy**

179.    Since at least November 2011, Ally Financial considered seeking bankruptcy protection for ResCap, its wholly-owned subsidiary, which reportedly lost $555 million since 2009, according to multiple published reports.  GMACM is a wholly-owned subsidiary of ResCap.

180.    Around that time, the financial industry was "betting that Ally [Financial] will place its [ResCap] mortgage unit into bankruptcy instead of supporting the business as the bank prepares for an initial public offering."  Bloomberg News, Ally May Put ResCap in Bankruptcy to Ease IPO: Corporate Finance, November 14, 2011.  As the article notes, Ally Financial has the power to decide whether its "mortgage unit," ResCap, should file for bankruptcy.  *See id*.

181.    Indeed, Ally Financial warned in its 2011 annual report that "[t]here is a significant risk that ResCap will not be able to meet its debt service obligations and other funding obligations in the near term."  Ally Fin. Inc., Annual Report (Form 10-K), at 19 (Feb. 28, 2012).

182.    That risk ultimately came to pass as Ally Financial disclosed earlier this year that the penalties assessed by the federal government and numerous state attorneys general regarding the servicing and foreclosure practices of Ally Financial and its subsidiaries, which include GMACM, "resulted in our Mortgage operations recording a $230 million charge in the fourth quarter of 2011." *Id*. at 31.  As Ally Financial detailed in its previous public filing, the "[t]he majority of [the charge] was recorded at Residential Capital, LLC ('ResCap') . . . [which] resulted in a covenant breach in certain of ResCap's credit facilities."  Ally Financial, Current Report (Form 8-K) (January 31, 2012). Indeed, as Ally Financial more recently explained, "ResCap is required to maintain consolidated net worth . . . of $250 million at the end of each month under the terms of certain of its credit facilities . . . [and] as a result of the fourth quarter charge, ResCap's consolidated net worth was $92 million

64

at December 31, 2011." Ally Fin. Inc., Annual Report (Form 10-K), at 31-32 (Feb. 28, 2012). ResCap's substantial shortfall, however, was "immediately remediated by Ally through a capital contribution of $197 million, which was provided through forgiveness of intercompany debt during January 2012." *Id*.

183. Moreover, in February, 2012, it was reported that Ally Financial had contacted buyout firms such as Fortress Investment Group LLC and Cerberus regarding a potential sale of ResCap through a pre-packaged bankruptcy to be effectuated by the end of March as ResCap faced financing and liquidity deadlines. *See* Bloomberg Businessweek, Ally's ResCap Said to Seek Buyers for Prearranged Bankruptcy, Feb. 8, 2012. According to the report, "[p]otential bidders are being told that a pre-packaged bankruptcy filing would allow the buyer to leave behind liabilities such as [RMBS] securitizations that have been the subject of litigation." *Id*. To that end, Ally Financial's CEO stated that he will not pursue the aforementioned initial public offering for Ally Financial "until [these] legacy mortgage issues are resolved." *Id*.

184. Nevertheless, a bondholder group representing holders of approximately $800 million in ResCap debt expressed its desire to "fight [Ally Financial] tooth and nail" to oppose the bankruptcy, based in part on the belief that "Ally [Financial] can't legally separate itself from ResCap because it has ***stripped assets from the unit***." Bloomberg News, Paulson, Tepper Said Among Investors Urging Ally to Back ResCap, Jan. 10, 2012 (emphasis added).

185. Indeed, as Ally Financial has pointedly noted in its most recent annual report: "In light of ResCap's liquidity and capital needs combined with volatile conditions in the marketplace, there is substantial doubt about ResCap's ability to continue as a going concern." Ally Fin. Inc., Annual Report (Form 10-K), at 18 (Feb. 28, 2012).

186.    On May 14, 2012, ResCap and certain of its subsidiaries, including GMACM, filed petitions for bankruptcy protection under Chapter 11.

**E.    Ally Financial's Pre-Petition "Harvesting" Of Subsidiary Assets**

187.    On June 1, 2012, the Official Committee of Unsecured Creditors in the ResCap/GMACM bankruptcy (the "Unsecured Creditors") moved for an order authorizing them to conduct an investigation of a "complex constellation of pre- and post-petition transactions, involving billions of dollars of transfers and financings among interested parties." Specifically, the Unsecured Creditors sought to investigate transactions through which Ally Financial stripped or apparently plans to strip the Debtors of valuable assets. *In re: Residential Capital, LLC, Debtors*, No. 12-12020 ("UCC Motion") (S.D.N.Y. filed June 1, 2012) (ECF No. 192).

188.    The proposed transactions include a "stalking horse bid" by Ally Financial of up to $1.6 billion for a portfolio of mortgage loans and securities owned by the Debtors, a $150 million secured loan to the Debtors under an amendment to a pre-petition secured loan agreement, and a proposed settlement agreement between the Debtors and Ally Financial (the "Ally Settlement Agreement").

189.    Under the Ally Settlement Agreement, Ally Financial would contribute $750 million to the Debtors' estates in exchange for (i) releases by the estates of all legal claims that the Debtors have against Ally Financial, and (ii) non-consensual releases by third party holders of legal claims against Ally Financial. *See* Settlement and Plan Sponsor Agreement, *In re: Residential Capital* (S.D.N.Y. May 14, 2012) (ECF Nos. 6-8).

190.    Notably, the Debtor and third-party releases in the Ally Settlement Agreement would release any and all "causes of action under theories of veil piercing and alter ego liability." In other

words, Ally Financial is seeking to settle any veil-piercing or alter-ego claims that may be alleged

against it by its own subsidiaries, ResCap and GMACM, as well as by any third parties such as

Plaintiffs herein, for $750 million.

191.    In 2011, ResCap appointed two new board members, Jonathan Bally and John E.

Mack, who purportedly investigated the legal claims that the Debtors may have against Ally

Financial.  Based on the purported investigation, these supposedly independent directors negotiated

the Ally Settlement Agreement and the proposed releases.

192.    Additionally, the Debtors, which possess pertinent non-public facts regarding the

subjugation of the Debtors by Ally Financial, specifically aver in the Ally Settlement Agreement that

they "believe" that the Debtors possess valid "veil piercing and alter ego" claims against Ally

Financial.  An introductory clause of the Ally Settlement Agreement states:

> the Debtors believe certain claims exist against Ally related to the
> corporate relationship between the Debtors and Ally, including with
> respect to certain transactions between the Debtors and Ally,
> including equitable subordination, debt recharacterization, fraudulent
> conveyance, avoidance liability under federal or state laws, ***and other
> causes of action under theories of veil piercing and alter ego
> liability***.

*Id.* at 1 (emphasis added).

193.    The Unsecured Creditors also sought authorization to investigate a series of

suspicious related-party transactions that occurred prior to the bankruptcy filing. The Unsecured

Creditors allege that Ally Financial transferred billions of dollars of assets from the Debtors to Ally

Financial through such transactions.  UCC Motion ¶ 4, Ex. B ¶ 29.

194.    On June 4, 2012, creditor Berkshire Hathaway, Inc. ("Berkshire Hathaway") moved

for appointment of a bankruptcy examiner to conduct the investigation proposed by the Unsecured

Creditors.  *In re: Residential Capital* (ECF No. 208).  According to Berkshire Hathaway, an investigation was warranted in light of the "dozens of transactions with Ally and its affiliates involving billions of dollars of asset transfers and intercompany financing – transactions whose net effect was to transfer a substantial share of ResCap's operating assets to its parent."  Berkshire Hathway went on to state:

> The Debtors now seek to release Ally from any claims arising from these transactions, even while they admit that the Debtors possess valid claims against Ally, including for fraudulent transfer, equitable subordination, and alter ego. An examiner should determine whether this proposed release is fair to the Debtors and all their stakeholders.

> An examiner should also be tasked with reviewing the propriety of the Debtors' request to release Ally from any third-party claims. As the Second Circuit and this Court have observed, such non-debtor releases are especially susceptible to abuse, as they effectively offer a non-debtor a bankruptcy discharge without affording creditors the protections that would attend a bankruptcy. If there is a basis for such an extraordinary remedy in this case, it is nowhere to be found in the pleadings the Debtors have filed to date. The Debtors' settlement agreement merely recites that Ally's third party release "is justified by truly unusual circumstances," none of which are identified, and that the release is an "essential component and important to the success of the Plan," for reasons that are neither explained nor evident.

> What is evident—abundantly so—is that the Debtors' plan fits neatly into Ally's publicly-stated goal of separating itself, once and for all, from ResCap. Whether Ally's agenda also happens to be in the best interest of ResCap and its creditors is another question, one that should be a focus of a searching inquiry.

> \*       \*       \*

> Ally has laid much of the blame for its financial difficulties on ResCap's mortgage operations and has publicly avowed its intention to make a clean break from ResCap and its liabilities.

> That break, however, comes after years of related-party transactions and asset transfers.  For example, the Rule 2004 Motion [filed by the

Unsecured Creditors] identifies at least twenty different transactions with Ally and its affiliates involving the purchase of assets and businesses from ResCap, or the extension of credit secured by ResCap's assets. (Rule 2004 Mot., Ex. B, Definition of "Specified Transactions.") These transactions involved billions of dollars and sizable on-going businesses.

. . . . Th[ese] and other transactions may give rise to various potential claims that Ally and affiliates have harvested assets from ResCap and seek a quick and easy divorce through bankruptcy.

195.    On June 20, 2012, the Bankruptcy Court granted Berkshire Hathaway's motion and appointed an examiner to conduct the investigation sought.

### F.    Ally Financial's Domination Of ResCap And GMACM

196.    Ally Financial has recently admitted to the FRB and FDIC that it "owns and controls" ResCap and GMACM.  *See* Consent Order.

197.    Ally Financial's public statements and actions demonstrate that at all relevant times Ally Financial: (i) wholly owned ResCap and GMACM; (ii) shared resources, management and employees with ResCap; (iii) considered its mortgage origination and servicing businesses through ResCap and GMACM to be "units" of Ally Financial; and (iv) had a business relationship with ResCap and GMACM designed to benefit itself at the expense of those subsidiaries.

198.    From its inception as the ultimate parent company, Ally Financial focused on controlling the management of its subsidiaries to the point that it treated ResCap and GMACM as extensions of itself, rather than as subsidiaries whose dealings were at arm's length.

199.    Ally Financial, at the direction of its board of directors, took a number of actions in 2005 to engender investor confidence in, and otherwise finance and support, its mortgage

securitization and servicing business, which was carried out by its subsidiaries.  Ally Financial substantially restructured its subsidiaries in 2005.

200.    ResCap, for example, did not conduct any operations whatsoever until GMAC Residential Holding Corp. and GMAC-RFC Holding Corp. – two of Ally Financial's wholly-owned subsidiaries – were transferred to ResCap in March 2005.  Those two subsidiaries represented substantially all of Ally Financial's mortgage securitization business.

201.    Ally Financial, at the direction of its board of directors, also provided ResCap with liquidity and capital.

202.    Further, Ally Financial's Form 8-K, filed on June 9, 2005, disclosed that ResCap would enter into an operating agreement with Ally Financial, under which Ally Financial would agree to "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries."  Proposed Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005 (hereinafter "2005 Operating Agreement").

203.    On information and belief, Ally Financial's restructuring and financial support of its subsidiaries was undertaken at the direction of the Ally Financial board of directors to improve and maintain the investment grade rating and profitability of Ally Financial's mortgage securitization business.  This restructuring enabled Ally Financial to present itself to its subsidiaries' securitization transaction partners as a stable corporate parent supporting and overseeing the business of its subsidiaries, which in turn made those subsidiaries more attractive as counterparties to market participants.

204.    On December 1, 2006, Ally Financial held its inaugural conference call with investors, at which time Rick Buxton, the then head of Ally Financial's Investor Relations, "welcome[d everyone] to the beginning of a new era [of Ally Financial] as an independent global financial services company."  On the same investor call, Eric Feldstein, Ally Financial's then CEO, explained  how Ally Financial was going to take steps to actively control its subsidiaries.  For instance, Feldstein declared that one of Ally Financial's first acts as controlling parent was "to integrate certain of GMAC mortgage operations . . . to drive some cost efficiencies."  *Id*.

205.    At all times since Ally Financial caused ResCap to be incorporated, it has owned 100% of ResCap.  Since incorporation, the ownership of ResCap has not changed.  Statement by Michael Carpenter, Ally Financial's CEO, Ally Financial Earnings Call, Nov. 2011.[3]

206.    Ally Financial has continued to exert its domination and control over ResCap via shared resources, management and employees.  For example, Ally Financial and ResCap shared at least three common board members, including two individuals who were active participants with respect to the intertwined relationship between Ally Financial and ResCap: (1) ResCap's chairman and Ally Financial's CEO, Eric Feldstein; and (2) Ally Financial's CFO and a director of ResCap, Sanjiv Khattri.  In fact, the 2005 Operating Agreement, between ResCap and Ally Financial, which Ally Financial filed with the SEC, and which upon information and belief is still currently in effect,

---

[3]    GM had created a shell company, GMAC Mortgage Group Inc., which was the direct parent of ResCap. However, there is no indication that this company conducted any business independent from Ally Financial. In fact, Ally Financial's first Annual Report as an independent entity, which was filed with the SEC on March 3, 2007, included a corporate hierarchy chart that evidenced Ally Financial's corporate structure. There was a direct line from Ally Financial to ResCap.  *See* Ally Fin. Form 10-K, at 2 (Mar. 3, 2007).  In addition, there is no indication that Ally Financial ever discusses ResCap as an "indirect subsidiary."  To the contrary, as discussed, below, Ally has publicly stated on numerous occasions that it is the owner of ResCap.

"require[s] that [ResCap's] board of directors include at least two independent directors, to be selected by [Ally]."  Proposed Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005.

207.    Eric A. Feldstein was Ally Financial's CEO and Chairman of its board of directors, and also served as Chairman of ResCap's board of directors.  Furthermore, Sanjiv Khattri has served as Executive Vice President and CFO of Ally Financial, while also serving as a director and CFO of ResCap.  Numerous other individuals served as Directors and Officers of both Ally Financial and ResCap, with many serving in roles directly related to the mortgage operations of both companies.

208.    ResCap and its own subsidiaries, including GMACM, shared numerous directors and senior management as well.

209.    David C. Walker is another example of the many employees who had overlapping responsibilities at Ally Financial and its subsidiaries, including GMACM. Walker joined Ally Financial in 1985 and has served as Vice President of GMAC Group and CFO of GMAC Mortgage Group. Walker has also served as a director at ResCap and GMACM, among other ResCap subsidiaries.

210.    Moreover, on April 26, 2007, "ResCap Investor Relations" announced the release of Ally Financial's 2007 first quarter financial results to investors in an email bearing the ResCap logo. That announcement stated that Ally Financial's financial results were found on both Ally Financial's and ResCap's websites.

211.    Ally Financial's domination and control of its subsidiaries, and in particular its use of ResCap to effectuate that control, is further evidenced by John Ruckdaschel, who, according to publicly available information, has served as in-house counsel at Ally Financial since October 2006. Although purportedly an Ally Financial employee, Ruckdaschel also sent and received e-mail using

a ResCap e-mail address, according to the complaint filed by FGIC against Ally Financial.  Further,

an employee of ResCap specifically instructed FGIC that all "official letters" regarding several Ally

Financial subsidiaries – including GMACM – should be sent not to the relevant (and supposedly

independent) subsidiary, but rather to Ruckdaschel, Ally Financial's internal counsel, according to

the FGIC complaint.

212.    As further evidence of Ally Financial's domination over ResCap, the 2005 Operating

Agreement also indicates that Ally Financial has expressly "restrict[ed] ResCap's ability to declare

dividends or prepay subordinated indebtedness owed to [Ally Financial] or its other affiliates." *See*

*id.*

213.    Conversely, as alleged above, Ally Financial has also agreed to directly pay the losses

or expenses of ResCap.  In the same 2005 Operating Agreement, Ally Financial stated that it would

stand behind ResCap and "indemnify, defend and hold [ResCap] harmless from and against any

losses [ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its

subsidiaries."  *Id.*

214.    Until ResCap filed for bankruptcy, Ally Financial continued to make additional public

statements that further demonstrated its willingness to support and fund ResCap.  For instance, in

May 2007, during an investor earnings call, Sanjiv Khattri, the Executive Vice President and Chief

Financial Officer of Ally Financial, repeatedly made statements that Ally Financial's board of

directors "will take whatever reasonable efforts that need to be done to maintain [ResCap's]

earnings."  Ally Financial's Q1 2007 Earnings Call, at 24 (May 2, 2007).

215.    Khattri pointed to the fact that "the [Ally Financial] Board . . . and [Ally Financial]

did not hesitate to inject a billion dollars of equity when it was appropriate . . ." Ally Financial's Q2

2007 Earnings Call, at 9 (July 30, 2007).  Khattri unequivocally stated that "[a]ll I can assure you [is] that if you look at the strategic plan of [Ally Financial], a strong ResCap with an investment grade rating is a key part of our plan and a key part of our value creation."  *Id*.

216.     Thus, Ally Financial's senior management assured the market that the company was supporting ResCap for the purposes of Ally Financial's own "value creation."

217.     The financial support Ally Financial gave to ResCap began in May 2005.  Upon information and belief, Ally Financial continued to prop up ResCap, an undercapitalized entity, by channeling capital and liquidity into ResCap even as its condition continued to deteriorate as the housing market crashed. In addition to the direct financial support Ally Financial provided ResCap, it was also instrumental in obtaining outside investments that flowed directly to its mortgage subsidiaries.  In 2008, Ally Financial announced to the market that it renewed a funding facility with Citibank, which provided "funding of up to $13.8 billion." Ally Fin. Inc., Form 8-K (Sept. 19, 2008). A portion of such funding was specifically earmarked for "mortgage assets across the [Ally Financial] and [ResCap] businesses."  *Id*.

218.     Indeed, Ally Financial's 2011 annual report states that "ResCap remains heavily dependent on [Ally Financial] and its affiliates for funding and capital support."  Ally. Fin. Inc., Annual Report (Form 10-K), at 128 (Feb. 28, 2012).

219.     Additionally, Ally Financial's annual reports further note its pursuit of strategic alternatives with ResCap, and highlight the extent to which Ally Financial manipulated its control over its subsidiaries to enhance its own financial health.  According to Ally Financial:  "On December 31, 2009, we announced that due to our ongoing strategic review of how to best deploy [Ally's] current and future liquidity, we decided to pursue strategic alternatives with respect to

ResCap and committed to a plan . . . related to management's intent to sell certain ResCap related assets and businesses. . . .   In order to maximize value, we will consider a variety of options including one or more sales, spin-offs, or other potential transactions . . . [that we believe] should minimize the impact of any significant future losses related to ResCap's legacy mortgage business . . ."  Ally Fin. Inc., Annual Report (Form 10-K), at 3-4 (Feb. 26, 2010).

220.    There is also substantial evidence that billions of dollars of TARP funds meant to stabilize Ally Financial were given to ResCap.  *See* TARP Report dated March 10, 2010, at 41, 44. Upon information and belief, the TARP funds were commingled among a variety of entities within Ally Financial's mortgage family, including ResCap.

221.    Further, Ally Financial has established a "Mortgage Repurchase Reserve" to account for the potentially significant liabilities stemming from repurchase demands made on its mortgage-related business units.  The balance of the Mortgage Repurchase Reserve was $825 million as of the fourth quarter of 2011.  *See* Ally Financial's Q4 2011 Earnings Presentation at 16. Although these repurchase demands are generally made on Ally Financial's subsidiaries – including GMACM – in discussing the reserve on an earnings call, Ally Financial CFO Jim Mackey made clear that it was Ally Financial that was recording "repurchase expense[s]" related to mortgages, as he stated that Ally Financial "had lower mortgage repurchase expense of $44 million." Ally Financial's Q4 2011 Earnings Call, at 4 (Feb. 2, 2012).

222.    Similarly, in discussing Ally Financial's Mortgage Repurchase Reserve on Ally Financial's third quarter 2011 earnings call, Mackey further described losses attributable to mortgage loan repurchases as belonging to Ally Financial, when he stated:  "Our mortgage repurchase reserve is [as it then stood] $829 million . . . .  Our loss experience improved during the quarter due to the

75

fact that we had fewer mortgage insurance rescission payments that we experienced last quarter and that did not repeat this quarter."  Ally Financial's Q3 2011 Earnings Call at 6 (Nov. 2, 2011).

223.    On the same call, Ally Financial CEO Carpenter explained that "we have routinely repurchased problem loans voluntarily and by contract . . . ."  *Id.* at 8.

224.    Additionally, Ally Financial recorded a $230 million charge in the fourth quarter of 2011 as a result of the nationwide mortgage settlement that included ResCap and GMACM.  *See* Ally Fin. Inc., Form 10-K, at 12 (Feb. 28, 2012).

### G.    Ally Financial's Disregard Of Corporate Formalities

225.    Ally Financial describes its subsidiaries as its own business units rather than separate and distinct entities.  For example, Ally Financial declared, in a section of its website specifically intended for investors, that GMACM is a "business unit" of Ally Financial, rather than an indirect subsidiary owned by ResCap.    See Ally Financial Website, *available at* http://www.ally.com/about/investor/ (last visited Dec. 9, 2011).

226.    The origination and securitization of mortgage loans by ResCap and GMACM have long been integral parts of Ally Financial's core business.  In its 2006 Annual Report, Ally Financial (then reporting as GMAC LLC) stated that "[w]e are a leading real estate finance company focused primarily on the residential real estate market. Our business activities include the origination, purchase, servicing, sale and securitization of residential mortgage loans." GMAC LLC, Annual Report (Form 10-K), at 3 (Mar. 13, 2007).  Ally Financial further stated that "we utilize asset and mortgage securitizations and sales as a critical component of our diversified funding strategy."  *Id.* at 5.

227.   Ally Financial continued to publicly report on its own business and that of its subsidiaries on an integrated basis:  "We engage in the origination, purchase, servicing, sale, and securitization of consumer (*i.e.*, residential) mortgage loans and mortgage-related products. Mortgage operations include the Residential Capital, LLC (ResCap) legal entity, [and] the mortgage operations of Ally Bank."  Ally Fin. Inc., Annual Report (Form 10-K), at 3 (Feb. 26, 2010).  More recently, continuing to discuss its various mortgage operations as a single enterprise, Ally Financial stated that "[o]ur Origination and Servicing operations is one of the leading originators of conforming and government-insured residential mortgage loans in the United States.  We are one of the largest residential mortgage loan servicers in the United States and we provide collateralized lines of credit to other mortgage originators." Ally Fin. Inc., Annual Report (Form 10-K), at 4 (Feb. 28, 2012).

228.   Moreover, as alleged above, Ally Financial – at least in the view of certain of ResCap's creditors – is believed to have stripped assets from its subsidiary.

229.   In addition to the dominance and control Ally Financial exerted over its mortgage units, ResCap also viewed GMACM as part of its own business. For example, in its investor presentation from 2007, ResCap declared that GMACM is "owned and operated by GMAC Residential Capital Company, LLC [ResCap]."  The presentation further stated that ResCap "is part of the [Ally Financial] family of companies."

230.   As alleged above, Ally Financial exerted its dominance and control over ResCap and GMACM.  When Ally Financial was not directly controlling GMACM, it was using ResCap as an instrument to do so.

231.     Prior to ResCap's and GMACM's bankruptcy filing, Ally Financial also used those subsidiaries' resources as its own to earn favorable credit ratings.  For instance, a Moody's report in November 2011 rated Ally Financial as an "above average" originator of mortgage loans.  It is evident from that report that Ally Financial obtained such a rating by providing information related to its ResCap mortgage units.  Ally Financial itself is not engaged in the origination business.  Instead, it used its ResCap mortgage units as instruments to obtain favorable ratings.

232.     Such disregard for the corporate form has persisted over time. For instance, Fitch Ratings in 2007 publicly reported that "operations of [Ally Financial]'s residential mortgage servicing businesses – which include [GMACM], and HomeComings Financial Network – have been integrated into" ResCap.   Moreover, Moody's reported that in 2007, "ResCap combined all servicing operations under one servicing entity . . . under common management [and] common systems."

233.     Even the employees of Ally Financial's subsidiaries think of themselves as employees of Ally Financial rather than separate entities since there appears to be no difference.  For example, Thomas F. Marano served as an officer of Ally Financial as well as Chairman and CEO of ResCap.  His responsibilities include overseeing the mortgage lending and servicing in ResCap.  In testimony before the House Financial Services Subcommittee on November 18, 2011, Marano stated that "Ally [Financial]'s mortgage business is conducted through GMAC Mortgage."  On December 23, 2011, Marano also signed a comment letter to the Federal Housing Financial Agency ("FHFA") on behalf of both Ally Financial and GMACM.  Upon information and belief, Marano – in his dual role as an officer of Ally Financial as well as Chairman and CEO of ResCap – directed and controlled the actions of GMACM.

234.     A further example is supplied by Jeffrey Stephan, a loan officer of GMACM who was implicated in the robo-signing issues associated with servicing mortgage loans.  He was asked the following questions at his deposition:

Q: Could you please state your name for the record.

A: My name is Jeffrey Stephan.

Q: Okay. And who do you work for?

A: GMAC, LLC [Ally Financial].

Q: And is there a difference between GMAC, LLC and GMAC Mortgage, LLC?

A: GMAC, LLC - I'm trying to think of the word to use - the most recent name.

Q: Okay.

A: It's GMCA [sic] Mortgage Corporation.

Q: Okay.

A: I'm not sure how you would word that.

Q: Okay. So are they -- does GMAC, LLC -- now has that basically taken over these other entities --

A: Yes.

Q: -- that formerly existed?

A: Yes.

Q: So these entities no longer currently exist?

A: Right.

Q: Okay. And how long then have you been employed by GMAC, LLC?

79

A: Five years.

Jeffrey Stephan Deposition, *GMAC Mortgage, LLC v. Neu*, No. 50 2008 CA 040805, (Fla. 15th Cir.,

Dec. 10, 2009), at 4:25-5:22.

### H.   Ally Financial's Control of GMACM's Servicing Practices, Including Those Relating to LPI

235.    As alleged above, Ally Financial, ResCap, and GMACM entered into a Consent

Order with the FRB and FDIC on April 13, 2011.  The Consent Order was entered because Ally

Financial, ResCap, and GMACM were accused of a series of foreclosure-related abuses, including:

(i) failing to properly increase financial, staffing, and managerial resources to meet an increasing

number of foreclosures; (ii) failing to properly put in place "adequate internal controls, policies and

procedures, compliance risk management, internal audit, training, and oversight of the foreclosure

process"; (iii) filing false affidavits in foreclosure actions; and (iv) litigating foreclosure proceedings

without "confirming that the promissory note and mortgage document were properly endorsed or

assigned."  *Id*. at 3-4.

236.    The Consent ordered required Ally Financial, ResCap, and GMACM to adopt new

servicing procedures and practices.  Ally Financial is obligated to make sure that ResCap and

GMACM take certain remedial actions to operate in a "safe and sound manner and in compliance

with the terms of mortgage loan documentation and related agreements with borrowers, all

applicable state and federal laws . . . rules, regulations, and court orders, as well as . . . servicing

guides with GSEs or investors, and other contractual obligations, including those with the Federal

Housing Administration."

237. Specifically, the Consent Order required Ally Financial to improve its compliance programs, internal audit, communications with borrowers, vendor management, management information systems, employee training, and oversight. Ally Financial was also required to strengthen its "Enterprise Compliance Program" or "ECP" with respect to "residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations." Additionally, Ally Financial was required to implement a "Program for Board Oversight" by the Ally Financial and ResCap boards of directors.

238. Ally Financial, ResCap, and GMACM filed a series of reports with the FRB and FDIC from July 13, 2011 through December 14, 2011, detailing their progress in implementing the terms of the Consent Order. Notably, despite their ostensible separateness, Ally Financial, ResCap, and GMACM submitted joint reports that bore the Ally Financial letterhead. The entities explained the joint submissions to the FRB and FDIC on the grounds that:

> the Companies believe enterprise risk management is a holistic and continuous process involving governance, policies, procedures, tools, methodologies and resources that ***transcend legal entity and organizational boundaries***.

239. As alleged above, the Consent Order requires GMACM to pay for independent foreclosure reviews, and to compensate borrowers for any financial injuries discovered.

240. On April 26, 2012, in view of ResCap's impending bankruptcy, Ally Financial entered into a supplemental agreement with the FRB regarding the Consent Order. Ally Financial agreed to be "secondarily liable" for GMACM's obligations to compensate injured borrowers and to pay for the reviews. Additionally, Ally Financial agreed to use "all reasonable best efforts" to ensure ResCap's continued performance under the Consent Order, notwithstanding ResCap's

bankruptcy, by seeking to require any successor or purchaser of ResCap to honor the Consent Order's terms.

241.    As also alleged above, Ally Financial, ResCap, and GMACM each participated in the $25 billion nationwide mortgage settlement.  The settlement resolved claims in a complaint filed by 49 state attorneys general against Ally Financial, ResCap, and GMACM jointly.  Ally Financial, ResCap, and GMACM each executed the Consent Judgment filed with the U.S. District Court for the District of Columbia on March 12, 2012.

242.    The $25 billion settlement mandates "comprehensive reform of mortgage servicing practices," for which Ally Financial, ResCap, and GMACM, as signatories to the Consent Judgment, are jointly responsible.

## X.    TOLLING OF THE STATUTES OF LIMITATIONS

243.    The claims of Plaintiffs and the Class are subject to both equitable estoppel, stemming from the concealment by GMACM and Defendants of the facts alleged herein, and equitable tolling, stemming from the Plaintiffs' inability to obtain adequate information to plead the claims alleged herein.  Defendants are estopped from relying on a statute of limitations defense because they and GMACM purposefully concealed the misconduct alleged.  At all relevant times Defendants and GMACM maintained a shroud of secrecy around their illicit dealings.  Separate and apart from the acts of concealment of GMACM and the Balboa Defendants, any applicable statutes of limitations are properly tolled because Plaintiffs and the Class did not know, and could not have learned, the facts underlying their claims until shortly before filing this action.

244.    Furthermore, at all relevant times Plaintiffs and the Class were relieved of any duty to investigate because they reasonably and justifiably relied on GMACM to fulfill its contractual

duties under the mortgage loan contracts of Plaintiffs and the Class in good faith, and to similarly execute its duties under the PSAs, Servicing Agreements and GSE Servicing Guidelines in good faith and in an honest manner. Even assuming there had been some indication of wrongdoing (which there was not), and Plaintiffs and the Class had attempted to investigate, such investigation would have been futile because it would not, until recently, have been possible to uncover any specific information as to GMACM's involvement in the unlawful kickback scheme alleged herein.

245. Due to the complex, undisclosed and self-concealing nature of the scheme alleged herein, neither Plaintiffs, nor any other member of the putative Class whose claims would otherwise be time-barred, possessed or could have possessed sufficient information or the requisite expertise to discover the misconduct alleged. Plaintiffs were able to discover the underlying basis for their claims only with the assistance of counsel.

246. Issues relating to mortgages and mortgage servicing have been in the news since the 2008 financial crisis. Nevertheless, the news coverage has generally related to improper foreclosure practices. It was not until January 2012 that any major national news outlets began publishing reports about improper kickbacks relating to the referral of LPI business.

247. The first time *The New York Times* published a news article about such kickbacks was on January 10, 2012. *The New York Times* broke the story that Benjamin Lawsky, the Superintendent of the NYSDFS, was investigating several large banks in connection with improper practices relating to LPI, including "kickbacks." *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

248. Prior to such time, there was insufficient coverage of allegations of potential kickbacks relating to LPI to have put Plaintiffs or the Class on inquiry notice of Defendants'

misconduct.  Indeed, on January 18, 2012, *American Banker* (a self-described "financial services trade journal" with a readership of only approximately 31,000 that is "read by senior banking and financial services executives as well as consultants, lawyers, accountants and other professionals who serve the financial industry" and which previously published articles on force-placed insurance) observed that Superintendent Lawsky's New York probe had finally "brought national attention to banks' alleged self-dealing in the sale of force-placed insurance."  "Banks Face Thicket of Force-Placed Threats," *American Banker* (Jan. 18, 2012).

249.     Furthermore, even had Plaintiffs or members of the Class been on inquiry notice of misconduct relating to LPI in the mortgage servicing industry prior to January 10, 2012, despite diligent investigation they would have had no specific factual basis to allege – or even suspect – that GMACM was involved in any misconduct until, at the earliest, May 21, 2012, when, as alleged above, GMACM and Balboa admitted at the NYSDFS's LPI hearings to GMACM's receipt of free tracking services, paid for indirectly through GMACM's LPI premiums.  Prior to May 21, 2012, there was simply no publicly available information that even a highly skilled investigator could have uncovered linking GMACM to potential kickbacks relating to LPI.  Prior to such time, Plaintiffs and the Class did not have an adequate factual basis to plead the claims alleged herein.

250.     Any applicable statutes of limitations should be equitably tolled inasmuch as, in the exercise of reasonable diligence, Plaintiffs and the Class could not have known of the violations alleged herein until, at the earliest, May 21, 2012.  Furthermore, any delay by Plaintiffs and the Class in asserting the claims herein was excusable because they could not reasonably have discovered the misconduct alleged herein absent specialized knowledge and/or assistance of counsel.

## XI.    CLAIMS FOR RELIEF

### COUNT I

### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968
### (Against all Defendants)

251.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

252.    Plaintiffs, each Class member, each Defendant, and GMACM, are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

### The Enterprise

253.    For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of the Defendants and GMACM, including their respective officers, directors, employees, agents and direct and indirect subsidiaries (the "Enterprise").  The Enterprise was separate and distinct from the persons that constituted the Enterprise.

254.    The Enterprise was primarily managed by GMACM, which organized the fraudulent scheme and procured the involvement of the Defendants.  Each of the Defendants, however, agreed to, and did, participate in the conduct of the Enterprise, and carried out their roles using broad and independent discretion.

255.    The companies and individuals that constitute the Enterprise were associated for the common purpose of defrauding borrowers and loan owners by overcharging them for LPI with respect to GMACM-serviced loans.  The purpose thereof was to induce borrowers to pay, and the owners of the loans to incur, overcharges in respect to such insurance.  At all relevant times, the

Enterprise was engaged in and its activities affected interstate commerce.  The proceeds of the Enterprise were distributed to its participants, GMACM and Defendants.

256.   The Enterprise operated from at least March 2003.  Its operation is ongoing. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants and GMACM engage.

### The Pattern of Racketeering Activity

257.   At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants and GMACM conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this complaint.  The RICO Defendants and GMACM have conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

a.   GMACM enters into servicing agreements with owners and/or holders of whole loans.  The servicing agreements provide, *inter alia*, that GMACM is obligated to maintain continuous hazard insurance on the secured properties.

b.   GMACM buys LPI with respect to the loans it services from Balboa and Meritplan.  GMACM pays insurance premiums to Balboa and Meritplan for the LPI.

c.   GMACM hires Newport, an affiliate of Balboa and Meritplan, as a subcontractor to perform GMACM's "insurance tracking" responsibilities.

d.   GMACM and the Balba Defendants conceal the fact from the public, borrowers, and loan owners, that GMACM pays Newport nothing for its insurance tracking services.

e.   Balboa and Meritplan pay rebates/kickbacks to GMACM.

f.   The money to pay the rebates/kickbacks is derived from GMACM's LPI insurance premiums. The amount of the rebates/kickbacks is computed as a percentage of GMACM's LPI insurance premiums.

g.     The rebates/kickbacks are paid in the form of free tracking services and bogus "commissions."

h.     The free tracking services are provided through Newport. In particular, Balboa and Meritplan engaged Newport and pay Newport to render tracking services to GMACM for free. GMACM pays nothing. Payment is routed by Balboa and Meritplan to Newport via "intercompany expense allocations."

i.     The bogus "commissions" are paid by Balboa and Meritplan to an affiliate of GMACM, John Doe. The "commission" payments are made on the false pretense that John Doe is a third-party insurance agent. Balboa and Meritplan falsely label the payments to John Doe as "commissions."

j.     John Doe receives the "commissions" on GMACM's behalf and then transfers them to GMACM. Ally Financial – the parent corporation of John Doe and GMACM – facilitates such transfers through its "global cash management system."

k.     As a *quid pro quo* for the rebates/kickbacks, GMACM continues to procure LPI from Balboa and Meritplan and continues to outsource insurance tracking to Newport.

l.     GMACM retains the rebates/kickbacks for itself, while billing and charging borrowers based on the full purported price of the LPI. The rebates/kickbacks reduce GMACM's LPI costs, but those savings are not passed through to borrowers. Instead, borrowers are billed and charged the full purported price of the LPI. GMACM subtracts the inflated LPI amounts off the top of borrowers' mortgage payments before applying any balance to principal, interest or other charges.

m.     Additionally, when borrowers make their mortgage payments, GMACM subtracts the inflated amounts billed with respect to LPI off the top before applying any balance to principal, interest or other charges.

n.     Because amounts paid for LPI constitute "servicing advances," GMACM's "servicing advances" are improperly inflated by the failure to pass through the rebates/kickbacks to borrowers. GMACM reimburses itself from the proceeds of the loans based on the inflated servicing advances. To the extent borrowers fail to pay, loan owners bear the inflated charges.

o.     Newport computes the amounts purportedly due and issues notices to borrowers fraudulently setting forth the balances owed for LPI based on the full prices of the LPI premiums without subtracting the rebates/kickbacks.

87

Additionally, the notices falsely describe the balances as reflecting the "cost of the coverage" and the amounts necessary to "reimburse" GMACM for moneys "advanced." In fact, the costs of the coverage are less than the stated balances because the rebates/kickbacks reduced those costs. Moreover, GMACM "advanced" less than the stated balances because the rebates/kickbacks reduced the amounts advanced. Furthermore, under borrowers' loan agreements, GMACM is only entitled to reimbursement for its LPI costs. The amounts demanded are extra-contractual, exceeding the amounts legally due under borrowers' mortgage loan agreements, because they are in excess of GMAC's LPI costs. GMACM issues statements to borrowers incorporating the fraudulently inflated LPI charges.

p.      The notices and statements lull borrowers into believing that no fraudulent scheme is occurring and that GMACM and Defendants are simply exercising GMACM's rights under borrowers' mortgage loan agreements. By lulling Plaintiffs and the Class into a false sense of security, the notices and statements make it less likely that borrowers will object to the improper charges, complain to the authorities, or bring lawsuits.

q.      GMACM issues remittance reports, monthly servicing reports, and annual certifications of compliance to loan owners that include information about GMACM's compensation, advances, and reimbursements. The reports and certifications fraudulently set forth balances for GMACM's advances and reimbursements based on the full prices of the LPI without subtracting the rebates/kickbacks. The reports and certifications also fraudulently exclude the compensation that GMACM derives from the kickbacks/rebates, which are not disclosed in the reports and certifications. Moreover, the reports and certifications fraudulently conceal that Newport is not compensated by GMACM "from [GMACM's] own funds" but, instead, through the LPI insurance premiums, despite the fact that GMACM is thereby breaching its agreements with loan owners. The reports and certifications also omit disclosure that GMACM breached borrowers' mortgage loan agreements by billing them for reimbursement of LPI costs in amounts in excess of GMACM's actual costs.

r.      The remittance reports, monthly servicing reports, and annual certifications of compliance lull loan owners into believing that no fraudulent scheme is occurring and that GMACM and Defendants are simply exercising GMACM's rights under their servicing agreements. By lulling loan owners into a false sense of security, the remittance reports, monthly servicing reports, and annual certifications of compliance notices and statements make it less likely that loan owners will object to the improper charges, complain to the authorities, or bring lawsuits.

88

**The Predicate Acts of Mail and Wire Fraud Including "Honest Services" Fraud**

258.    The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.  Specifically, the Defendants and GMACM engaged in an intentional scheme or artifice to defraud borrowers and the owners of the loans serviced by GMACM and to obtain money or property from said borrowers and loan owners through false or fraudulent pretenses, representations and promises.

259.    The conduct of Defendants and GMACM in violation of the mail and wire fraud statutes included, without limitation, a fraudulent scheme to deprive the loan owners of their intangible rights to GMACM's "honest services" through bribes and kickbacks in violation of 18 U.S.C. § 1346.  As alleged above, GMACM owed a contractual obligation to render residential mortgage loan servicing duties to the loan owners.  GMACM owed a duty to render those services in an honest manner.  Nevertheless, GMACM misused its position to extract bribes and kickbacks from the Balboa Defendants at the expense of the loan owners.  GMACM thereby breached its obligations to render "honest services."  Each of the Defendants intentionally and wilfully conspired and participated in GMACM's "honest services" violations.  Specifically, each of the Defendants participated in devising and carrying out the scheme through the activities alleged above.

260.    The bribes, kickbacks, false statements and omissions, and mail and/or wire communications of the Defendants and GMACM in furtherance of the scheme constituted predicate acts of mail and/or wire fraud.

261.   It was reasonably foreseeable to Defendants and GMACM that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

262.   The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions.  The precise dates of such transmissions cannot be alleged without access to the books and records of Defendants and GMACM.  Nevertheless, Plaintiffs can allege such transmissions generally.

263.   For the purpose of furthering and executing the scheme, Defendants and GMACM regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data and funds, and also regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier.  For example:

a.   Newport issued materially false and misleading notices relating to LPI to borrowers via mail;

b.   Newport also communicated to borrowers with respect to LPI issues by telephone;

c.   GMACM issued monthly statements incorporating the falsely overstated LPI charges to borrowers via mail and/or wire;

d.   GMACM issued materially false and misleading remittance reports, monthly servicing reports and annual certifications of compliance to loan owners via the mail and/or electronically via wire;

e.   Newport and/or GMACM received LPI payments from borrowers via mail and/or wire;

f.   GMACM transmitted LPI premiums to Balboa and Meritplan via mail and/or wire;

g.    Balboa and Meritplan transmitted money to Newport via "intercompany expense allocations" consummated via wire;

h.    Balboa and Mertiplan transmitted funds to John Doe reflecting purported "commissions" via mail and/or wire; and.

i.    Ally Financial transferred funds representing "commissions" from John Doe to GMACM through its "global cash management system" via wire for each loan covered by LPI.

264.    Defendants and GMACM utilized the mails and/or wires for the purpose of furthering and executing the scheme.  As GMACM's insurance tracking subcontractor, Newport drafts and issues standardized notices to borrowers.  Prior to the placement of LPI, Newport issues notices titled "Request for Property Insurance" and "Second Request for Property Insurance" demanding evidence of insurance and warning that LPI will be imposed if such evidence is not forthcoming.  Once LPI is imposed, Newport issues "Notices of Placement."  For example, Newport issued a Request for Property Insurance to the Davidsons on June 14, 2009, to Rothstein on December 12, 2010, and to Kobryn on February 9, 2012.  Newport issued a Second Request for Property Insurance to the Davidsons on June 14, 2009, to Rothstein on December 12, 2010, and to Kobryn on March 25, 2012. Newport issued a Notice of Placement to the Davidsons on August 2, 2009, to Rothstein on January 3, 2011, and to Kobryn on May 13, 2012.  Borrowers also received standardized monthly billing statements from GMACM.

265.    These are only examples of certain instances of the pattern of racketeering activity consisting of mail and/or wire fraud violations engaged in by Defendants and GMACM.  Each electronic and/or postal transmission was incident to an essential part of the scheme.  As detailed above, Defendants and GMACM engaged in similar activities with respect to each member of the Class and with respect to the owners of the loans of each member of the Class.

266.    Each such electronic and/or postal transmission was incident to an essential part of the scheme.

267.    Additionally, each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud borrowers and the owners of the loans.

268.    Defendants and GMACM each participated in the scheme to defraud knowingly, wilfully and with a specific intent to defraud borrowers and the owners of the loans into paying and/or incurring falsely inflated, unauthorized charges in connection with LPI.

269.    The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).  The predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding borrowers and loan owners to pay and incur the falsely inflated, unauthorized charges with respect to LIP and thereby enable Defendants and GMACM to reap illicit profits.

270.    Defendants and GMACM were common participants in the predicate acts.  Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers and owners of the loans.

**The Predicate Acts of Extortion,
Attempted Extortion,
And Conspiracy to Commit Extortion**

271.    The pattern of racketeering activity also consisted of extortion, attempted extortion, and conspiracy to commit extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(a).

272.    As alleged above, the mortgage loan agreements of Plaintiffs and the Class authorize the lender to charge borrowers the costs of any LPI placed on their property.  Nothing in the

agreements authorizes the lender to charge any amount in excess of the lender's cost.  Pursuant to the scheme alleged herein, however, Plaintiffs and the Class were charged amounts in excess of GMACM's LPI costs with respect to the borrower's property.  The rebates/kickbacks that GMACM received reduced such costs.  Nevertheless, GMACM charged borrowers based on the full purported price of the LPI.

273.    At all relevant times, by virtue of the conduct alleged above, Defendants and GMACM induced, and attempted and conspired to induce, Plaintiffs and the Class to pay these extra-contractual amounts, which were in excess of GMACM's LPI costs and not due under their respective mortgage loan agreements, through the wrongful use of actual or threatened fear of economic harm.  Specifically, Defendants and GMACM used, and attempted and conspired to use, the actual or threatened fear of foreclosure to induce Plaintiffs and the Class to pay the improper charges imposed.

274.    As alleged above, the mortgage loan agreements of Plaintiffs and the Class entitled GMACM to add any LPI charges to the balances of their loans and to foreclose in order to collect such charges if unpaid.  The mortgage loan agreements provide, in words or substance, that any LPI charges "shall become additional debt of Borrower secured by this Security Instrument . . . ," and that the lender or its authorized servicer is entitled to foreclose to collect any unpaid amounts due.

275.    The notices that Defendants and GMACM issued to Plaintiffs and the Class in furtherance of the scheme explicitly warned that the LPI charges imposed "are your responsibility," that such charges "will be included in any statements that you may receive going forward," and that "we will . . . collect the insurance charges by adding it to your monthly mortgage payment."

Mortgage loan servicers routinely collect unpaid LPI charges through foreclosure. Superintendent Lawsky found that LPI charges frequently "push distressed homeowners over the foreclosure cliff."

276. By virtue of the facts alleged above, Plaintiffs and the Class reasonably believed: (i) that Defendants and GMACM possessed the power to collect any unpaid LPI charges through foreclosure; and (ii) that Defendants and GMACM would exploit that power and foreclose if borrowers failed to pay the LPI charges that were imposed.

277. Additionally, by virtue of the facts alleged above, Defendants and GMACM agreed to engage in the acts alleged above, and intentionally performed acts, including, without limitation, the acts alleged above, that, under the circumstances as Defendants and GMACM believed them to be, constituted violations of the Hobbs Act and/or substantial steps in the commission of a Hobbs Act violation. Moreover, Defendants and GMACM thereby affected and intended to affect interstate commerce.

278. Plaintiffs and the Class received nothing of value in exchange for payment of the excess LPI charges.

### Injury to Plaintiffs and the Class

279. As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by Defendants and GMACM, Plaintiffs and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c). Plaintiffs and the Class paid falsely inflated, unauthorized LPI charges by reason, and as a direct, proximate and foreseeable result, of the scheme alleged. Moreover, the overcharging of Plaintiffs and the Class for LPI was an integral and necessary part of the scheme, as those overcharges constituted purported "servicing advances" that GMACM was entitled to recoup "off the top" from the proceeds of the loans.

280.     Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

281.     Ally Financial is directly liable for its role in the scheme.  Ally Financial helped devise the scheme and participates in the scheme by transferring funds representing "commissions" from John Doe to GMACM through Ally Financial's "global cash management system."  In addition, Ally Financial is vicariously liable for GMACM's violations by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

282.     Ally Bank is directly liable under agency principles for the RICO violations of its authorized agent, GMACM, and for the RICO violations of its authorized sub-agent, Newport. When GMACM engaged in the RICO violations alleged herein, it was acting within the course and scope of its authority as an authorized agent of Ally Bank.  When Newport, GMACM's tracking sub-contractor (the services of which were paid for by Balboa and Meritplan), engaged in the RICO violations alleged herein, Newport was acting within the course and scope of its authority as an authorized sub-agent of Ally Bank.

283.     Balboa and Meritplan are directly liable for their own violations of RICO, as alleged above.  Balboa and Meritplan are also liable for the RICO violations of their agent, Newport.  As alleged above, pursuant to the scheme, Balboa and Meritplan engaged Newport to provide GMACM with tracking services.  At all times relevant herein, when Newport committed the RICO violations alleged herein, Newport was acting within the course and scope of its authority as an authorized agent of Balboa and Meritplan.

## COUNT II

### CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)
### (Against all Defendants)

284.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

285.    RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

286.    The Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

287.    As set forth in Count I, above, at all relevant times, Plaintiffs and the Class were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

288.    As also set forth in Count I, above, at all relevant times, the Defendants and GMACM were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

289.    The Defendants and GMACM formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently overcharging borrowers and loan owners with respect to LPI.  The purpose thereof was to induce borrowers and loan owners to pay or incur fraudulently inflated, unauthorized charges with respect to LPI.

290.    The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

291.    As set forth in Count I, above, Defendants and GMACM conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

96

292.     The Defendants and GMACM were each associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

293.     The Defendants and GMACM committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count I.

294.     As a direct and proximate result of the overt acts and predicate acts of Defendants and GMACM in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the Class have been and are continuing to be injured in their business and property in an amount to be determined at trial.  Such injuries include, but are not limited to, fraudulently inflated charges with respect to LPI, as a direct, proximate and foreseeable result of the scheme alleged herein.

295.     Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

296.     Ally Financial, in addition to being directly liable for its role in conspiring in the scheme, is vicariously liable for GMACM's acts of conspiracy because, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

297.     Ally Bank is directly liable under agency principles for the RICO conspiracy violations of its authorized agent, GMACM, and for the RICO conspiracy violations of its authorized

sub-agent, Newport.  When GMACM engaged in the RICO conspiracy violations alleged herein, it was acting within the course and scope of its authority as an authorized agent of Ally Bank.  When Newport, GMACM's tracking sub-contractor (the services of which were paid for by Balboa and Meritplan), engaged in the RICO conspiracy violations alleged herein, Newport was acting within the course and scope of its authority as an authorized sub-agent of Ally Bank.

298.    Balboa and Meritplan are directly liable for their own RICO conspiracy violations, as alleged above.  Balboa and Meritplan are also liable for the RICO conspiracy violations of their agent, Newport.  As alleged above, pursuant to the scheme, Balboa and Meritplan engaged Newport to provide GMACM with tracking services.  At all times relevant herein, when Newport committed the RICO conspiracy violations alleged herein, Newport was acting within the course and scope of its authority as an authorized agent of Balboa and Meritplan.

## COUNT III

### VIOLATION OF RESPA, 12 U.S.C. § 2607(a)
### (Against all Defendants)

299.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

300.    Plaintiffs' loans and those of the members of the Class are "federally related" mortgage loans within the meaning of RESPA.

301.    Throughout the Class Period, Defendants provided "settlement services" with respect to "federally-related mortgage loans," as such terms are defined by RESPA, 12 U.S.C. §§ 2602(1) and (3).

302.    Pursuant to 12 U.S.C. § 2607(a), Defendants were prohibited from giving or accepting any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or

otherwise, for the referral of any business "incident to or a part of a real estate settlement service involving a federally related mortgage loan."

303.     HUD, in regulations relating to RESPA, has defined the term "settlement" as "the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan."  24 C.F.R. § 3500.2(b).

304.     Also in regulations relating to RESPA, HUD has defined a "settlement service" as "any service provided in connection with a prospective or actual settlement" – a definition that specifically includes the "provision of services involving hazard, flood, or other casualty insurance." 24 C.F.R. § 3500.2(b)(11).

305.     The provision of LPI constitutes a "settlement service" under RESPA.  At a minimum, the provision of LPI constitutes business "incident to," if not "a part of," a real estate settlement service under 12 U.S.C. § 2607.

306.      The Balboa Defendants unlawfully gave and GMACM unlawfully received "kickbacks" within the meaning of RESPA, 12 U.S.C. § 2602(2), in connection with the referral of LPI business.  As alleged above, the kickbacks were paid in the form of free tracking services and bogus "commissions."

307.     Such payments constituted fees, kickbacks or things of value pursuant to an agreement that LPI business would be referred to Balboa and Meritplan.  Such practices violated RESPA, 12 U.S.C. § 2607(a).

308.     Plaintiffs and the Class were actually harmed by the unlawful scheme of Defendants and GMACM.

309.     Defendants therefore violated Section 8(a) of RESPA.  Pursuant to RESPA, 12 U.S.C. § 2607(d), Defendants are jointly and severally liable to Plaintiffs and the Class in an amount equal to three times the amounts they have paid or will have paid with respect to LPI as of the date of judgment.

310.     In accordance with RESPA, 12 U.S.C. § 2607(d), Plaintiffs also seek attorneys' fees and costs of suit on behalf of themselves and the Class.

311.     Ally Financial is vicariously liable for GMACM's violations of RESPA by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

312.     Ally Bank is directly liable under agency principles for the RESPA violations of its authorized agent, GMACM, and for the RESPA violations of its authorized sub-agent, Newport. When GMACM engaged in the RESPA violations alleged herein, it was acting within the course and scope of its authority as an authorized agent of Ally Bank.  When Newport, GMACM's tracking sub-contractor (the services of which were paid for by Balboa and Meritplan), engaged in the RESPA violations alleged herein, it was acting within the course and scope of its authority as an authorized sub-agent of Ally Bank.

313.     Balboa and Meritplan are directly liable for their own violations of RESPA, as alleged above.  Balboa and Meritplan are additionally liable for RESPA violations of their authorized agent, Newport.  As alleged above, pursuant to the scheme, Balboa and Meritplan engaged Newport as their agent to provide GMACM with tracking services.  At all times relevant herein, when Newport engaged in the RESPA violations alleged herein, Newport was acting within the course and scope of its authority as an authorized agent of Balboa and Meritplan.

**COUNT IV**

**BREACH OF CONTRACT**
**(Against Ally Financial and Ally Bank)**

314.     Plaintiffs repeat and reallege each and every paragraph as if fully set forth herein.

315.     Pursuant to its servicing agreements with loan owners, GMACM is an assignee of rights and delegee of correlative duties under the mortgage loan agreements of Plaintiffs and the Class.  Alternatively, pursuant to the servicing agreements, GMACM is the agent of the owners of the loans of Plaintiffs and the Class.  As such, GMACM stands in the shoes of the original lenders, has accepted the obligations of the original lenders, and possesses the same rights as the original lenders.

316.     At no time did GMACM acquire, or could GMACM have acquired, any rights with respect to the loans of Plaintiffs and the Class other than those set forth in the mortgage loan agreements.

317.     The mortgage loan agreements of Plaintiffs and the Class authorize the lender to obtain LPI in the event of any lapse in the borrower's voluntary insurance.  The mortgage loan agreements of Plaintiffs and the Class also authorize the lender to charge borrowers the costs of the insurance on their property.  Nothing authorizes the lender to charge any amount in excess of the lender's cost.  Lenders owe borrowers a contractual duty to limit any LPI charges to the lender's *bona fide* cost for the coverage.

318.     GMACM breaches the mortgage loan agreements of Plaintiffs and the Class by charging borrowers amounts in excess of GMACM's LPI cost with respect to the borrower's property.  The rebates/kickbacks that GMACM receives reduce such costs.  Nevertheless, GMACM

101

charges borrowers based on the full purported price. GMACM's failure to pass through to borrowers the cost savings represented by the rebates/kickbacks breaches the terms of the mortgage loan agreements.

319.     As a direct, proximate, and legal result of the foregoing, Plaintiffs and the Class have suffered damages.

320.     Ally Financial is vicariously liable for GMACM's breaches of contract by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

321.     Ally Bank is liable under agency principles for the breaches of its agent, GMACM. As alleged above, Ally Bank owns loans and/or the servicing rights to loans serviced by GMACM pursuant to a series of servicing agreements in effect since at least 2001. In committing the breaches alleged herein, GMACM was acting within the scope of duties delegated to it by Ally Bank.

322.     Additionally, Ally Bank is liable for the breaches of contract as an assignee and party to the contracts. As alleged above, Ally Bank owns loans serviced by GMACM. Acting through an agent does not relieve Ally Bank, a party to the instruments, of direct contractual liability to borrowers.

## COUNT V

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Ally Financial and Ally Bank)

323.     Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

324.     As alleged above, GMACM is an assignee of rights and delegee of correlative duties under the mortgage loan agreements of Plaintiffs and the Class. Alternatively, GMACM is the agent

of the owners of the loans of Plaintiffs and the Class.  As such, GMACM stands in the shoes of the original lenders, has accepted the obligations of the original lenders, and possesses the same rights as the original lenders.

325.    Every contract, including the mortgage loan contracts of Plaintiffs and the Class, contains an implied covenant of good faith and fair dealing.

326.    Pursuant to the implied covenant of good faith and fair dealing, GMACM was obligated to perform its duties under the mortgage loan agreements in good faith and to deal fairly with Plaintiffs and the Class.

327.    As alleged above, the mortgage loan agreements of Plaintiffs and the Class authorize the lender to obtain LPI in the event of any lapse in the borrower's voluntary insurance.  The mortgage loan agreements of Plaintiffs and the Class also authorize the lender to charge borrowers the costs of the insurance on their property.  Nothing authorizes the lender to charge any amount in excess of the lender's cost.   Lenders owe borrowers a contractual duty to limit any LPI charges to the lender's *bona fide* cost for the coverage.

328.    GMACM breached its duty of good faith and fair dealing by charging borrowers amounts in excess of GMACM's LPI costs.  GMACM's failure to pass through to borrowers the cost savings represented by the rebates/kickbacks constituted bad faith conduct toward Plaintiffs and the Class. GMACM thereby dealt with Plaintiffs and the Class unfairly, and contravened the reasonable expectations of Plaintiffs and the Class.

329.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

330.     Ally Financial is vicariously liable for GMACM's breaches of contract by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

331.     Ally Bank is liable under agency principles for the breaches of its agent, GMACM. As alleged above, Ally Bank owns loans and/or the servicing rights to loans serviced by GMACM pursuant to a series of servicing agreements in effect since at least 2001.  In committing the breaches alleged herein, GMACM was acting within the scope of duties delegated to it by Ally Bank.

332.     Additionally, Ally Bank is liable for its breaches of the covenant of good faith and fair dealing as an assignee and party to the contracts.  As alleged above, Ally Bank owns loans serviced by GMACM.  Acting through an agent does not relieve Ally Bank, a party to the instruments, of direct contractual liability to borrowers.

**COUNT VI**

**COMMON LAW RESTITUTION/UNJUST ENRICHMENT/DISGORGEMENT**
**(Against Ally Financial and Ally Bank)**

333.     Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

334.     Plaintiffs and the Class have conferred a substantial benefit on GMACM derived from improper and unauthorized charges with respect to LPI.  These benefits came at the expense of Plaintiffs and the Class.

335.     The circumstances are such that in equity and good conscience  restitution should be made by GMACM to Plaintiffs and the Class.

336.     As a result of GMACM's unjust enrichment, Plaintiffs and the Class have sustained damages in an amount to be determined at trial.  Plaintiffs and the Class seek full disgorgement and

restitution of GMACM's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

337.     Plaintiffs and the Class are entitled to restitution and/or disgorgement of profits realized by GMACM as a result of its unfair, unlawful and/or deceptive practices.

338.     Ally Financial is vicariously liable for GMACM's unjust enrichment by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

339.     Ally Bank is directly liable under agency principles for the unjust enrichment of its authorized agent, GMACM.  When GMACM engaged in the misconduct alleged herein, it was acting within the course and scope of its authority as an authorized agent of Ally Bank.

**COUNT VII**

**BREACH OF FIDUCIARY DUTY/MISAPPROPRIATION OF FUNDS HELD IN TRUST (Against Ally Financial and Ally Bank)**

340.     Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

341.     The mortgage agreements of Plaintiffs and the Class contains standard escrow provisions, which are typical of other mortgages serviced by GMACM.

342.     The mortgage agreements of Plaintiffs and the Class provide that borrowers shall make monthly payments for "premiums for any and all insurance required by Lender," including LPI.

343.     The mortgage agreements of Plaintiffs and the Class further provides that any excess escrow funds are to be returned to Plaintiffs.

344.     GMACM accepts monies from Plaintiffs and the members of the Class for insurance on a monthly basis and holds such funds in escrow.

345.    GMACM is obligated to hold escrowed funds in trust. GMACM owes Plaintiffs and the Class a fiduciary duty with respect to the handling of escrowed funds.

346.    GMACM breached its fiduciary duty to Plaintiffs and the Class by: (i) demanding excessive escrow payments for LPI; (ii) collecting and holding excessive funds in escrow, in amounts greater than necessary to pay for the true cost of LPI; (iii) failing to properly account to Plaintiffs and the Class for such excess funds; and (iv) engaging in self-dealing through the diversion of rebates/kickbacks to its own pockets as alleged above.

347.    These actions were undertaken by GMACM in bad faith for its own benefit and were not intended to benefit Plaintiffs or other Class members.

348.    As a direct result of GMACM's actions and subversion of the interests of Plaintiffs and the Class to GMACM's own interest, Plaintiffs and the Class have suffered injury in the form of unauthorized escrow charges and a loss of funds from their escrow accounts.

349.    Plaintiffs and the Class are entitled to damages for GMACM's beach of its fiduciary obligations and misappropriation of escrow funds.  In addition, Plaintiffs and the Class are entitled to punitive damages because GMACM acted in bad faith in deliberate and/or reckless disregard of their rights and its obligation to hold their escrow funds in trust.

350.    Ally Financial is vicariously liable for GMACM's breach of fiduciary duty by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

351.    Ally Bank is liable under agency principles for the breaches of its agent, GMACM. As alleged above, Ally Bank owns loans and/or the servicing rights to loans serviced by GMACM

pursuant to a series of servicing agreements in effect since at least 2001. In committing the breaches alleged herein, GMACM was acting within the scope of duties delegated to it by Ally Bank.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

a. An order declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for an order certifying this case as a class action and appointing Plaintiffs as representative of the Class;

b. An order awarding compensatory damages on behalf of Plaintiffs and the Class in an amount to be proven at trial;

c. Judgment for Plaintiffs and the Class on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' practices, along with exemplary damages to each Class member for each violation;

d. Judgment for Plaintiffs and the Class on their RICO claims and RESPA claims, in an amount to be proven at trial, for three times the amount of the excess charges imposed on Plaintiffs and the Class;

e. Restitution of an amount equal to all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiffs and the Class;

f. Pre-judgment and post-judgment interest as provided for by law or allowed in equity;

g. An order awarding Plaintiffs and the Class their attorneys' fees and costs; and

h. Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury of the claims alleged herein.

Dated: January 22, 2012

**KIRBY McINERNEY LLP**

By: _____

   Mark A. Strauss (mstrauss@kmllp.com)
   J. Brandon Walker (bwalker@kmllp.com)
825 Third Avenue, 16th Floor
New York, New York 10022
Tel:  (212) 371-6600
Fax: (212) 751-2540

*Attorneys for Plaintiffs*

108