# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**LANDON ROTHSTEIN, JENNIFER DAVIDSON, ROBERT DAVIDSON**, **and IHOR KOBRYN**, individually and on behalf of all others similarly situated,

        Plaintiffs,

    v.

**ALLY FINANCIAL, INC. f/k/a GMAC INC., ALLY BANK f/k/a GMAC BANK, JOHN DOE CORPORATION, BALBOA INSURANCE COMPANY, MERITPLAN INSURANCE COMPANY, and NEWPORT MANAGEMENT CORPORATION**,

        Defendants.

**ECF Case**

Civil Action No.: 1:12-CV-3412-AJN

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO DISMISS OF DEFENDANTS BALBOA INSURANCE COMPANY, MERITPLAN INSURANCE COMPANY, AND NEWPORT MANAGEMENT CORPORATION

# TABLE OF CONTENTS

Page No.

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    The Facts Alleged in the SAC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    Balboa Competitor Assurant Agrees to Stop Paying Kickbacks
to Servicers – Balboa Is Called Upon to Agree to Same Reforms . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.     THE FILED-RATE DOCTRINE DOES NOT BAR PLAINTIFFS' CLAIMS . . . . . . 7

II.    THE SAC ADEQUATELY PLEADS RICO CLAIMS AGAINST BALBOA . . . . . 11

    A.    The SAC Adequately Alleges that Balboa Participated in a Pattern of
Racketeering Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          1.    The SAC Adequately Alleges that Balboa Committed Mail
and Wire Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

               a.    The SAC Adequately Alleges a Fraudulent Scheme . . . . . . . . 13

               b.    The SAC Adequately Alleges Balboa's Fraudulent Intent . . . 19

               c.    The Fraud Allegations Satisfy Rule 9(b) . . . . . . . . . . . . . . . . 20

          2.    The SAC Adequately Alleges that Balboa Committed Honest
Services Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

          3.    The SAC Adequately Alleges that Balboa Committed Extortion . . . . 24

    B.    The SAC Adequately Pleads that Balboa "Participated" in the
"Operation or Management" of a RICO Enterprise    . . . . . . . . . . . . . . 26

    C.    The SAC Adequately Alleges That Plaintiffs Have RICO Standing
by Injury Proximately Caused by Balboa . . . . . . . . . . . . . . . . . . . . . . . . . 29

    D.    The SAC States a Claim for RICO Conspiracy . . . . . . . . . . . . . . . . . . . . . 32

**III.    THE SAC ADEQUATELY ALLEGES A CLAIM FOR VIOLATION OF RESPA**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# TABLE OF AUTHORITIES

## *CASES*

*Abbey v. 3F Therapeutics, Inc.*,
    No. 06 Civ. 409, 2009 WL 4333819 (S.D.N.Y. Dec. 2, 2009). . . . . . . . . . . . . . . . . . . . . . 15

*Abels v. JPMorgan Chase Bank, N.A.*,
    678 F. Supp. 2d 1273 (S.D. Fla. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*AIU Ins. Co. v. Olmecs Med. Supply Inc.*,
    No. 04 Civ. 2934, 2005 WL 3710370 (E.D.N.Y. Feb. 22, 2005) . . . . . . . . . . . . . . . . . . . 27

*Allstate Ins. Co. v. Ahmed Halima*,
    No. 06 Civ. 1316, 2009 WL 750199 (E.D.N.Y. Mar. 19, 2009). . . . . . . . . . . . . . . . . . . . 21

*Amsterdam Tobacco Inc. v. Philip Morris Inc.*,
    107 F. Supp. 2d 210 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Associated Wrecking, Inc. v. Local 95 Pension Fund*,
    No. 92 Civ. 1841, 1994 WL 118987 (S.D.N.Y. Mar. 31, 1994). . . . . . . . . . . . . . . . . . . . 20

*Baisch v. Gallina*,
    346 F.3d 366 (2d Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 31

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Bermudez v. First of Am. Bank Champion, N.A.*,
    860 F. Supp. 580 (N.D. Ill. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Bhd. Of R.R. Trainmen v. Baltimore & O.R.. Co.*,
    331 U.S. 519 (1947).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Black Radio Network, Inc. v. NYNEX Corp.*,
    44 F. Supp. 2d 565 (S.D.N.Y. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Blessing v. Sirius XM Radio Inc.*,
    775 F. Supp. 2d 650 (S.D.N.Y. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

*Bonilla v. Volvo Car Corp.*,
    150 F.3d 62 (1st Cir.1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 21, 31

*Bronzin v. United States*,
    309 F.2d 158 (8th Cir. 1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Calabrese v. CSC Holdings, Inc.*,
    283 F. Supp. 2d 797 (E.D.N.Y. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Cannon v. Wells Fargo Bank N.A.*,
    No. 12 Civ. 1376, 2013 WL 132450 (N.D. Cal. Jan. 9, 2013). . . . . . . . . . . . . . . . . . . 10

*Carcamo-Flores v. I.N.S.*,
    805 F.2d 60 (2d Cir.1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Carnation Co. v. Pac. Westbound Conference*,
    383 U.S. 213 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Center Cadillac, Inc. v. Bank Leumi Trust Co. of N.Y.*,
    808 F.Supp. 213 (S.D.N.Y. 1992),
    *aff'd*, 99 F.3d 401 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 25, 29

*Chubb & Son Inc. v. Kelleher*,
    No. 92 Civ. 4484, 2010 WL 5978913 (E.D.N.Y. Oct. 22, 2010). . . . . . . . . . . . . . . . . 14

*City of New York v. Smokes-Spirits.com, Inc.*,
    541 F.3d 425 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*City of New York v. Venkataram*,
    396 F. App'x 722 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Commercial Cleaning Serv., L.L.C. v. Colin Serv. Sys., Inc.*,
    271 F.3d 374 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Connecticut Nat. Bank v. Fluor Corp.*,
    808 F.2d 957 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Dietrich v. Bauer*,
    76 F. Supp. 2d 312 (S.D.N.Y. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
    822 F.2d 1242 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

iv

*Eastman Kodak Co. v. Camarata*,
  No. 05 Civ. 6384, 2006 WL 3538944 (W.D.N.Y. Dec. 6, 2006). . . . . . . . . . . . . . . 26, 27

*ECA Local 134 IBEW Joint Pension Fund v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Ellsworth v. U.S. Bank, N.A.*,
  No. 12 Civ. 02506, 2012 WL 6176905 (N.D. Cal. Dec. 11, 2012). . . . . . . . . . . . . . . . . 10

*F.T.C. v. Verity Int'l, Ltd.*,
  443 F.3d 48 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Florida Mun. Power Agency v. Florida Light & Power Co.*,
  64 F.3d 614 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Florida v. Tenet Healthcare Corp.*,
  420 F. Supp. 2d 1288 (S.D. Fla. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Fuji Photo Film USA v. McNulty*,
  640 F. Supp. 2d 300 (S.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Gipson v. Fleet Mortg. Grp., Inc.*,
  232 F. Supp. 2d 691 (S.D. Miss. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Gustafson v. BAC Home Loans Servicing, LP*,
  No. 11 Civ. 915, 2012 WL 7071488 (C.D. Cal. Dec 26, 2012). . . . . . . . . . . . . . . . . . . 18

*Halperin v. eBankerUSA.com*,
  295 F.3d 352 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hecht v. Commerce Clearing House, Inc.*,
  897 F. 2d 21 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Hemi Group, LLC v. City of New York*,
  559 U.S. 1 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 32

*Holmes v. SEC Investor Prot. Corp.*,
  503 U.S. 258 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
  253 F. Supp. 2d 262 (D. Conn. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11

*In re American Express Co. Shareholder Litig.*,
 39 F.3d 395 (2d Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Citigroup, Inc. Auction Rate Sec. Mktg. Litig.*,
 No. 08 Civ 3095, 2011 WL 744745 (S.D.N.Y. March 1, 2011),
 *aff'd, Finn v. Barney*, 471 F. App'x 30 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Lupron Mktg. and Sales Practices Litig.*,
 295 F. Supp. 2d 148 (D. Mass. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Refco Inc. Sec. Litig.*,
 826 F. Supp. 2d 478 (S.D.N.Y. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*In re Sumitomo Copper Litig.*,
 995 F. Supp. 451 (S.D.N.Y. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Sumitomo Copper Litig.*,
 104 F. Supp. 2d 314 (S.D.N.Y. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 27

*In re U.S. Foodservice Inc. Pricing Litig.*,
 No. 7 Civ. 1894, 2009 WL 5064468 (D. Conn. Dec. 15, 2009). . . . . . . . . . . . . . . . . . . 14

*In re Van der Moolen Holding N.V. Sec. Litig.*,
 405 F. Supp. 2d 388 (S.D.N.Y. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*JSC Foreign Econ. Ass'n Technostroyexport v. Weiss*,
 No. 06 Civ. 6095, 2007 WL 1159637 (S.D.N.Y. Apr. 18, 2007). . . . . . . . . . . . . . . . . . . 28

*Kassner v. 2nd Ave. Delicatessen, Inc.*,
 496 F.3d 229 (2d Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 13

*Kunzelmann v. Wells Fargo Bank, N.A.*,
 No. 11 Civ. 81373, 2012 WL 2003337 (S.D. Fla. June 4, 2012). . . . . . . . . . . . . . . . . . . 10

*Local 875 I.B.T. Pension Fund v. Pollack*,
 992 F. Supp. 545 (E.D.N.Y. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Marini v. Adamo*,
 812 F. Supp. 2d 243 (E.D.N.Y. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Mason Tenders Dist. Council Pension Fund v. Messera*,
 No. 95 Civ. 9341, 1996 WL 351250 (S.D.N.Y. June 26, 1996). . . . . . . . . . . . . . . . . . . 27

*Mendoza v. Zirkle Fruit Co.*,
    301 F.3d 1163 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*,
    No. 91 Civ. 2923, 1994 WL 88129 (S.D.N.Y. March 15, 1994). . . . . . . . . . . . . . . . . 20

*Miller v. Lazard, Ltd.*,
    473 F. Supp. 2d 571 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Moore v. PaineWebber, Inc.*,
    189 F.3d 165 (2d Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Morning Star Packing Co. v. SK Foods, L.P.*,
    No. 09 Civ. 0208, 2011 WL 4591069 (E.D. Cal. Sep. 30, 2011). . . . . . . . . . . . . . . . 31

*Pollack v. Laidlaw Holdings, Inc.*,
    No. 90 Civ. 5788, 1995 WL 261518 (S.D.N.Y. May 3, 1995). . . . . . . . . . . . . . . . . . 16

*ReSource N.E. of Long Island, Inc. v. Town of Babylon*,
    80 F. Supp. 2d 52 (E.D.N.Y. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*River Plate & Braz. Conferences v. Pressed Steel Car Co.*,
    227 F.2d 60 (2d Cir. 1955).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Russello v. United States*,
    464 U.S. 16 (1983).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*,
    84 F.3d 629 (2d Cir.1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Sandwich Chef of Tex., Inc., v. Reliance Nat'l Indem. Ins. Co.*,
    111 F. Supp. 2d 867 (S.D. Tex. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Schilke v. Wachovia Mortg., FSB*,
    820 F. Supp. 2d 825 (N.D. Ill. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

vii

*Schwartz v. Lawyers Title Ins. Co.*,
   680 F. Supp. 2d 690 (E.D. Pa. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 19

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
   473 U.S. 479 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Skilling v. United States*,
   130 S. Ct. 2896 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
   476 U.S. 409 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Steven v. Union Planters Corp.*,
   No. 00 Civ. 1695, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000) . . . . . . . . . . . . . . . . 10

*Tribune Co. v. Purcigliotti*,
   869 F. Supp. 1076 (S.D.N.Y. 1994),
   *aff'd sub nom. Tribune Co. v. Abiola*, 66 F.3d 12 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 27

*Twenty First Century L.P.I. v. LaBianca*,
   19 F. Supp. 2d 35 (E.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*U1IT4less, Inc. v. FedEx Corp.*,
   No. 11 Civ. 7163, 2012 WL 4459377 (S.D.N.Y. Sept. 25, 2012) . . . . . . . . . . . . . . . . . 19

*United States  v. Castro*,
   89 F.3d 1443 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States ex rel. Poteet v. Medtronic, Inc.*,
   552 F.3d 503 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States Fire Ins. Co. v. United Limousine Serv., Inc.*,
   303 F. Supp. 2d 432 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Allen*,
   155 F.3d 35 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Autuori*,
   212 F.3d 105 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18

*United States v. Bortnovsky*,
   879 F.2d 30 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Brandon*,
  17 F.3d 409 (1st Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Capo*,
  817 F.2d 947 (2d Cir. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Coppola*,
  671 F.3d 220 (2d Cir. 2012),
  *cert denied*, 133 S.Ct. 843 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Cortes-Caban*,
  691 F.3d 1 (1st Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Gelb*,
  700 F.2d 875 (2d Cir. 1983).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. George*,
  477 F.2d 508 (7th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Gotti*,
  459 F.3d 296 (2d Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Holohan*,
  436 F. App'x 242 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Kim*,
  246 F.3d 186 (2d Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Lilly*,
  13 F.3d 15 (1st Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. McDonnell*,
  No. 10 Civ. 1123, 2011 WL 2463194 (C.D. Cal. June 20, 2011). . . . . . . . . . . . . . . . . . 23

*United States v. Norton*,
  No. 99 Civ.10078, 2000 WL 33281703 (W.D. Va. Nov. 14, 2000). . . . . . . . . . . . . . . . 19

*United States v. Philip Morris USA, Inc.*,
  449 F. Supp. 2d 1 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Roebuck*,
  No. 11 Civ. 127, 2012 WL 4955208 (D. Vt. Oct. 17, 2012). . . . . . . . . . . . . . . . . . . . 14, 16

*United States v. Rybicki*,
    354 F.3d 124 (2d Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Speer*,
    419 F. App'x 562 (6th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Tocco*,
    135 F.3d 116 (2d Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Trapilo*,
    130 F.3d 547 (1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Von Barta*,
    635 F.2d 999 (2d Cir. 1980).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States. v. Abelis*,
    146 F.3d 73 (2d Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Vaughn v. Air Line Pilots Ass'n*,
    377 F. App'x 88 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Voit v. Wonderware Corp.*,
    977 F. Supp. 363 (E.D. Pa. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Wallace v. Powell*,
    No. 09 Civ. 286, 2010 WL 3398995 (M.D. Pa. Aug. 24, 2010). . . . . . . . . . . . . . . . . . . 32

*Watkins v. Smith*,
    No. 12 Civ. 4635, 2012 WL 5868395 (S.D.N.Y. Nov. 19, 2012). . . . . . . . . . . . . . . . . . 24

*Wegoland Ltd. v. NYNEX Corp.*,
    27 F.3d 17 (2d Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

*Weinberger v. Mellon Mortgage. Co.*,
    No. 98 Civ. 2490, 1998 WL 599192 (E.D. Pa. Sep. 10, 1998). . . . . . . . . . . . . . . . 18, 20

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
    530 F. Supp. 2d 486 (S.D.N.Y. 2007),
    *aff'd*, 328 F. App'x 695 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Zito v. Leasecomm Corp.*,
    No. 02 Civ. 8074, 2003 WL 22251352 (S.D.N.Y. Sep 30, 2003). . . . . . . . . . . . . . . 30, 32

x

***STATUTES***

12 U.S.C. § 2607(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 1341. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 1346. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 1951(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

18 U.S.C. § 1961(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. § 1962(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. § 1964(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

24 C.F.R. § 3500.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

Plaintiffs Landon Rothstein, Jennifer Davidson, Robert Davidson, and Ihor Kobryn ("Plaintiffs") submit this memorandum of law, together with the March 25, 2012 Declaration of Mark A. Strauss ("Strauss Decl."), in opposition to the motion of Balboa Insurance Company ("BIC"), MeritPlan Insurance Company ("MIC"), and Newport Management Corporation ("NMC") (collectively, "Balboa") to dismiss the Second Amended Class Action Complaint (the "SAC").

## PRELIMINARY STATEMENT

Balboa paid kickbacks, disguised those kickbacks by funneling them through an affiliate, and prepared and issued fraudulent and extortionate mailings. Such deliberate misconduct destroys the thesis of Balboa's motion, *i.e.*, that it merely provided professional services to GMAC Mortgage, LLC ("GMACM"),[1] which alone is responsible for any wrongdoing. Balboa, by its own acts, committed the predicate violations, participated in the operation or management of the RICO enterprise, and proximately injured plaintiffs.

Indeed, while Balboa seeks to shift blame to GMACM, GMACM has returned the favor by implicating Balboa. In sworn testimony to the New York State Department of Financial Services ("NYSDFS"), which conducted a broad-ranging probe of improper kickbacks in the lender-placed insurance ("LPI") industry, GMACM sought to distance itself from any wrongdoing by claiming that it "wholly" outsourced the suspicious activities to Balboa. Strauss Decl. Ex. A, at 670-71. "Our motto is simply to turnkey and outsource it, and have the insurance wholly done by Balboa. . . . [T]he economics of their business, you would have to ask them," GMACM said, attempting to deflect the commissioners' questions regarding the very transactions alleged in this lawsuit. *Id*. at 670-71.

---

[1] Abbreviations not defined herein have the meanings ascribed to them in the SAC. References to "¶_" are to paragraphs of the SAC. References to "Br. at _" are to Balboa's memorandum of law in support of the instant motion.

Given the assertions made by Balboa's alleged co-conspirator GMACM, factual issues are at minimum raised as to Balboa's role in the misconduct.   Dismissal as a matter of law is inappropriate.

Balboa's filed-rate doctrine arguments miss an essential point – the doctrine does not apply unless the precise charge at issue actually was filed with and approved by a governing regulatory agency.   LPI cost reimbursements purportedly due under mortgage loan agreements are not so filed or approved.   Balboa does not contend otherwise.   Courts punctiliously distinguish between filed and unfiled charges, and reject fallacious attempts like Balboa's to conflate regulated with unregulated transactions.   The doctrine does not apply.

Balboa's RICO arguments also have no merit.   The SAC alleges a scheme to overcharge in the course of a contract – a classic fraudulent scheme in violation of the mail and wire fraud statutes. Balboa committed honest services fraud by paying kickbacks; Balboa need not have received kickbacks, as Balboa suggests.   Balboa did not stand mute, but trumpeted lies, and, hence, owed a disclosure duty.   Balboa committed extortion in that it "exploited" borrowers' fears of foreclosure to induce payment; Balboa need not have made any "threats," express or otherwise.   The "operation or management" test is more than satisfied by Balboa's payment of kickbacks and false statements. Furthermore, it is no defense to Balboa's criminal acts that GMACM purportedly masterminded the scheme.

The SAC states a claim.   The motion should be denied.

## FACTS

### A.    The Facts Alleged in the SAC

This is a putative class action lawsuit on behalf of residential mortgage loan borrowers charged for LPI in connection with loans serviced by GMACM.  Standard mortgage loan contracts require borrowers to maintain hazard insurance.  If borrowers' hazard insurance lapses, the owner of the loan (or its designated servicer) is entitled to purchase LPI and be reimbursed by the borrower for the cost.  The charges become additional debt secured by the lender's lien.  The servicer is entitled to recoup the charges "off the top" of borrowers' payments.  To the extent borrowers default, the servicer is entitled to recoup the charges out of loan proceeds otherwise due the loan owners. ¶¶ 46-47, 62-63.

Here, Balboa (through BIC and MIC) sold LPI to the servicer GMACM.  The gravamen of the SAC is that Balboa participated with GMACM in a coordinated racketeering enterprise to overstate GMACM's LPI costs, and thereby overcharge borrowers and loan owners for reimbursement.  The scheme was conducted through kickbacks, overbilling, false statements and/or omissions, and misappropriation.  Moreover, Balboa committed mail and wire fraud, honest services fraud, and extortion.

Specifically, the SAC alleges that BIC and MIC paid GMACM kickbacks representing an estimated 15%-30% of the LPI premiums.  ¶ 80.  The kickbacks reduced GMACM's LPI costs.  Nevertheless, borrowers and loan owners were charged based on the full purported price of the LPI. In other words, GMACM pocketed the kickbacks for itself without passing on the savings to borrowers or loan owners.  ¶¶ 7, 69.  Moreover, Balboa paid GMACM the kickbacks as a *quid pro quo* in return for GMACM's lucrative LPI business.  ¶¶ 79, 257.

3

BIC and MIC disguised the kickbacks by funneling them through their affiliate, NMC.  ¶ 71. NMC is in the business of providing insurance tracking services to mortgage servicers on a subcontracting basis.  ¶ 32.  BIC and MIC transferred the kickbacks to NMC via "intercompany expense allocations."   NMC then passed the kickbacks on to GMACM in the form of free insurance tracking services, for which GMACM would otherwise have had to pay.  ¶¶ 59-60, 70-72.

BIC and MIC also disguised the kickbacks by funneling them through an affiliate of GMACM, John Doe Corporation ("John Doe").  BIC and MIC fraudulently characterized the payments to John Doe as "commissions."  BIC and MIC paid John Doe the "commissions" on the pretense that John Doe was a third-party insurance agent.  This pretense was false, as John Doe was not a third-party insurance agent but, instead, was a commonly-controlled affiliate of GMACM. ¶¶ 75-76.[2]

NMC mailed fraudulent and extortionate statements to borrowers, demanding payment based on the full purported price of the LPI.  ¶ 111.  The notices falsely asserted that the overstated charges represented what was required to "reimburse" GMACM for money that it supposedly "advanced" for the "cost of the insurance." ¶ 112.   The mailings also warned borrowers that they were "responsible" for the LPI payments under the terms of their loan agreements, and that any unpaid amounts would be added to the balances of their loans.  ¶¶ 111, 114.  When borrowers made loan payments, GMACM misappropriated the overstated charges "off the top."

---

[2]  Citing GMACM's testimony to the NYSDFS, Balboa asserts that "no commissions were actually paid."  Br. at 14 n.8.  GMACM's testimony, however, only addressed GMACM's existing practices, and GMACM itself, not its affiliates.  Strauss Decl. Ex. A, at 589 ("GMAC[M] does not receive commissions."). Nothing suggests that Balboa paid no "commissions" to an affiliate of GMACM during the class period, as Plaintiffs allege.  On this motion, the Court must accept the facts alleged in the SAC as true.  *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

Meanwhile, GMACM issued erroneous reports to loan owners incorporating Balboa's LPI cost overstatements.  To the extent borrowers failed to pay the charges, GMACM recouped the overstated amounts out of loan proceeds otherwise due the loan owners. ¶¶ 81, 115-20.

Notably, the servicing agreements between the loan owners and GMACM stipulated that GMACM pay any subcontractors from GMACM's "own funds."  ¶¶ 72, 119.  By the scheme, GMACM effectively paid NMC out of loan proceeds.  ¶ 71.

In March 2012, Fannie Mae, one of GMACM's largest servicing clients, determined that servicers' receipt of free tracking services from LPI insurers resulted in improper double-billing.  ¶ 96.  "Fannie Mae is often paying twice for Insurance Tracking services; once via the servicing fee that Fannie Mae pays to Servicers, and again via the Lender Placed Insurance premiums, since those premiums may include or subsidize the costs of tracking services," Fannie Mae found.  *Id.*  As of March 2012, Fannie Mae prohibited servicers administering loans on its behalf, *e.g.*, GMACM, from engaging in such double-billing practices.  ¶¶ 97-98.

In November 2012, American Residential Equities, LLC ("ARE"), another GMACM servicing client, commenced an adversary proceeding accusing Balboa and GMACM of fraud in connection with Balboa's payment of "commission" kickbacks to GMACM.  ¶ 105.

## B.   Balboa Competitor Assurant Agrees to Stop Paying Kickbacks to Servicers – Balboa Is Called Upon to Agree to Same Reforms

On March 21, 2013, New York State Governor Andrew M. Cuomo announced that the NYSDFS investigation of improper practices in the LPI industry had produced a "major settlement" with LPI insurer Assurant, Inc. ("Assurant"), Balboa's leading competitor.  Strauss Decl. Ex. B.[3]

---

[3]  The Court may take judicial notice of this publicly filed regulatory settlement.  *See In re Citigroup,* (continued...)

5

The settlement includes restitution for certain homeowners, and a $14 million penalty paid to the State of New York.  Strauss Decl. Exs. B-C.

Moreover, the settlement involves Assurant's agreement to a set of reforms that include ending the practice of paying kickbacks to mortgage loan servicers, *i.e.*, the very misconduct alleged in this lawsuit.  Specifically, Assurant agreed that it will no longer: (i) "pay commissions to a bank or servicer or a person or entity affiliated with a bank or servicer on force-placed insurance policies obtained by the servicer," or (ii) "provide free or below-cost, outsourced services to servicers, lenders, or their affiliates . . . ."  *Id*. Ex. B.

Governor Cuomo called upon QBE Insurance Group ("QBE"), Balboa's parent corporation, to  "step up to the plate now" and agree to the same reforms.  "These reforms will make Assurant a stronger and better company focused on its customers.  Other force-placed insurers, including QBE, need to step up to the plate now and put in place these reforms," Governor Cuomo said. Governor Cuomo also stated that "[t]he force placed insurance industry has for too long been plagued by an intricate web of relationships between insurers and banks that pushed distressed families over the foreclosure cliff.  Today's agreement starts us on the road to reform, which will clean up this industry and truly protect working people."  *Id*. Ex. B.

The NYSDFS also announced findings of its LPI investigation.  "Our investigation found that insurers and banks built a network of troubling relationships and payoffs that helped drive premiums sky high.  Those improper practices created significant conflicts of interest and saddled homeowners,

---

[3](...continued)
*Inc. Auction Rate Sec. Mktg. Litig.*, No. 08 Civ. 3095, 2011 WL 744745, at *3 n.3 (S.D.N.Y. March 1, 2011), *aff'd, Finn v. Barney*, 471 F. App'x 30 (2d Cir. 2012).

taxpayers, and investors with millions of dollars in unfair and unnecessary costs," Superintendent

Lawsky stated.  *Id.*  Furthermore,

> [E]ven though banks and servicers are the ones who choose which force-placed insurance policy to purchase, the high premiums are ultimately charged to homeowners, and, in the event of foreclosure, the costs are passed onto investors.  And when the mortgage is owned or backed by a government-sponsored enterprise, such as Fannie Mae or Freddie Mac, those costs are ultimately borne by taxpayers.

> DFS's investigation found that Assurant competed for business from the banks and mortgage servicers through what is known as "reverse competition."  That is, rather than competing by offering lower prices, the insurers competed by offering what is effectively a share in the profits.  This profit sharing pushed up the price of force-placed insurance by creating incentives for banks and mortgage servicers to buy force-placed insurance with high premiums.

*Id.*

The findings of the NYSDFS confirm the allegations of the SAC.

## ARGUMENT
### I.
### THE FILED-RATE DOCTRINE DOES NOT BAR PLAINTIFFS' CLAIMS

Balboa's filed-rate doctrine arguments miss an essential point – the doctrine does not apply

unless the precise charge at issue actually was filed with and approved by a governing regulatory

agency.[4]  *See Carnation Co. v. Pac. Westbound Conference*, 383 U.S. 213, 216 (1966) (shipper's

implementation of rate-making agreements not approved by Federal Maritime Commission were not

subject to the doctrine); *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 422

n.29 (1986) (explaining that doctrine was "not even implicated in *Carnation* . . . , because the

---

[4]  The filed rate doctrine bars suits against regulated entities grounded on "allegation[s] that the rates charged by the [entity] are unreasonable."  *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994). "Simply stated, the doctrine holds that any 'filed rate' – that is, one approved by the governing regulatory agency – is *per se* reasonable and unassailable in judicial proceedings brought by ratepayers." *Id.*

ratemaking agreements challenged in that case had not been approved by, or filed with [the Commission].")); *River Plate & Braz. Conferences v. Pressed Steel Car Co.*, 227 F.2d 60, 63 (2d Cir. 1955) (rates never approved by shipping board not subject to doctrine); *see also Florida Mun. Power Agency v. Florida Light & Power Co.*, 64 F.3d 614, 616 (11th Cir. 1995) (noting that the Supreme Court has "emphasized the limited scope of the filed rate doctrine to preclude damage claims only where there are validly filed rates").

Here, the precise charges at issue – LPI cost reimbursements purportedly due under mortgage loan agreements – were not so filed or approved. Balboa does not contend otherwise. The premise of Balboa's filed-rate arguments is simply that the reimbursements were "based on" filed rates. Br. at 2, 6.

Balboa, however, cites no authority in support of its theory that a defendant's unilateral choice to "base" an unfiled, unapproved charge on a filed rate somehow renders the unfiled charge also a filed rate. The law is directly to the contrary. *See, e.g.*, *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 275 (D. Conn. 2003) (that "by industry practice" manufacturers "determined" butter and cream prices based on "formulas" incorporating regulated milk prices did not subject the butter and cream prices themselves to the filed rate).

Courts punctiliously distinguish between filed and unfiled charges, and reject fallacious attempts like Balboa's to conflate regulated transactions with unregulated ones. *See, e.g.*, *Florida Mun. Power Agency*, 64 F.3d at 616 (remanding to determine whether "network services" were a "different product" from "point-to-point transmissions" covered by filed rate); *Blessing v. Sirius XM Radio Inc.*, 775 F. Supp. 2d 650, 658 (S.D.N.Y. 2011) (filed rate doctrine inapplicable to Music

Royalty Fee as FCC "did not in fact approve" the fee but merely approved a one-year price cap thereon).

The Second Circuit's decision in *F.T.C. v. Verity International Ltd.*, 443 F.3d 48 (2d Cir. 2006) is dispositive. There, online pornographers routed adult "information services" to users' computers via telephone from Madagascar, billing them based on the filed rates for the calls (and receiving kickbacks from the long-distance carriers). *Id.* at 62. The court instructed that the "fundamental question in the filed-rate-doctrine analysis [is] the nature of the service for which consumers were billed," and whether that service is "covered by" a filed tariff. *Id.* Because the defendants could not identify a filed tariff covering "the actual service rendered to users of [defendants'] billing system," *i.e.*, adult "information services," the doctrine did not bar the FTC's claim that the defendants' billing practices were misleading. *Id.*

Likewise, here, Balboa does not and cannot identify any filed tariff "actually" covering LPI cost reimbursements purportedly due under mortgage loan agreements. Hence, the filed rate doctrine does not apply. Far from immunizing defendants from liability, defendants' practice of "basing" the reimbursement charges on the filed rates is precisely what Plaintiffs allege was wrongful. Borrowers' loan agreements only allowed defendants to charge reimbursement for GMACM's costs, not the filed rates. ¶ 62. As in *Verity* and *Ice Cream Liquidation*, the practice of billing based on filed rates applicable to distinct transactions was, and is, a pretext for an overcharge.

To be sure, the filed rate doctrine governs the premiums that Balboa charged GMACM. Borrowers, however, were not parties to those insurance transactions – a fact the insurance contracts make clear.[5] Balboa's filings also make clear that there is a difference between the premiums that

---

[5] *See, e.g.*, February 22, 2013 Declaration of Kurt Peterson ("Peterson Decl.") Ex. B, at 51 ("The contract of insurance is only between the NAMED INSURED and Meritplan Insurance Company. There is

(continued...)

Balboa charged lenders and what lenders were entitled to "charge back" to borrowers under their "mortgage contracts." Peterson Decl. Ex. C, at 2 ("This program is designed so that the lender pays the insurer for all premium and charges back only those parts of the premium which are allowed to be charged to the borrower.").[6]

Numerous courts have held the filed rate doctrine inapplicable to bar LPI claims similar to those here. *See, e.g.*, *Cannon v. Wells Fargo Bank N.A.*, No. 12 Civ. 1376, 2013 WL 132450, at *8 (N.D. Cal. Jan. 9, 2013) (noting the "'limited scope of the filed rate doctrine to preclude damage claims only where there are validly filed rates'" and holding doctrine inapplicable to claim that LPI charges were inflated by kickbacks); *Abels v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273, 1277 (S.D. Fla. 2009) (same); *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11 Civ. 81373, 2012 WL 2003337, at *2 (S.D. Fla. June 4, 2012) (doctrine inapplicable to claim that "impermissible kickbacks" were "included in the premiums that were added to the balance of [plaintiff's] mortgage loan"); *Ellsworth v. U.S. Bank, N.A.*, No. 12. Civ. 02506, 2012 WL 6176905, at *12 (N.D. Cal. Dec. 11, 2012) (doctrine inapplicable to bar LPI kickback claim); *Gipson v. Fleet Mortg. Grp., Inc.*, 232 F. Supp. 2d 691, 707 (S.D. Miss. 2002) (same).[7]

---

[5](...continued)
no contract of insurance between the BORROWER and Meritplan Insurance Company. The insurance purchased is intended for the benefit and protection of the NAMED INSURED . . .").

[6]   Balboa misleadingly refers to the LPI cost reimbursement charges as "Plaintiffs' insurance premiums." Br. at 8. This characterization contradicts the well-pled allegations of the SAC, and is devoid of factual basis. GMACM paid insurance premiums. Plaintiffs paid cost reimbursements due under their mortgage loans.

[7]   The cases cited by Balboa – *Schilke v. Wachovia Mortgage, FSB*, 820 F. Supp. 2d 825 (N.D. Ill. 2011), and *Steven v. Union Planters Corp.*, No. 00 Civ. 1695, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000) – are inapposite. In those cases, the plaintiffs actually challenged the "reasonableness" of the premiums charged by the insurer. Here, Paintiffs allege overstated cost reimbursement charges under their loan
(continued...)

Balboa's filed rate doctrine arguments also fail because the doctrine "applies only to allegations that a regulated entity's filed rates are unreasonable." *Blessing*, 775 F. Supp. 2d at 658. Plaintiffs do not allege that Balboa's rates were unreasonable.  They allege that defendants overcharged them for "reimbursement" of GMACM's LPI "costs."   Whatever the rates and regardless of whether those rates were reasonable, defendants were not entitled to charge in excess of GMACM's costs.  Balboa's contention that the claims will "enmesh" the court in second guessing regulators has no merit.   "[P]laintiffs do not challenge, either directly or indirectly, the reasonableness of the rate contained in any filed tariff." *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F. Supp. 2d 565, 574 (S.D.N.Y. 1999); *Ice Cream Liquidation*, 253 F. Supp. 2d at 276 ("plaintiff is not asking the Court to engage in judicial rate-making by substituting its judgment for that of the USDA").[8]

## II.
## THE SAC ADEQUATELY PLEADS RICO CLAIMS AGAINST BALBOA

RICO provides a private cause of action to "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c).  Section 1962 lists four "Prohibited activities."  Subsection (c) provides:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly,

---

[7](...continued)
agreements.  The other filed-rate cases cited by Balboa are inapposite because, unlike this case, they involved challenges to duly filed rates.

[8] Balboa also argues that the Plaintiffs' claims implicate the "non-discrimination prong" of the filed-rate doctrine. This has no merit.  GMACM was the "ratepayer," *Wegoland*, 27 F.3d at 21-22, not Plaintiffs. If anything, it was Balboa's improper provision of kickbacks – *i.e.*, effectively discounted premiums – to GMACM that implicates the "non-discrimination prong."

in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

18 U.S.C. § 1962(c).

To state a claim for a violation of section 1962(c), plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). A "pattern" of racketeering activity requires the commission of at least two predicate acts listed under section 1961(1). 18 U.S.C. § 1961(5).

The Supreme Court has admonished that "RICO is to be read broadly" as evidenced not only by "Congress' self-consciously expansive language and overall approach but also [by] its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.'" *Sedima*, 473 U.S. at 497-98 (citation omitted). The *Sedima* Court, in reviewing Congress' liberal intentions in creating RICO's remedies, recognized that such breadth is "nowhere more evident than in the provision of a private action for those injured by racketeering activity." *Id*. at 498.

Here, Balboa challenges the RICO claims in the SAC on four grounds: (i) that the SAC fails to allege that Balboa conducted a pattern of racketeering activity through the commission of predicate acts; (ii) that the SAC fails to allege that Balboa participated in the "operation or management" of the RICO enterprise; (iii) that the SAC fails to allege that plaintiffs have RICO standing by injury caused by Balboa, and (iv) that the SAC fails to allege the "agreement" required for RICO conspiracy. Br. at 12, 20-23.

Balboa does not dispute that the SAC adequately alleges RICO claims against GMACM. It simply suggests that GMACM is solely responsible for the violations.

Balboa's arguments have no merit.[9]

## A.     The SAC Adequately Alleges that Balboa Participated in a Pattern of Racketeering Activity

### 1.     The SAC Adequately Alleges that Balboa Committed Mail and Wire Fraud

"A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir.1996) (citing *United States v. Gelb*, 700 F.2d 875, 879 (2d Cir. 1983)).

Balboa erroneously maintains that the SAC fails to plead mail and wire fraud because it supposedly does not: (i) allege a fraudulent scheme, (ii) allege Balboa's fraudulent intent, or (iii) satisfy the particularity requirements of Rule 9(b).  Br. at 12, 16.

### a.     The SAC Adequately Alleges a Fraudulent Scheme

A "scheme to defraud" has been described as any "plan to deprive a person of something of value by trick, deceit, chicane or overreaching." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (citations omitted).  "The term 'scheme to defraud' is measured by a 'nontechnical standard. It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general [and] business life of members of society.'" *United States v. Trapilo*, 130 F.3d 547, 550 n.3 (1997) (quoting *United States v. Von Barta*, 635 F.2d 999, 1005 n.12 (2d Cir. 1980)).

---

[9]  When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must assume all facts alleged in the complaint to be true, and draw all reasonable inferences in favor of the plaintiff.  *Kassner*, 496 F.3d at 237.  To avoid dismissal, the complaint must simply contain "enough facts to state a claim to relief that is plausible on its face [and] nudge [ ] [the plaintiff's] claims across the line from conceivable to plausible . . . ."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

13

Here, the SAC alleges a scheme to overcharge in the course of a contract – a classic fraudulent scheme in violation of the mail and wire fraud statutes. *See, e.g.*, *Center Cadillac, Inc. v. Bank Leumi Trust Co. of N.Y.*, 808 F.Supp. 213 (S.D.N.Y. 1992), *aff'd*, 99 F.3d 401 (2d Cir. 1995) (fraudulent scheme in violation of mail and wire fraud pleaded where lender issued statements overstating amounts owed and misstating interest rate charged); *In re U.S. Foodservice Inc. Pricing Litig.*, No. 07 Civ. 1894, 2009 WL 5064468, at *18 (D. Conn. Dec. 15, 2009) (same; contractor issued bills inflating costs under cost-plus contract).[10]

The overcharge scheme deceived borrowers and loan owners into making excess payments. ¶¶ 7-12, 67-72. *See Bronzin v. United States*, 309 F.2d 158, 159 (8th Cir. 1962) ("[A] scheme which contemplates the sending of bills through the mails . . . for the purpose of inducing [victims] to part with money they do not owe, is a fraudulent scheme.").

The scheme also deceptively lulled borrowers and loan owners into believing that the overstated "reimbursement" amounts were properly due and owing, thereby concealing GMACM's misappropriation of the excess money "off the top" of borrowers' payments and loan owners' proceeds. ¶¶ 81, 114, 120; *see also Schwartz v. Lawyers Title Ins. Co.*, 680 F. Supp. 2d 690 (E.D. Pa. 2010) (denying motion to dismiss mail and wire fraud claims where plaintiffs alleged a scheme to "misrepresent[] the amount due and owing . . . and misappropriat[e] the overcharges"); *United States v. Roebuck*, No. 11 Civ. 127, 2012 WL 4955208 (D. Vt. Oct. 17, 2012) (claim stated for mail

---

[10]  *See, e.g.*, *United States v. Kim*, 246 F.3d 186 (2d Cir. 2001) (fraudulent scheme in violation of mail and wire fraud statutes alleged that defendants submitted inflated travel vouchers); *Chubb & Son Inc. v. Kelleher*, No. 92 Civ. 4484, 2010 WL 5978913, at *4 (E.D.N.Y. Oct. 22, 2010) (same; inflated insurance claims), *report and recommendation adopted*, 2011 WL 839553 (E.D.N.Y. Mar. 7, 2011); *Sandwich Chef of Tex., Inc., v. Reliance Nat'l Indem. Ins. Co.*, 111 F. Supp. 2d 867, 873 (S.D. Tex. 2000) (same; inflated insurance bills).

and wire fraud where misstatements concealed embezzlement).  Hence, a fraudulent scheme is alleged.

Balboa urges that any fraud was immaterial.  Br. at 13.

The SAC, however, is replete with allegations that the overcharges were material. Defendants overstated GMACM's LPI costs by 15%-30%, garnering defendants tens of millions of dollars a year in excess reimbursements.  ¶ 80.  *See Schwartz*, 680 F. Supp. 2d at 698-99 (10% overcharge not immaterial as a matter of law).  Moreover, the overcharges were of such magnitude that they prompted the NYSDFS to launch an investigation, and ARE to sue.  ¶¶ 100-03, 105.  The overcharges also imposed such excess "costs on taxpayers" that Fannie Mae banned the practice. ¶¶ 97-98.  The NYSDFS also found that LPI kickbacks "saddled homeowners, taxpayers, and investors with millions of dollars in unfair and unnecessary costs."  Strauss Decl. Ex. B.

"Materiality is generally a question for the fact finder."  *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007).  In light of these facts, it cannot be said that the overcharges were "so obviously unimportant . . . that reasonable minds could not differ on the question of their importance.'"  *Abbey v. 3F Therapeutics, Inc.*, No. 06 Civ. 409, 2009 WL 4333819, at *9 (S.D.N.Y. Dec. 2, 2009) (quoting *ECA Local 134 IBEW Joint Pension Fund v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009)).[11]

---

[11] Balboa's reliance on *Moore v. PaineWebber, Inc.*, 189 F.3d 165 (2d Cir. 1999), is unavailing.  Br. at 13.  *Moore* involved fraudulent inducement to enter into a contract, not fraudulent overbilling in the course of a contract, as here.  *See, e.g.*, *Center Cadillac*, *supra*.  Furthermore, to the extent that *Moore* suggested that materiality, either under RICO or the mail fraud statute, requires some element of first-party reliance, *Moore* is no longer good law.  *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ("[A] plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations.").

Balboa argues that its mailings to borrowers were not deceptive because they truthfully disclosed the circumstances under which LPI would be imposed and what borrowers would be charged, thus supposedly enabling borrowers to make an "informed decision" about LPI.  Br. at 14-15.

This strawman argument, however, fails to address the falsity alleged – *i.e.*, GMACM's "costs" and the "reimbursements" legitimately owed.  Balboa does not dispute that the SAC adequately alleges that those amounts were materially overstated.

Balboa's strawman argument also erroneously assumes that borrowers' only choice – apart from being overbilled on LPI – was to buy their own hazard insurance.  Had borrowers known of the overcharges, however, they could also have objected to defendants' wrongdoing (as did Fannie Mae), alerted authorities (such as the NYSDFS), or sued (as Plaintiffs, and ARE, are now).  Balboa's false statements perpetuated the fraud by concealing it.  *See Pollack v. Laidlaw Holdings, Inc.*, No. 90 Civ. 5788, 1995 WL 261518, at *23 (S.D.N.Y. May 3, 1995) (mail fraud lulled victims, postponing their complaint to authorities); *Roebuck*, 2012 WL 4955208, at *4 (mail fraud concealed and obscured misappropriation; rational juror could determine that embezzlement would otherwise have been detected).

Balboa also argues that a purported disclosure included in certain mailings – *i.e.*, that GMACM or one of its affiliates "may receive compensation" – cured any deception.  Br. at 14.

At best, however, such purported disclosure was an inadequate and deceptive "half-truth." *See Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 69 (1st Cir. 1998) ("the *locus classicus* of fraud is a . . . false statement or a half truth, *i.e.*, a statement that is literally true but is made misleading by a significant omission").  Nothing in the purported disclosure identified the payer, nature, source, or

16

amount, of the "compensation," or reconciled the claim with the false statements regarding the sums supposedly required to "reimburse" GMACM for its "costs."   The purported disclosure also deceitfully depicted the "compensation" as something that was contingent, merely possible, and innocent, when, in fact, Balboa was paying, and GMACM was receiving, illegal kickbacks as part of an existing business arrangement.[12]

Hence, even if the purported disclosure contained a grain of truth, it was deceptive in context. *See, e.g.*, *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006) ("The mail fraud statute covers all fraudulent and deceptive statements, including statements that are literally true but deceptive in the context in which they are made."); *Halperin v. eBankerUSA.com*, 295 F.3d 352, 357 (2d Cir. 2002) ("The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would . . . mislead . . .").

The inadequacy of the purported disclosure is further evidenced by the fact that the NYSDFS was able to uncover the fraud only by subpoenaing Balboa and GMACM and interrogating their executives under oath (tellingly, in their testimony, none of the executives sought to rely on, or even mentioned, the purported disclosure).   ¶¶ 73, 100-03; *see also* Strauss Decl. Ex. D.   Additionally, loan owner ARE sued Balboa and GMACM alleging fraud based on material non-disclosure. ¶ 105.

Balboa maintains that any omission claims in the SAC fail because Balboa did not owe a disclosure duty.  Br. at 15.  The SAC, however, alleges that Balboa made material misstatements and

---

[12]  *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) (quoting *Voit v. Wonderware Corp.*, 977 F. Supp. 363, 371 (E.D. Pa. 1997)) (internal quotation marks omitted) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.").

engaged in fraudulent conduct (*i.e.*, paid kickbacks). Such allegations plead actionable mail and wire fraud irrespective of any omissions. Furthermore, Balboa did not "stand mute," but "trumpeted lies," *i.e.*, it issued the fraudulent mailings, thus giving rise to a disclosure duty.[13] *In re Lupron Mktg. and Sales Practices Litig.*, 295 F. Supp. 2d 148, 167 (D. Mass. 2003); *United States v. Autuori*, 212 F.3d at 119 (disclosure duty arises "where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading").[14]

NMC also owed a contractual and statutory disclosure duty. NMC subcontracted to perform obligations under GMACM's servicing agreements. ¶¶ 6, 72. Those agreements required compliance with the terms of the underlying mortgages. Strauss Decl. Ex. E, at 60. The servicing agreements and the mortgages, in turn, required accurate billings to borrowers, and did not authorize overbilling. ¶¶ 55-56; *see also* Strauss Decl. Ex. F, at 62. The mortgages were also subject to the requirement that borrowers be issued truthful and accurate statements under § 1026.7 of subpart B of Regulation Z of the Truth and Lending Act, 12 C.F.R. § 226.[15]

---

[13] Balboa argues that it did not owe a "public" disclosure duty. Br. at 15. Whether Balboa's disclosure duty extended to the general public, however, is irrelevant. At minimum, Balboa owed a disclosure duty to Plaintiffs and loan owners.

[14] Balboa's reliance on *Gustafson v. BAC Home Loans Servicing, LP*, No. 11 Civ. 915, 2012 WL 7071488 (C.D. Cal. Dec 26, 2012), and *Weinberger v. Mellon Mortgage. Co.*, No. 98 Civ. 2490, 1998 WL 599192 (E.D. Pa. Sep. 10, 1998), is unavailing. Those cases did not involve insurers alleged to have overstated reimbursement charges purportedly due under borrowers' mortgage agreements. Hence, those cases are inapposite.

[15] NMC also owed a contractual and statutory disclosure duty to loan owners. NMC subcontracted to provide LPI cost data for inclusion in reports to loan owners. Strauss Decl. Ex. E, at 60. NMC's reporting obligations were subject to federal servicing standards, *see* Item 1122 of Reg. AB, 17 C.F.R. 229.1122, to which NMC regularly affirmed its compliance. *Id.*

### b.    The SAC Adequately Alleges Balboa's Fraudulent Intent

A strong inference of fraudulent intent can be alleged in two ways. "First, the plaintiff may allege 'a motive for committing fraud and a clear opportunity for doing so.' Second, where no motive is apparent, the plaintiff may plead *scienter* by 'identifying circumstances indicating conscious behavior by the defendant . . . .'" *Vaughn v. Air Line Pilots Ass'n*, 377 F. App'x 88, 90-91 (2d Cir. 2010) (citations omitted).

Here, the SAC alleges Balboa's conscious misbehavior in that it issued notices to borrowers overstating the amounts required to "reimburse" GMACM for its LPI "costs," while being aware of the true costs (after all, Balboa was the one that paid the kickbacks which reduced those costs in the first place). ¶¶ 114, 120; *see also Schwartz*, 680 F. Supp. 2d at 712 (knowledge of true prices at time defendants issued inflated bills alleges fraudulent intent); *U1IT4less, Inc. v. FedEx Corp.*, No. 11 Civ. 7163, 2012 WL 4459377, at *10 (S.D.N.Y. Sept. 25, 2012) (same).

The SAC also alleges Balboa's conscious misbehavior in that Balboa disguised the kickbacks by routing them through NMC and John Doe (rather than, *e.g.*, simply sending GMACM a check). ¶¶ 71-72. *See United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 513 (6th Cir. 2009) (fraudulent intent proved at trial by evidence that defendants "disguise[d]. . . illegal kickbacks as legitimate [transactions]"); *United States v. George*, 477 F.2d 508, 511 (7th Cir. 1973) (same; defendant sought to conceal kickbacks by passing them through third-party).

The SAC also alleges Balboa's motive and opportunity in that Balboa paid the kickbacks, and received a *quid pro quo*, *i.e.*, GMACM's lucrative LPI business, in return. ¶ 79. *See George*, 477 F.2d at 513-14 (motive and opportunity adequately pleaded by allegation that supplier paid kickbacks to customer's agent in return for orders); *United States v. Norton*, No. 99 Civ.10078, 2000

WL 33281703, at *4-5 (W.D. Va. Nov. 14, 2000) (same; physician paid kickbacks in exchange for prompt and full reimbursements from hospital).

Balboa urges that the SAC fails to plead fraudulent intent because there is no claim that Balboa intended to deceive borrowers that LPI was "preferable." Br. at 16. This strawman argument, however, takes aim at an allegation not in the SAC, which alleges that Balboa intended to deceive borrowers and loan owners as to GMACM's "costs," and, hence, the amounts legitimately required in "reimbursement." ¶¶ 110-13. The SAC adequately alleges Balboa's fraudulent intent in this regard.[16]

### c.   The Fraud Allegations Satisfy Rule 9(b)

"[T]he essence of Rule 9(b) is that each defendant be advised of the fraud claims against it." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91 Civ. 2923, 1994 WL 88129, at *17 (S.D.N.Y. March 15, 1994); *see DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).[17]

The SAC satisfies this requirement. It details the role of each Balboa defendant. BIC and MIC paid GMACM kickbacks, disguising the kickbacks by funneling them through NMC using

---

[16]  Balboa's reliance on *Weinberger v. Mellon Mortgage Co.*, No. 98 Civ. 2490, 1998 WL 599192 (E.D. Pa. Sept. 10, 1998), is unavailing. There, the plaintiffs did not allege that the defendants deliberately disguised kickbacks or knowingly issued mailings overstating the servicer's LPI "costs" and the amounts owed by borrowers in "reimbursement." Hence, *Weinberger* is inapposite. The other cases relied on by Balboa are also inapposite. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993) (mere breach of contract did not establish fraud); *Connecticut Nat. Bank v. Fluor Corp.*, 808 F.2d 957 (2d Cir. 1987) (defendants lacked economic incentive to deceive); *Associated Wrecking, Inc. v. Local 95 Pension Fund*, No. 92 Civ. 1841, 1994 WL 118987 (S.D.N.Y. Mar. 31, 1994) (complaint gave only "vague description of the alleged fraudulent scheme").

[17]  Non-fraud elements of a RICO claim may be pled pursuant to the less-stringent notice pleading standard of Rule 8. *Calabrese v. CSC Holdings, Inc.*, 283 F. Supp. 2d 797, 811 (E.D.N.Y. 2003) (citing *In re Sumitomo Copper Litig.*, 104 F. Supp. 2d 314, 319 (S.D.N.Y. 2000)).

"intercompany expense allocations," and through John Doe mislabeled as "commissions." ¶¶ 9, 75-78.  NMC, the "bagman," delivered the kickbacks to GMACM in the form of free tracking services, for which GMACM would otherwise have had to pay.  ¶¶ 59, 70-72.  NMC also prepared and mailed fraudulent statements to borrowers.  ¶¶ 108-14.

These allegations permit BIC, MIC, and NMC, "to identify their alleged role and acts in the fraud to appropriately respond to the complaint."  *Allstate Ins. Co. v. Ahmed Halima*, No. 06 Civ. 1316, 2009 WL 750199, at *5 (E.D.N.Y. Mar. 19, 2009).  The allegations meet Rule 9(b).

Balboa argues that the SAC fails to particularize the role of BIC and MIC because only NMC is alleged to have issued false mailings.  Br. at 17-18.  "It is not essential that the defendant actually undertake the mailing," however, "so long as it was reasonably foreseeable that a third-party would use the mails in the ordinary course of business as a result of the defendant's acts."  *ReSource N.E. of Long Island, Inc. v. Town of Babylon*, 80 F. Supp. 2d 52, 60 (E.D.N.Y. 2000) (citing *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir. 1989)); *Baisch v. Gallina*, 346 F.3d 366, 375 (2d Cir. 2003) (quoting *United States v Tocco*, 135 F.3d 116, 124 (2d Cir. 1998) ("Even if Gallina never mailed a fraudulent letter himself, Baisch has sufficiently alleged that Gallina committed mail fraud by 'act[ing] with knowledge that the use of the mails will follow in the ordinary course of business,' and that the use of mail could have been 'reasonably foreseen.'").

Moreover, in cases where the mails or wires were "used in furtherance of a master plan to defraud, the communications need not have contained false or misleading information themselves." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) (citations and internal quotation marks omitted) ("The gravamen of the [mail fraud] offense is the scheme to defraud, and any mailing that is incident to an essential

part of the scheme satisfies the mailing element, even if the mailing itself contains no false information.").

Here, the SAC alleges facts sufficient to infer that BIC and MIC foresaw use of the mails – BIC and MIC paid NMC to use the mails.  ¶¶ 71-72, 108-14.  The SAC also alleges that the mails were used incident to a "master plan to defraud" involving kickbacks, misstatements, overcharges, misappropriation, and injury to both borrowers and loan owners.

Balboa urges that NMC was somehow not "responsible" for the "content" of its mailings, the implication being that GMACM was "responsible."  Br. at 17.  The SAC, however, alleges that NMC knowingly participated in the scheme.  It is no defense to NMC's criminal acts that it supposedly was acting at GMACM's behest.  *See United States v. Holohan*, 436 F. App'x 242, 246 (4th Cir. 2011) (defendant who "willfully participated in the overall scheme to defraud with significant knowledge of its essential character" violated mail and wire fraud statutes regardless that her role was "purely administrative" and she was "simply following orders"); *United States v. Cortes-Caban*, 691 F.3d 1, 12 n.13 (1st Cir. 2012) (rejecting "so-called Nuremberg defense"); *United States v. Speer*, 419 F. App'x 562, 567 (6th Cir. 2011) (employee who "executed" fraudulent transactions "willfully participated" and was guilty of mail fraud regardless of the fact that acts were done at behest of principals/owners); *United States v. Brandon*, 17 F.3d 409, 438 (1st Cir. 1994) ("This 'just following orders' defense cannot stand in the face of the evidence showing that Landman knew down payments were being falsified . . . .  Landman's intent was to participate in transactions designed to deceive Bay Loan."); *see generally United States v. Lilly*, 13 F.3d 15, 18 n.8 (1st Cir. 1994) ("Take, for example, two participants in a criminal enterprise, one the mastermind and one a bottom-rung underling . . . . [B]oth may be chargeable . . . , say, if the underling is a forger who,

22

knowing the plan, follows the mastermind's lead and doctors the critical paperwork, thus consummating the fraud.").

Furthermore, contrary to Balboa's implication, GMACM's sworn testimony suggests that Balboa was acting independently, not at GMACM's behest.  *See* Strauss Decl. Ex. A, at 670-71 ("Our motto is simply to turnkey and outsource it, and have the insurance wholly done by Balboa.").

### 2.    The SAC Adequately Alleges that Balboa Committed Honest Services Fraud

Balboa does not dispute that the SAC adequately alleges that GMACM committed honest services fraud.[18]  Balboa simply urges that it cannot be liable for honest services fraud because only GMACM owed, and breached, an honest services duty.  Br. at 18.

By paying GMACM kickbacks in derogation of loan owners' right to honest services, however, Balboa "participated" in GMACM's honest services violations.  *See United States v. McDonnell*, No. 10 Civ. 1123, 2011 WL 2463194, at *6-7 (C.D. Cal. June 20, 2011) ("*Skilling* contemplates that a defendant can be guilty of Honest Services Fraud when he or she pays a bribe rather than merely receives one . . . . Thus, the fact that Mr. McDonnell did not *receive* a bribe does not exculpate him from Honest Services Fraud liability.") (emphasis in original).[19]

---

[18] "Honest services" fraud is proscribed by 18 U.S.C. § 1346.  The mail and wire fraud statutes prohibit any person from "devis[ing] or intend[ing] to devise" a "scheme or artifice to defraud."  18 U.S.C. §§ 1341 & 1343.  Section 1346 provides that a "'scheme or artifice to defraud' includes a scheme and artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346.  In *Skilling*, the Supreme Court held that Section 1346 criminalizes "fraudulent schemes to deprive another of honest services through bribes or kickbacks."  *Skilling v. United States*, 130 S. Ct. 2896, 2905 (2010).  Here, the SAC alleges that Balboa paid GMACM kickbacks, thereby inflating GMACM's LPI cost reimbursements, and breaching GMACM's duty to pay NMC from GMACM's "own funds."  ¶¶ 61-62.  *See World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 507 (S.D.N.Y. 2007) (right of honest services protects right derived from contract), *aff'd*, 328 F. App'x 695 (2d Cir. 2009).

[19] *See generally McDonnell*, 2011 WL 2463194, at *7 ("Though the majority of cases to which Section 1346 applies involve defendants who received a bribe, *Skilling* did not limit the statute to such
(continued...)

Hence, Balboa, and not just GMACM, committed honest services fraud. *See, e.g.*, *United States v. Rybicki*, 354 F.3d 124, 146-47 (2d Cir. 2003) (*en banc*) (affirming conviction of attorney who paid kickbacks to employees of insurance company to expedite claims).

### 3. The SAC Adequately Alleges that Balboa Committed Extortion

Balboa does not dispute that the SAC adequately alleges that borrowers were induced to pay the alleged overcharges because they feared foreclosure.[20] Balboa simply argues that plaintiffs' extortion claim is inadequate because (i) the SAC fails to plead that Balboa or any other Defendant "expressly" threatened borrowers with foreclosure and (ii) GMACM had the legal right to foreclose. Br. at 18-20. These arguments fail.

In this Circuit, threats made by the defendant, express or otherwise, are not a prerequisite to liability for extortion under the Hobbs Act. "[T]he Hobbs Act 'leaves open the cause of the fear' inducing a party to consent to part with property and does not require that such fear be 'created by implicit or explicit threats.' What is required is evidence that the defendant knowingly and willfully created or instilled fear, ***or used or exploited existing fear*** with the specific purpose of inducing another to part with property." *United States v. Coppola*, 671 F.3d 220, 241 (2d Cir. 2012) (emphasis added) (citation omitted), *cert denied*, 133 S.Ct. 843 (2013) .

---

[19](...continued)
circumstances. To the contrary, the Court in *Skilling* approvingly cited many cases in which defendants paid a bribe . . . . Moreover, the Court in *Skilling* repeatedly talked about mere 'participation' in a bribery or kickback scheme. The Court's repeated language suggests that participation in a bribery or kickback scheme is sufficient for a Section 1346 conviction.") (citations omitted).

[20] Extortion under the Hobbs Act is committed when a defendant "1) induces the plaintiff, with the plaintiff's consent, to part with property, 2) through the wrongful use of actual or threatened force, violence or fear (including fear of economic loss), 3) in such a way as to adversely affect interstate commerce." *Watkins v. Smith*, No. 12 Civ. 4635, 2012 WL 5868395 (S.D.N.Y. Nov. 19, 2012); *see also* 18 U.S.C. § 1951(a). Here, the SAC allege that Balboa used or exploited borrowers' fears of foreclosure to induce them to pay the excess charges. ¶¶ 271-78.

Here, the SAC alleges that Balboa "used or exploited" borrowers' fear of foreclosure by mailing notices that demanded excess payment under their mortgages. ¶ 273. This suffices.[21]

Moreover, the SAC alleges that Balboa did make threats – Balboa warned borrowers in the notices that they were "responsible" for the excess charges under the terms of their loans, as to which GMACM controlled the lien and had a right to foreclose. ¶¶ 274-75. This alleges extortion. *See United States v. Gotti*, 459 F.3d 296, 333 (2d Cir. 2006) (conviction of extortion where defendant told victim that co-conspirator would be "'pissed off'" if payments were late).

Furthermore, whether GMACM had the legal right to foreclose is irrelevant. "Although defendants may have been entitled to use threats of economic harm to obtain repayment of their existing obligations, they were not entitled to obtain more money than they were due." *Center Cadillac*, 808 F. Supp. at 232. Here, the SAC alleges that Balboa used threats of foreclosure to obtain more money than was due from borrowers. ¶ 273.

Balboa submits that, if the allegations in the SAC are sufficient to state a claim for extortion, then "every borrower who disputes any charge on their mortgage account could bring a claim for extortion . . ." Br. at 19. If the disputed charge consists of an intentional overcharge, as here, then, yes, the borrower could allege extortion.[22]

---

[21] *See United States. v. Abelis*, 146 F.3d 73, 83 (2d Cir. 1998) ("the law within this Circuit is clear that the wrongful use of fear need not be a consequence of an implicit or explicit threat as the appellants contend"); *United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987) (en banc) ("It is not necessary that the Government prove that the fear of economic loss was the consequence of a direct threat made by the defendant.").

[22] Balboa also argues that the SAC fails specifically to allege that plaintiffs "paid" the excess charges. Br. at 18-19. In fact, the SAC so alleges. *See* ¶ 279 ("Plaintiffs and the Class paid falsely inflated, unauthorized LPI charges . . . ."). Balboa additionally argues that there is no allegation in the SAC that any threatened foreclosure was "imminent." Br. at 19. Balboa cites no authority, however, in support of an "imminence" requirement for extortion under the Hobbs Act, and there is none.

**B.    The SAC Adequately Pleads that Balboa "Participated" in the "Operation or Management" of a RICO Enterprise**

Balboa urges that the SAC fails to allege that Balboa "participated" in the "operation or management" of the RICO enterprise.  Br. at 20-21.

To be liable under RICO, a defendant must have "conduct[ed] or participat[ed], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  In *Reves v. Ernst & Young*, 507 U.S. 170 (1993), the Supreme Court adopted the "operation or management" test to determine whether a defendant's "participation" was sufficient, explaining that:

> the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required.

507 U.S. at 179 (emphasis in original).

In this Circuit,

> "the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage."  Except where the facts and inferences to be drawn from them are "indisputabl[e]," a civil RICO defendant's actions taken to advance the enterprise's objectives typically "must be assessed by a fact-finder" to determine whether those actions, "assessed in the context of all the relevant circumstances, constitutes participation in the operation or management of the enterprise's affairs."

*Eastman Kodak Co. v. Camarata*, No. 05 Civ. 6384, 2006 WL 3538944, at *3 (W.D.N.Y. Dec. 6, 2006) (citations omitted) (citing *United States v. Allen*, 155 F.3d 35, 42 (2d Cir. 1998)).

Here, the SAC alleges that Balboa paid kickbacks to another participant in the scheme, namely, GMACM, thereby, *e.g.*, influencing GMACM's selection of LPI insurer and tracking

26

subcontractor.  ¶¶ 67-78.  This meets the test for "operation or management."  *See Reves*, 507 U.S. at 184 ("An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery."); *In re Sumitomo Copper Litig.*, 104 F. Supp. 2d at 318 (quoting *Mason Tenders Dist. Council Pension Fund v. Messera*, No. 95 Civ. 9341, 1996 WL 351250, at *6 (S.D.N.Y. June 26, 1996)) ("The RICO statute has been repeatedly construed to cover both insiders as well as those peripherally connected to a RICO enterprise, particularly where the 'outsiders' are alleged to have engaged in kickbacks in order to influence the enterprise's decision"); *see also Twenty First Century L.P.I. v. LaBianca*, 19 F. Supp. 2d 35, 43 (E.D.N.Y. 1998) (evidence that contractor paid kickbacks in RICO action based on mail and wire fraud sufficient to defeat summary judgment as to "operation or management" element); *Eastman Kodak Co.*, 2006 WL 3538944, at *3 (same); *United States v. Castro*, 89 F.3d 1443, 1452 (11th Cir. 1996) (evidence at trial in mail fraud prosecution that defendant paid kickbacks satisfied "operation or management" test).

The SAC also alleges that Balboa prepared and issued fraudulent statements. ¶¶ 108-114. This also meets the test for "operation or management."  *See United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 453 (S.D.N.Y. 2004) (element of "operation or management" satisfied by allegation that defendant made "critical misrepresentations," created "false documents," and served as "the point of communication" with victims); *AIU Ins. Co. v. Olmecs Med. Supply Inc.*, No. 04 Civ. 2934, 2005 WL 3710370, at *9 (E.D.N.Y. Feb. 22, 2005) ("operation or management" test met where doctors provided "misleading prescriptions which facilitated the submission of fraudulent claims"); *Local 875 I.B.T. Pension Fund v. Pollack*, 992 F. Supp. 545, 561-62 (E.D.N.Y. 1998) (same; defendants prepared fraudulent documents to be forwarded to the

plaintiffs); *Tribune Co. v. Purcigliotti*, 869 F. Supp. 1076, 1098 (S.D.N.Y. 1994) (same; defendants filed false compensation claims), *aff'd sub nom. Tribune Co. v. Abiola*, 66 F.3d 12 (2d Cir. 1995).

Balboa suggests that GMACM "operated or managed" the scheme, while Balboa merely provided professional services to GMACM. Br. at 20. There is, however, "no blanket immunity for professionals regardless of their involvement in a criminal enterprise." *JSC Foreign Econ. Ass'n Technostroyexport v. Weiss*, No. 06 Civ. 6095, 2007 WL 1159637, at *8 (S.D.N.Y. Apr. 18, 2007). Where, as here, professionals are "alleged to have exceeded the mere rendering of legitimate professional services, the 'operation or management' requirement will be pleaded adequately." *Id.*[23]

Even if Balboa's role in the enterprise was subordinate to that of GMACM, "an enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Fuji Photo Film USA v. McNulty*, 640 F. Supp. 2d 300, 314 (S.D.N.Y. 2009).

Furthermore, according to GMACM, Balboa ran the "whole" show. Balboa did not take a subordinate role. *See* Strauss Decl. Ex. A, at 670-71 ("Our motto is simply to turnkey and outsource it, and have the insurance wholly done by Balboa. . . . [T]he economics of their business, you would have to ask them."). Given GMACM's assertions, factual issues at minimum exist as to the sufficiency of Balboa's "participation."

---

[23] Balboa's reliance on *Dietrich v. Bauer*, 76 F. Supp. 2d 312 (S.D.N.Y. 1999), and *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425 (2d Cir. 2008), is unavailing. In *Dietrich*, the complaint was devoid of any allegation that the defendants "associated with each other or any other defendant for an unlawful purpose or exercised any control over each other or any other defendant." 76 F. Supp. 2d at 348. In *Smokes-Spirits.com*, the defendants merely provided "internet website hosting" services to the wrongdoers. 541 F.3d at 449 n.28. By comparison, the SAC alleges that Balboa contracted with GMACM to pay kickbacks, make false statements, and overbill.

C.     **The SAC Adequately Alleges That Plaintiffs Have RICO Standing by Injury Proximately Caused by Balboa**

Balboa argues that the SAC fails to allege that Plaintiffs have RICO standing by injury proximately caused by Balboa.  Br. at 21-22.

To establish proximate cause, a RICO plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 989 (2010) (quoting *Holmes v. SEC Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).  "A link that is too remote, purely contingent, or indirect is insufficient." *Id.* (quoting *Holmes*, 503 U.S. at 271, 274) (internal quotation marks omitted).[24]

Here, the theory of proximate cause pleaded in the SAC is straightforward – defendants overcharged, Plaintiffs overpaid.  This theory involves no independent factors or intervening or superseding acts by non-participants in the scheme that break the causal chain between the predicate acts and the harm.  There is nothing "remote, purely contingent, or indirect."  Proximate cause, and standing, are alleged.  *See City of New York v. Venkataram*, 396 F. App'x 722, 724-25 (2d Cir. 2010) (proximate cause alleged by fraudulent invoices that induced undeserved payments).[25]

Balboa urges that borrowers proximately caused their own injuries by failing to maintain homeowners' insurance.  Br. at 22.  Any such failures, however, occurred prior to Balboa's

---

[24]  A plaintiff has standing under 18 U.S.C. § 1964(c) if he was "injured in his business or property by reason of a violation of" the civil RICO statute.  18 U.S.C. § 1964(c).  To establish that the injury he sustained was caused "by reason of" a RICO violation, a civil plaintiff must demonstrate that the RICO violation was not merely its "but for" cause but was its proximate or legal cause as well.  *Holmes*, 503 U.S. at 268.

[25]  *See, e.g.*, *Marini v. Adamo*, 812 F. Supp. 2d 243, 267-68 (E.D.N.Y. 2011) (losses proximately caused by fraudulent requests for payment); *Twenty First Century L.P.I.*, 19 F.Supp.2d at 41 (same; by inflated invoices); *Center Cadillac*, 808  F. Supp. at 229 (same; by misstatements of amounts due, and by extortion).

violations, not after, and, hence, cannot constitute intervening – much less superseding – causes of the harm, or sever the causal chain. *See Amsterdam Tobacco Inc. v. Philip Morris Inc.*, 107 F. Supp. 2d 210, 219 (S.D.N.Y. 2000) (intervening event must occur "between" the alleged RICO violations and the plaintiff's injuries). Balboa erroneously confuses a mere "but for" cause with an "intervening" one. *See Zito v. Leasecomm Corp.*, No. 02 Civ. 8074, 2003 WL 22251352, at *19 (S.D.N.Y. Sep 30, 2003) ("there can be multiple 'but for' causes of varying degrees of directness. . . . The requirement of proximate causation is the stricter one."). In *Bermudez v. First of America Bank Champion, N.A.*, 860 F. Supp. 580, 593 (N.D. Ill. 1994), *withdrawn pursuant to settlement*, 886 F. Supp. 643 (N.D. Ill. 1995), the court rejected an argument similar to that raised by Balboa.[26]

Balboa also urges that plaintiffs have no standing to assert the predicate act of honest services fraud, as any "such liability could only conceivably run . . . to the loan investors," who were owed the honest services duty. Br. at 18.

The honest services violations, however, proximately injured both loan owners and borrowers. As the Second Circuit stated in *Commercial Cleaning Services, L.L.C. v. Colin Services Systems, Inc.*, 271 F.3d 374 (2d Cir. 2001), a RICO defendant "might be obligated to compensate two or more different classes of plaintiffs, each of which suffered a different concrete injury, proximately caused by the violation." *Id.* at 384; *see also In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 536 (S.D.N.Y. 2011) ("An injury can be direct even if the plaintiff is not the only target of

---

[26] *See id.* (rejecting contention that borrowers "proximately caused their own injuries by failing to maintain insurance coverage on the vehicles," as argument "side-steps the fact that plaintiffs do not complain about the fact that Champion purchased insurance and charged the premiums to plaintiffs' accounts, rather plaintiffs complain that Champion purchased unauthorized coverage and then overcharged plaintiffs by passing on the cost of the unauthorized coverage to them. . . . [I]t cannot be said that plaintiffs proximately caused the purchase of unauthorized coverage and the subsequent overcharging.").

30

the defendant's misconduct."); *Morning Star Packing Co. v. SK Foods, L.P.*, No. 09 Civ. 0208, 2011 WL 4591069, at *6 (E.D. Cal. Sep. 30, 2011) (quoting *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1172 (9th Cir. 2002)) ("The existence of 'different classes of plaintiffs . . .' does not defeat standing.").

In *Baisch*, 346 F.3d at 375, the Second Circuit held that a contractor's mail fraud in submitting overstated vouchers for payment to Nassau County proximately injured not just the County, but also the plaintiff, who loaned the contractor money based on the County's anticipated payments. *Id*. Hence, the plaintiff had standing. *Id*. The court stated:

> The fraud against Nassau County was the basis for the fraud against Baisch that led to his injury. The frauds against Baisch and those against Nassau County were not just linked; they were intertwined as coordinated parts of one racketeering enterprise, and they formed a "pattern" of racketeering . . . . RICO standing extends to all directly injured parties . . . . The frauds by the defendants plainly injured Baisch directly . . . . No precedent suggests that a racketeering enterprise may have only one 'target,' or that only a primary target has standing.

*Id*. at 374-75 (citations omitted); *see also Bridge*, 553 U.S. at 639 (2008) (tax lien bidder's mail fraud in lying to county about compliance with county's single simultaneous bidder rule proximately injured plaintiffs, who were competing bidders, where as a result of fraud violators were able to obtain higher share of valuable liens, leaving plaintiffs with fewer liens).

Likewise, here, defendants' honest services fraud injured borrowers directly. The scheme targeted both classes of victims – borrowers and loan owners – "as coordinated parts of one racketeering enterprise." The kickbacks overstated GMACM's LPI costs; as a result, both borrowers and loan owners were overcharged for reimbursement. Moreover, Balboa "do[es] not and cannot argue that the Plaintiffs' injur[ies] [are] derivative" of those of loan owners. *In re Refco*, 826 F.

Supp. 2d at 537.  Borrowers suffered their own distinct losses, and "there is no intermediate party that is better situated to seek recovery."  *Id*.

Accordingly, Plaintiffs have standing to assert the predicate act of honest services fraud.  *See, e.g.*, *Wallace v. Powell*, No. 09 Civ. 286, 2010 WL 3398995, at *12 (M.D. Pa. Aug. 24, 2010) (scheme to pay kickbacks to judges in exchange for sentencing youth offenders to for-profit juvenile detention facility proximately injured juveniles and their parents, even though judges owed honest services duty only to "the people of Pennsylvania").[27]  At minimum, it cannot be said that Plaintiffs' proximate cause allegations fail as a matter of law.[28]

### D.    The SAC States a Claim for RICO Conspiracy

The "core" of a RICO civil conspiracy is "an agreement to commit predicate acts . . . ."  *Hecht v. Commerce Clearing House, Inc.*, 897 F. 2d 21, 25 (2d Cir. 1990).  Balboa urges that the SAC does not plead any facts "implying" an agreement between the defendants.  Br. at 22.

The SAC, however, expressly alleges that BIC, MIC, and NMC struck deals to engage in the scheme with GMACM in 2003.  ¶¶ 67, 69.  Balboa publicized those deals (albeit not the illegal aspects) in a press release.  *See* Strauss Decl. Ex. G.  Balboa and GMACM admitted to the existence of the deals in sworn testimony.  *See id*. Ex. A.  Balboa has agreed to produce the deal documents

---

[27] Balboa cites *In re American Express Co. Shareholder Litigation*, 39 F.3d 395, 400 (2d Cir. 1994), for the purported proposition that proximate cause involves analysis of the defendant's "intent" and "purpose."  Br. at 21.  In *Hemi*, however, the Supreme Court rejected such a subjective formulation.  559 U.S. at 991.  It is no longer good law.

[28] *See Zito*, 2003 WL 22251352, at *20 ("Plaintiffs may not be able to prove [proximate cause], but they have alleged it and are entitled to present evidence in support of their theory."); *Florida v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288, 1307 n.15 (S.D. Fla. Aug. 29, 2005) ("At this stage of the litigation, the degree of involvement by each alleged actor in the causal chain is unknown, and Tenet has simply failed to demonstrate that it should be absolved of all liability merely because some other actors may have impacted on Plaintiffs' injuries.").

in discovery.  Accordingly, sufficient facts exist to infer the requisite "agreement."  Conspiracy adequately is alleged.

## III.
## THE SAC ADEQUATELY ALLEGES A CLAIM FOR VIOLATION OF RESPA

RESPA, 12 U.S.C. § 2607(a), makes it unlawful to "accept any fee, kickback, or thing of value pursuant to any agreement . . . that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."  "Settlement" is defined as "the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan."  24 C.F.R. § 3500.2.

Balboa urges that plaintiffs' RESPA claim should be dismissed on the sole ground that RESPA supposedly only applies to charges imposed at loan closings, not those imposed after borrowers bought their homes.  Br. at 23.

Balboa, however, misses an essential point – transactions relating to LPI "regard[] a lien on property" inasmuch as borrowers' mortgages provide that "any amounts disbursed by the Lender" for LPI "shall become additional debt of Borrower secured by [the mortgage] Security Instrument." ¶ 48.  In other words, loan owners (or their designated servicers) are entitled to a lien in the amount of any LPI.  ¶ 88.  Hence, the "execution" of a transaction relating to LPI falls squarely within the definition of a "Settlement."  24 C.F.R. § 3500.2.  Here, the SAC alleges that Balboa executed such transactions.  ¶ 140.

The authorities relied on by Balboa are not controlling or persuasive.  The plaintiffs in those cases did not allege or argue that LPI transactions "regard a lien."  Nothing in RESPA suggests that the statute only applies to loan transactions.  RESPA is an anti-kickback statute applicable to

33

transactions "regarding a lien," not a reformulation of the Truth in Lending Act, which governs disclosures in connection with loans. To be sure, a mortgage loan is a type of transaction "regarding a lien," but it is not the only type. Had Congress intended to limit the scope of RESPA to loan transactions, it presumably would have used the word "loan." *See Russello v. United States*, 464 U.S. 16, 27-28 (1983). Moreover, the definition of "Settlement" expressly contemplates that the transaction may occur after a property already "*is* subject to" a federally related loan. 24 C.F.R. § 3500.2 (emphasis added). Nothing suggests that the transaction itself must constitute the extension of the federally related loan.[29] Balboa's construction impermissibly renders the phrases "regarding a lien" and "is subject to" meaningless. *See Carcamo-Flores v. I.N.S.*, 805 F.2d 60, 66 (2d Cir.1986) ("There is a presumption against construing a statute as containing superfluous or meaningless words or giving it a construction that would render it ineffective.").

Courts cannot "undo or limit" the plain meaning of the statute. *Bhd. Of R.R. Trainmen v. Baltimore & O.R. Co.*, 331 U.S. 519, 529 (1947). RESPA applies. The SAC states a claim against Balboa for kickbacks in violation of RESPA.

---

[29] Balboa focuses on language in 24 C.F.R. § 3500.2 suggesting that a "Settlement" "'*may* be called 'closing' or 'escrow' in different jurisdiction.'" Br. at 23 (emphasis added) (quoting 24 C.F.R. § 3500.2) . This expressly  non-exclusive example cited by the regulation does not foreclose that other transactions which "regard a lien" are also "Settlements."

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court deny the motion to dismiss of defendants Balboa Insurance Company, MeritPlan Insurance Company, and Newport Management Corporation.

Dated: New York, New York
      March 22, 2013

                       **KIRBY McINERNEY LLP**

                       By:  /s/ Mark A. Strauss
                         Mark A. Strauss (mstrauss@kmllp.com)
                        J. Brandon Walker (bwalker@kmllp.com)
                       825 Third Avenue, 16th Floor
                       New York, New York 10022
                       Tel:  (212) 371-6600
                       Fax: (212) 751-2540

                       *Attorneys for Plaintiffs Landon Rothstein et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2013, I electronically filed the foregoing using the CM/ECF system, which will send notification of such filing to counsel of record.

                       /s/ Mark A. Strauss
                       Mark A. Strauss