**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x          **ECF CASE**
**LANDON ROTHSTEIN, JENNIFER**          :
**DAVIDSON, ROBERT DAVIDSON,**
**and IHOR KOBRYN, individually and**          :
**on behalf of all others similarly situated,**

                                                                      :

          **Plaintiffs,**

                                                                      :          12 Civ. 3412 (AJN)

          **v.**

                                                                      :

**ALLY FINANCIAL, INC. f/k/a GMAC**
**INC., ALLY BANK f/k/a GMAC BANK,**          :
**JOHN DOE CORPORATION,**
**BALBOA INSURANCE COMPANY,**          :
**MERITPLAN INSURANCE**
**COMPANY, and NEWPORT**          :
**MANAGEMENT CORPORATION,**

                                                                      :

          **Defendants.**

                                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**REPLY MEMORANDUM IN FURTHER SUPPORT OF THE BALBOA DEFENDANTS'**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**


                                        **BuckleySandler LLP**
                                        1133 Avenue of the Americas
                                        Suite 3100
                                        New York, New York 10036
                                        Tel:  (212) 600-2310
                                        Fax: (212) 600-2405

                                        *Counsel for Defendants Balboa*
                                        *Insurance Company, Meritplan*
                                        *Insurance Company and Newport*
                                        *Management Corporation*

Of Counsel:
Robyn C. Quattrone (*pro hac vice*)
Ross E. Morrison
Katherine L. Halliday (*pro hac vice*)

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

**ARGUMENT** ......................................................................................................... 1

   **I.**     **PLAINTIFFS' CLAIMS ARE BARRED BY THE FILED RATE DOCTRINE.** ............................................................................. 1

   **II.**    **THE SAC FAILS TO STATE A CLAIM UNDER § 1962(C) OR § 1962(D) OF RICO.** ................................................................ 7

        **A.**    **The SAC Does Not Allege that the Balboa Defendants Committed Mail or Wire Fraud.** ................................................ 7

        **B.**    **The SAC Does Not Allege That the Balboa Defendants Committed Honest Services Fraud.** ......................................... 11

        **C.**    **The SAC Does Not Allege that the Balboa Defendants Committed Extortion.** ....................................................... 12

   **III.**   **THE SAC FAILS TO STATE A RICO CONSPIRACY CLAIM.** ................. 13

   **IV.**   **THE SAC FAILS TO STATE A CLAIM UNDER RESPA.** .......................... 13

**CONCLUSION** ...................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Abels v. J.P. Morgan Chase Bank, N.A.*,
   678 F. Supp. 2d 1273 (S.D. Fla. 2009) ................................................................. 5, 6

*Allstate Ins. Co v. Halima*,
   No. 06-cv-1316(DLI)(SMG), 2009 WL 7501995 (E.D.N.Y. Mar. 19, 2009) ......................... 11

*Baisch v. Gallina*,
   346 F.3d 366 (2d Cir. 2003) ................................................................................ 11

*Blessing v. Sirius XM Radio Inc.*,
   775 F. Supp. 2d 650 (S.D.N.Y. 2011) ...................................................................... 9

*Boyle v. D'Onofrio*,
   99 F. Supp. 2d 541 (D.N.J. 2000),
   *aff'd*, 254 F.3d 1077 (3d Cir. 2001) ...................................................................... 8

*Chubb & Son Inc. v. Kelleher*,
   Nos. 92 CV 4484 (TLM)(RML), 95 CV 0951 (CBA)(RML),
   2010 WL 5978913 (E.D.N.Y. Oct. 22, 2010)................................................................ 9

*Ellsworth v. U.S. Bank, N.A.*,
   No. C 12-02506, 2012 WL 6176905 (N.D. Cal. Dec. 11, 2012)............................................. 6

*FTC v. Verity International, Ltd.*,
   443 F.3d 48 (2d Cir. 2006) .................................................................................. 6

*Gipson v. Fleet Mortg. Grp.*,
   232 F. Supp. 2d 691 (S.D. Miss. 2002) ..................................................................... 6

*Gustafson v. BAC Home Loans Servicing, LP*,
   No. SACV 11-915-JST (ANx), 2012 WL 7071488 (C.D. Cal. Dec. 26, 2012) ......................... 9

*Hemi Grp v. City of N.Y.*,
   559 U.S. 1, 130 S. Ct. 983 (2010).......................................................................... 12

*Hill v. BellSouth Telecomms., Inc.*,
   364 F.3d 1308 (11th Cir. 2004) ............................................................................ 4

*In re GeoPharma, Inc. Sec. Litig.*,
   399 F. Supp. 2d 432 (S.D.N.Y. 2005) .................................................................. 10, 13

*In re Livent, Inc. Noteholders Sec. Litig.*,
   151 F. Supp. 2d 371 (S.D.N.Y. 2001) ..................................................................... 10

*In re Smith*,
   Bankr. No. 04-50723, 2012 WL 1123049 (Bankr. W.D. Tex. Apr. 3, 2012)............................ 6

*JSC Foreign Econ. Ass'n Technostroyexport v. Weiss*,
   No. 06 Civ. 6095(JGK), 2007 WL 1159637 (S.D.N.Y. Apr. 18, 2007)................................... 13

*Kunzelmann v. Wells Fargo Bank, N.A.*,
   No. 9:11-cv-81373, 2012 WL 200337 (S.D. Fla. June 4, 2012)............................... 6

*Kunzelmann v. Wells Fargo Bank, N.A.*,
   No. 9:11-cv-81381, 2013 WL 139913 (S.D. Fla. Jan. 10, 2013)............................... 6

*Marcus v. AT&T Corp.*,
   138 F.3d 46 (2d Cir. 1998) ................................................................... 3, 4

*McAnaney v. Astoria Fin. Corp.*,
   357 F. Supp.2d 578 (E.D.N.Y. 2005) ................................................... 14

*McNeary-Calloway v. JP Morgan Chase Bank, N.A.*,
   863 F. Supp. 2d 928 (N.D. Cal. 2012) .................................................. 14

*Roberts v. Wells Fargo Bank, N.A.*,
   No. 4:12-cv-200, 2013 WL 1233268 (S.D. Ga. Mar. 27, 2013)........................ 4, 5, 6

*Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*,
   111 F. Supp. 2d 867 (S.D. Tex. 2000) .................................................. 10

*Schilke v. Wachovia Mortg., FSB*,
   705 F. Supp. 2d 932 (N.D. Ill. 2010) .................................................... 5

*Schilke v. Wachovia Mortg., FSB*,
   820 F. Supp. 2d 825 (N.D. Ill. 2011) .................................................... 5

*Schwartz v. Lawyers Title Ins. Co.*,
   680 F. Supp. 2d 690 (E.D. Pa. 2010) ................................................... 9

*Snow v. First Am. Title Ins. Co.*,
   332 F.3d 356 (5th Cir. 2003) ............................................................. 14

*United States v. Gotti*,
   459 F.3d 296 (2d Cir. 2006) .............................................................. 13

*United States v. Kim*,
   246 F.3d 186 (2d Cir. 2001) .............................................................. 9

*United States v. McDonnell*,
   Nos. SACV 10-1123 DOC, SACR 04-0309 DOC,
   2011 WL 2463194 (C.D. Cal. June 20, 2011) ....................................... 12

*United States v. Rybicki*,
　354 F.3d 124 (2d Cir. 2003) ............................................................................ 12

*Vaughn v. Air Line Pilots Ass'n*,
　377 F. App'x 88 (2d Cir. 2010) ...................................................................... 10

*Wegoland Ltd. v. NYNEX Corp.*,
　27 F.3d 17 (2d Cir. 1994) ...................................................................... 3, 4, 7

*Weinberger v. Mellon Mortg. Co.*,
　No. CIV.A.98-2490, 1998 WL 599192 (E.D. Pa. Sept. 10, 1998) ........................... 9

**Statutes**

12 U.S.C. § 2607 (2011) ........................................................................... 14

**Regulations**

24 C.F.R. § 3500.2 (2012) ......................................................................... 14

The Balboa Defendants respectfully submit this reply memorandum in further support of their motion to dismiss the SAC, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## ARGUMENT

## I.  PLAINTIFFS' CLAIMS ARE BARRED BY THE FILED RATE DOCTRINE.

As set forth in the Balboa Defendants' moving papers, Mem. 6-11, the filed rate doctrine mandates dismissal of all of Plaintiffs' claims against them.  Indeed, that doctrine bars any claims challenging Plaintiffs' Lender-Placed Insurance ("LPI") premiums, because those premiums were calculated from insurance rates that applicable state regulators approved.  In their opposition papers, Plaintiffs do not dispute that their LPI premiums were derived from a filed rate, and that the filed rate doctrine would bar any challenge to those premiums.  *See* Pls. Mem. 9 ("To be sure, the filed rate doctrine governs the premiums that Balboa charged GMACM.").

Instead, Plaintiffs make a single, remarkable argument as to why the filed rate doctrine does not preclude their claims:  they argue that, because GMAC Mortgage, LLC ("GMACM") purchased the LPI policies on their individual properties and paid the premiums in the first instance before passing through those premiums to Plaintiffs under their individual mortgage agreements, they did not pay and are not challenging the premiums, but rather something Plaintiffs call "LPI cost reimbursements."  The Court can swiftly reject this argument.  Plaintiffs paid and without question directly challenge their LPI premiums, and Plaintiffs' argument is nothing more than a misguided attempt to circumvent applicable Second Circuit case law barring their damages claims.  The Court need go no further and should dismiss the SAC.

First, Plaintiffs ignore the facts that (i) the "LPI cost reimbursements" – which is a term Plaintiffs have created, as it is not found in their mortgage agreements – are simply the premiums applicable to the LPI policies placed on their respective properties that GMACM billed them for

1

after paying those charges in the first instance; and (ii) the SAC directly challenges those premiums.[1]  GMACM notified each of the Plaintiffs that they were responsible for the exact amount of the premiums, as follows:

- GMACM obtained LPI for plaintiff Rothstein's property from MIC, which charged GMACM an annual premium of $425 for that insurance, *see* Cahen Decl. Ex. 3 (Notice of LPI issued by MIC to GMACM), and GMACM then passed that $425 premium on to Rothstein, *id.* at Exs. 2 and 3 (Notice of Placement, from GMACM to Rothstein).

- GMACM obtained LPI for the Davidsons plaintiffs' property from BIC, which charged GMACM an annual premium of $1,079 for that insurance, *see id.* at Ex. 6 (Notice of LPI issued by BIC to GMACM), and GMACM then passed that $1,079 premium on to the Davidsons, *id.* at Exs. 5 and 6 (Notice of Placement, from GMACM to the Davidsons).

- GMACM obtained LPI for plaintiff Kobryn's property from MIC, which charged GMACM an annual premium of $2,460 for that insurance, *see id.* Ex. 9 (Notice of LPI issued by MIC to GMACM), and GMACM then passed that $2,460 premium on to Kobryn, *id.* at Exs. 8 and 9 (Notice of Placement, from GMACM to Kobryn).

Plaintiffs mention none of these facts in their opposition papers.[2]  Moreover, the crux of the SAC is Plaintiffs' claim that they were charged too much for their LPI, because the premium costs that GMACM passed on to them were, according to them, improperly inflated by alleged rebates/kickbacks.  *See* SAC ¶ 110 (alleging that the notices Plaintiffs received from NMC concerning LPI placed on their respective properties were fraudulent because the "notices set forth the balances owed for LPI *based on the full cost of the premiums without subtracting the rebates/kickbacks*); ¶ 257(o) (same); ¶ 118 (alleging that reports and certifications Plaintiffs

---

[1] Plaintiffs' mortgage agreements provide that, if they fail to maintain LPI on their properties, the lender or the servicer "may obtain insurance coverage, at . . . Borrower's expense" and any amounts paid by the lender or servicer for the LPI will "become additional debt of Borrower."  SAC ¶ 48.

[2] Plaintiffs cite a sentence from BIC's rate filing and use it out of context to argue that there is a difference between the premiums and the charge that can be passed through to the borrowers.  Pls. Mem. 9-10 (citing Petersen Decl. Ex. C, at 2).  However, that rate filing explains that the parts of the premium that may not be charged to borrowers are those associated with property not secured by the mortgage or with types of insurance not authorized by the same, neither of which is at issue in the SAC.  Likewise, Plaintiffs' argument that the "LPI reimbursements" they paid are "based on" a filed rate is irrelevant because GMACM passed through the full cost of the premiums directly to Plaintiffs, and the SAC challenges those premiums.

received from GMACM "set forth balances for advances and reimbursements *based fraudulently on the full cost of the LPI premiums without subtracting the rebates/kickbacks*") (emphases added).  Thus, the charges Plaintiffs complain about in this case are, in fact, the premiums applicable to their LPI policies.  Calling the premiums "LPI reimbursement charges" does not change that fact.  And because Plaintiffs do not dispute that the filed rate doctrine applies to those LPI premiums, the filed rate doctrine bars their claims.

Moreover, Plaintiffs' damages theory, another topic Plaintiffs' opposition papers conspicuously ignore, make clear why the filed rate doctrine applies to and bars their claims.  As pointed out in the Balboa Defendants' moving memorandum, Mem. 9-10, the Second Circuit and numerous other courts have held that, no matter how a claim may be characterized, where an award of damages "would implicate the nondiscrimination and nonjusticiability strands of the filed rate doctrine . . . [then] that [] doctrine therefore bars such claims."  *Marcus v. AT&T Corp.*, 138 F.3d 46, 60 (2d Cir. 1998).  In *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 21-22 (2d Cir. 1994), the court held that the filed rate doctrine barred RICO and fraud claims that a telephone company had inflated its filed rates with fraudulent costs and thereby defrauded the plaintiffs who had paid those rates.  The Second Circuit reasoned that a court would need to determine the difference between "what part of the rate previously deemed reasonable was a result of the fraudulent acts" in order to award damages, thereby implicating the nonjusticiability prong of the filed rate doctrine, and an award of damages would lead to plaintiffs paying less than other ratepayers, violating the nondiscrimination prong of the doctrine.  *Id.*; *see also Marcus*, 138 F.3d at 60 (rejecting fraud claims challenging a filed rate under the filed rate doctrine because plaintiffs who were able to "recover damages would effectively receive a discounted rate for phone service," and a court would be required to determine a reasonable rate); *Hill v. BellSouth*

*Telecomms., Inc.*, 364 F.3d 1308, 1316 (11th Cir. 2004) ("Even if such a challenge does not, in theory, attack the filed rate, an award of damages to the customer-plaintiff would, effectively, change the rate paid by the customer to one below the filed rate paid by other customers.") (citing *Marcus*, 138 F.3d at 60).

Here, however Plaintiffs attempt to characterize their claims, the damages they seek are based on the alleged "rebates/kickbacks" purportedly part of the LPI premium costs passed through to them by GMACM.  *See* SAC, Prayer for Relief (seeking "three times the amount of the excess charges imposed on Plaintiffs and the Class").  Thus, in order to determine damages, this Court would necessarily need to determine the difference between the amounts that Plaintiffs were billed and paid (*i.e*., the premiums applicable to their LPI policies), and what those "premiums would have been absent the allegedly illegal 'commissions, kickbacks and free services' they contained."  *Roberts v. Wells Fargo Bank, N.A.*, No. 4:12-cv-200, 2013 WL 1233268 (S.D. Ga. Mar. 27, 2013); *see Wegoland*, 27 F.3d at 21-22.  Moreover, contrary to Plaintiffs' contentions, Pls. Mem. 10-11, to calculate that amount "would, in effect, result in a judicial determination of the reasonableness of" the premiums Plaintiffs paid or were charged, *Roberts*, 2013 WL 1233268, at *10 (quoting *Hill*, 364 F.3d at 1317), and an award of damages would allow Plaintiffs to effectively pay lower premiums for their LPI than other borrowers who are not part of this action.  *Marcus*, 138 F.3d at 160.  The filed rate doctrine prohibits precisely such results.

In *Roberts*, the most recent case to address this issue, the court rejected claims identical to those raised by Plaintiffs here.  Specifically, plaintiff Roberts claimed that Wells Fargo, which both owned and serviced her mortgage, had obtained LPI policies for her property, and, as here, had then passed through the cost of the premium to her under her mortgage agreement.  After

thoroughly surveying the filed rate doctrine (including the Second Circuit's *Wegoland* decision), the court held the doctrine barred Roberts' claims that her LPI premiums were inflated by "kickbacks" and "commissions," which Wells Fargo received from the insurance companies but did not subtract from the cost of the premiums it passed on to her, because

> the damages she seeks can only be measured by the difference between the premiums she paid and what the premiums would have been absent the allegedly illegal "commissions, kickbacks, and free services" they contained. . . . To calculate that amount "would, in effect, result in a judicial determination of the reasonableness of the premium Roberts paid." *See Hill,* 364 F.3d at 1317.  And if the legislature has vested in the [state commissioner of insurance] authority to make that determination, allowing Roberts's requested relief would disrespect that statutory grant of rate setting authority . . . .[3]

*Roberts*, 2013 WL 1233268, at *13.  Likewise, in *Schilke v. Wachovia Mortg., FSB*, 705 F. Supp. 2d 932, 942-45 (N.D. Ill. 2010), the court, relying on the Second Circuit's *Wegoland* and *Marcus* decisions, held that the filed rate doctrine applied to and barred damages claims identical to those raised by Plaintiffs here because the claims "effectively seek a refund of a portion of the [LPI insurance] premiums paid by Plaintiff,"  and "an award of damages [would] effectively allow[] the plaintiff to pay a different rate than other customers."  *Id.* at 944 (citations omitted); *see also Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835-36 (N.D. Ill. 2011).[4]

---

[3]  The court in *Roberts* certified to the Georgia Supreme Court the question of whether the filed rate doctrine applied to rates filed with the Georgia Commissioner of Insurance.  2013 WL 1233268, at *13-14.  There is no such issue in this case, as Plaintiffs do not dispute that the premiums for their LPI policies are subject to the filed rate doctrine.  Pls. Mem. 9 ("To be sure, the filed rate doctrine governs the premiums that Balboa charged GMACM.").

[4]  The LPI cases cited by Plaintiffs, *see* Pls. Mem. 10, do not save Plaintiffs' claims.  As an initial matter, the cases undercut Plaintiffs' contention that they did not pay LPI premiums, because there was no dispute in any of the cases that the plaintiffs paid LPI premiums, even though a mortgage servicer or lender paid those charges in the first instance and then passed them on to the plaintiffs pursuant to their mortgage agreements.  *See, e.g., Abels v. J.P. Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273, 1276 (S.D. Fla. 2009).  In addition, unlike the *Roberts* and *Schilke* decisions, the cases cited by Plaintiffs contain little or inapposite reasoning concerning the filed rate doctrine, and/or fail to address why a damages award for claims alleging that LPI premiums included "rebates/kickbacks" would not, in effect,

Finally, Plaintiffs' references, Pls. Mem. 5-7, to a Consent Decree entered into by the

New York State Department of Financial Services ("NYDFS") with Assurant, an insurance

company, only serve to further underscore why the filed rate doctrine applies in this case.[5]  In the

Consent Decree and the accompanying press release, the NYDFS repeatedly stated that the LPI

costs charged to borrowers are premiums, even though, as per industry practice, the mortgage

lender or servicer typically takes out the policy and pays the premium in the first instance.  *See*

Strauss Decl. Ex. B (NYDFS Press Release, at 1 ("banks and servicers are the ones who choose

---

allow the plaintiffs to pay less for their insurance than non-plaintiffs, and require a judicial determination of the reasonableness of the premiums.  *See Abels*, 678 F. Supp.2d at 1277 (finding filed rate doctrine inapplicable based on argument that defendant was a bank and not an insurer, and thus not subject to sufficient administrative oversight); *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 9:11-cv-81373, 2012 WL 200337, at *2-3 (S.D. Fla. June 4, 2012) (relying on *Abels* and finding filed rate doctrine inapplicable without mentioning the effect of a damages award); *Cannon v. Wells Fargo Bank, N.A.*, No. C-12-1376, 2013 WL 132450, at *9 (N.D. Cal. Jan. 9, 2013) (relying on *Abels* and *Kunzelmann* and failing to address the effect of a damages award); *Ellsworth v. U.S. Bank, N.A.*, No. C 12-02506, 2012 WL 6176905, at *12-13 (N.D. Cal. Dec. 11, 2012) (considering whether filed rate doctrine applied as a matter of California statutory law); *Gipson v. Fleet Mortg. Grp.*, 232 F. Supp. 2d 691, 707 (S.D. Miss. 2002) (rejecting application of filed rate doctrine in cursory manner with no discussion of damages); *see also Roberts*, 2013 WL 1233268, at *12 (declining to follow *Kunzelmann* and *Abels* because neither was "persuasive," and noting those cases accepted arguments that the filed rate doctrine did not apply "without much elaboration"); *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 9:11-cv-81381, 2013 WL 139913, at *11-12 (S.D. Fla. Jan. 10, 2013) (in subsequent decision, *Kunzelmann* court held that if alleged kickbacks/commissions were included in premiums, than filed rate doctrine could bar claims challenging the kickbacks/commissions).  As such, all of these cases are contrary to the Second Circuit authority cited above, which holds that the filed rate doctrine bars claims where a damages award would cause plaintiffs to pay different rates for the same insurance coverage.  Finally, Plaintiffs' citation to *FTC v. Verity International, Ltd.*, 443 F.3d 48, 62 (2d Cir. 2006), Pls. Mem. 9, only further demonstrates why the filed rate doctrine applies here.  In that case, the Second Circuit held that the filed rate doctrine did not apply to telephone information services (there, online adult entertainment) because such services were not covered by tariffs applicable only to telecommunications services.  Here, the filed rate doctrine applies to the premiums applicable to Plaintiffs' LPI policies – a fact Plaintiffs do not dispute, Pls. Mem. 9 – and the SAC challenges those premiums and the purported rebates/kickbacks included in them.

[5]  Plaintiffs' hyperbolic statement that the NYDFS investigation, and a lawsuit filed by American Residential Equities, LLC, *see* Pls. Mem. 5, "confirm the allegations of the SAC," *id.* at 7, is obviously incorrect, and both are irrelevant to this motion.  A regulator's investigation concerning another party or another party's lawsuit containing similar allegations to the SAC has no bearing on whether the SAC states a claim or has any merit whatsoever.  *See, e.g.*, *In re Smith*, Bankr. No. 04-50723, 2012 WL 1123049, at *2 (Bankr. W.D. Tex. Apr. 3, 2012) (court cannot take judicial notice of allegations asserted in a separate complaint "for the purpose of establishing the facts asserted therein").  In any event, the NYDFS's Consent Decree with Assurant did not include any findings of mail fraud, wire fraud, honest services fraud, or generic fraudulent schemes that Plaintiffs assert here.  *See* Strauss Decl. Exs. B and C.

which force-placed insurance policy to purchase, [and] the high *premiums are ultimately charged to homeowners. . .*" ) (emphasis added); *Id.* at Ex. C, ¶ 2 (Assurant Consent Order) ("Homeowners have reported that when they are charged for force-placed insurance, *the premiums* are far in excess of the premiums those homeowners were charged for voluntary homeowners insurance."); *id.* ("While servicers choose the force-placed product for their mortgage loan portfolio, the high *premiums* are charged to homeowners. . .") (emphasis added). Moreover, the involvement of a state regulatory agency and Assurant's agreement to, among other things, provide restitution to certain borrowers who had paid the cost of the LPI premiums and to file new premium rates which will "substantially reduce homeowners' premiums" when LPI is placed on their properties, Strauss Decl. Ex. B, at 2, only further demonstrates why the filed rate doctrine bars actions by private plaintiffs, like this one, which seek damages based on filed rates (*i.e.*, the premiums applicable to Plaintiffs' LPI policies).  *See Wegoland*, 27 F.3d at 21 ("Apart from participating in the political process and filing complaints with the regulatory agencies, individual ratepayers simply have no role in attacking the reasonableness of filed rates.").  Accordingly, Plaintiffs' claims against the Balboa Defendants should be dismissed.

## II.    THE SAC FAILS TO STATE A CLAIM UNDER § 1962(c) OR § 1962(d) OF RICO.

Although the Court need not reach any of these issues, Plaintiffs' RICO claims also fail for multiple, independent reasons that are not refuted in Plaintiffs' opposition to the Balboa Defendants' motion.

### A.    The SAC Does Not Allege that the Balboa Defendants Committed Mail or Wire Fraud.

The principal defect in the SAC's attempt to allege mail and wire fraud as RICO predicate acts is that the SAC's factual allegations do not establish that the Balboa Defendants,

GMACM, or any other alleged participant in the RICO enterprise was part of a fraudulent scheme.[6]  Plaintiffs' entire theory rests on a hypertechnical interpretation of the language in the LPI notice letters that is at odds with prior court decisions and common sense.  In brief, the SAC alleges that the LPI notice letters sent to Plaintiffs were fraudulent because the "cost" of the LPI coverage listed in the notices was greater than the net amount GMACM paid Balboa for the LPI.  SAC ¶¶ 108-14, 264.  In their opposition, Plaintiffs argue that this discrepancy was intended to lull borrowers into accepting the LPI without objection.  Pls. Mem. 14-16.[7]  This strained reading of the notices is untenable, particularly where the notice has the clear objective to convince borrowers that LPI is *not* desirable.  Indeed, the notices trumpet the fact that LPI provides less coverage for borrowers at a higher cost than the voluntary insurance of their choice, and encourage borrowers to obtain their own coverage, stating:  "[w]e recommend you obtain full insurance coverage that adequately protects your and the lender's interest with a company of your choice."  Cahen Decl. Exs. 6, 9; *see also id.* Exs. 1-5, 7, 8.  These admonitions are irreconcilable with Plaintiffs' argument that the notices were intended to deceive.  And Plaintiffs'  "use of relevant catch phrases such as 'fraudulent misrepresentation' [to overcome their inadequate allegations] does not transform the . . . scheme into a violation of the mail and wire fraud statutes."  *Boyle v. D'Onofrio*, 99 F. Supp. 2d 541, 547 (D.N.J. 2000), *aff'd*, 254 F.3d 1077 (3d Cir. 2001).

---

[6]  In their opposition, Plaintiffs assert that Balboa does not dispute that "the SAC adequately alleges RICO claims against GMACM," Pls. Mem. 12, or  "the SAC adequately alleges that GMACM committed honest services fraud."  *Id.* at 23.  This is patently false.  The Balboa Defendants did not specifically address whether the SAC stated RICO claims against GMACM because GMACM is not a named Defendant in this action and the Balboa Defendants have addressed their motion to the claims asserted against them.

[7] Plaintiffs also argue in their opposition that the notices' statement that GMACM or one of its affiliates may receive compensation in connection with the LPI is a "deceptive 'half-truth.'"  *Id.* at 16.  This argument should be disregarded because the SAC did not make any allegations with respect to this statement.

In addition, Plaintiffs do not successfully distinguish the reasoned analysis of two courts that have denied RICO claims based on similar allegations against LPI providers. *See Weinberger v. Mellon Mortg. Co.*, No. CIV.A.98-2490, 1998 WL 599192, at *4-5 (E.D. Pa. Sept. 10, 1998); *Gustafson v. BAC Home Loans Servicing, LP*, No. SACV 11-915-JST, 2012 WL 7071488, at *6-7 (C.D. Cal. Dec. 26, 2012); *see also* Mem. 14-15 (discussing cases). As both of these courts held, LPI notices that warn borrowers that they are getting a bad deal cannot possibly be intended to deceive. Plaintiffs' contention in a footnote that the cases are inapposite because the *Weinberger* and *Gustafson* plaintiffs did not use exactly the same words in their complaint, Pls. Mem. n.14, is meritless. The basic premise of the RICO claims in both cases – that LPI insurers, together with mortgage servicers, devised a fraudulent scheme to overcharge borrowers for LPI that centered on the content of the LPI notice letters, *see Weinberger*, 1998 WL 599192, at *5; *Gustafson*, 2012 WL 7071488, at *6-7 – is the same premise that underlies the SAC.

Moreover, even if examined apart from their context, the statements in Plaintiffs' LPI notices are insufficient to establish fraud because the alleged misrepresentations (or omissions) were not material. Materiality is assessed using an objective standard and "courts have recognized that ordinary consumers make purchasing decisions based on the price they must pay and the value they expect to receive–not on what the seller does with the money it receives." *Blessing v. Sirius XM Radio Inc.*, 775 F. Supp. 2d 650, 656 (S.D.N.Y. 2011).[8] It is not

---

[8] The cases that Plaintiffs reference where allegations of overcharges were sufficient to establish fraudulent schemes, Pls. Mem. 14-15 n.10, each involved circumstances where, unlike here, the plaintiff was not charged the applicable price for the particular service or good they received in exchange. *See Schwartz v. Lawyers Title Ins. Co.*, 680 F. Supp. 2d 690, 696-98 (E.D. Pa. 2010) (plaintiffs were billed using basic title insurance rate rather than lower rate applicable to reissues or refinances); *United States v. Kim*, 246 F.3d 186, 188 (2d Cir. 2001) (involved scheme to submit invoices including charges for baggage services that were provided for free); *Chubb & Son Inc. v. Kelleher*, Nos. 92 CV 4484 (TLM)(RML), 95 CV 0951 (CBA)(RML), 2010 WL 5978913, at *1 (E.D.N.Y. Oct. 22, 2010)

reasonable to conclude from the SAC that the Plaintiffs, or any other borrowers, would have responded differently to the LPI notice letters if they explained precisely how much the LPI would ultimately cost GMACM.

The SAC also fails to allege a fraudulent scheme because it does not allege that the Balboa Defendants had any duty of disclosure to Plaintiffs.  Mem. 15-16.  The new assertion in Plaintiffs' memorandum that NMC had an affirmative statutory and contractual duty to disclose the allegedly omitted or misrepresented facts in the Notices is nowhere in the SAC, and therefore not properly before the Court.  *See In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 445 n.100 (S.D.N.Y. 2005) (a complaint "cannot be amended by the brief in opposition to a motion to dismiss") (citing *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 432 (S.D.N.Y. 2001)).  And even if Plaintiffs had properly raised these allegations, the document brandished by Plaintiffs  (Exhibit E to the Strauss Declaration) does not support the existence of any duty owed by NMC.  Exhibit E is an excerpt from an audit form that on its face applies to NMC's business relationship vis-à-vis loans serviced by Aurora Loan Services, and not by GMACM.  Even with respect to the NMC-Aurora relationship, the document says nothing about NMC's provision of "LPI cost data for inclusion in reports to loan owners."  Pls. Mem. n.15.  The exhibit in no way establishes that NMC had disclosure obligations to any borrowers and certainly not to any of the Plaintiffs here.[9]

---

(defendants submitted insurance claims seeking payment for damage that had not occurred); *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co*., 111 F. Supp. 2d 867, 873 (S.D. Tex. 2000) (plaintiffs alleged that the invoices included charges that exceeded the approved, filed rate).

[9]  The SAC also is deficient because it lacks factual allegations to establish fraudulent intent for the Balboa Defendants.  Mem. 16.  In the very case that Plaintiffs cite for the proposition that scienter may be plead by "identifying circumstances indicating conscious behavior by the defendant," Pls. Mem. 19, the Second Circuit concluded that allegations that a defendant stood to gain financially from the alleged fraud – the same allegations as in the SAC – were not sufficient to establish motive or scienter.  *See Vaughn v. Air Line Pilots Ass'n*, 377 F. App'x 88, 90-91 (2d Cir. 2010).

Plaintiffs attempt to allege mail and wire fraud as RICO predicate acts is further deficient because the SAC does not identify the contributions of each of the Balboa Defendants to the degree of specificity required by Fed. R. Civ. P. 9(b).  The SAC's limited allegations delineating BIC, MIC, and NMC's roles are less detailed than the allegations in the cases cited by Plaintiffs, Pls. Mem. 21, or than required by Rule 9(b).  *See, e.g.*, *Allstate Ins. Co v. Halima*, No. 06-cv-1316, 2009 WL 750199, at *5 (E.D.N.Y. Mar. 19, 2009) (defendants allegedly managed the companies that "ordered, performed, wrote reports for, and billed" for tests that were "medically unnecessary"); *Baisch v. Gallina*, 346 F.3d 366, 374-75 (2d Cir. 2003) (defendant allegedly issued false certificates, recruited financing for the RICO enterprise, and concealed deceptive payroll practices).  Here, by contrast, the SAC alleges only that BIC and MIC provided LPI and paid NMC for providing tracking services, SAC ¶¶ 71-72, and that NMC issued the LPI notices without alleging it had responsibility for their content.  *Id.* ¶ 108.[10]

### B.  The SAC Does Not Allege That the Balboa Defendants Committed Honest Services Fraud.

None of Plaintiffs' efforts to sustain honest services fraud as a RICO predicate act adequately addresses the Balboa Defendants' basic argument:  the claim fails because the Balboa Defendants owed no duty to provide honest services to loan owners.  Plaintiffs instead cite irrelevant cases holding that both the payment and the receipt of a bribe can give rise to an honest services claim.  *See* Pls. Mem. 23.  Plaintiffs' other argument in their opposition, that the Balboa Defendants are liable by virtue of their contribution to GMACM's purported honest services fraud, is untenable because the SAC does not allege that the Balboa Defendants paid a

---

[10]  Plaintiffs endeavor to inflate NMC's role by invoking the Nuremberg defense and citing inapposite criminal cases upholding jury convictions where defendants had argued that they were simply unknowing subservients, but the evidence proved otherwise.  *See* Pls. Mem. 22.  None of these cases stand for the proposition that participation in a fraudulent scheme is sufficiently alleged by stating that the defendant was following the instructions of the scheme's alleged mastermind.

commission (or "kickback") to a GMACM affiliate with the goal or intent to negatively affect GMACM's relationship with its loan owners.[11]

Additionally, Plaintiffs lack standing to assert RICO claims based on honest services fraud because they were not injured by the alleged honest services fraud.  The only entities that could conceivably assert such a claim are the loan owners themselves.  Mem. 18; *see Hemi Grp v. City of N.Y.*, 559 U.S. 1, 130 S. Ct. 983, 990 (2010) (holding that plaintiff failed to allege a RICO injury where the "conduct directly causing the harm was distinct from the conduct giving rise to the fraud" and there were direct victims of the fraud "better situated . . . to seek recovery.") (citation omitted).

### C.      The SAC Does Not Allege that the Balboa Defendants Committed Extortion.

In defending their purported extortion claim, Plaintiffs yet again inappropriately characterize the Balboa Defendants' silence as consent that an element of the claim was sufficiently plead.  The Balboa Defendants do not agree that the SAC "adequately alleges that borrowers were induced to pay the alleged overcharges because they feared foreclosure."  Pls. Mem. 24.  To the contrary, while the SAC asserts that Plaintiffs "reasonably believed" that the Balboa Defendants had "the power to collect any unpaid LPI charges through foreclosure" and "would exploit that power," SAC ¶ 276, it does not allege any facts that would make this belief reasonable or even plausible.  To the contrary, no reasonable person could interpret the notice letters as threats to foreclose.  Extortion claims must be based on more than a non-threatening letter seeking payment of a sum owed, even where the amount owed is in dispute or is based on

---

[11]  The SAC also alleges that "GMACM misused its position as the servicer of loans to extract bribes and kickbacks from the Balboa Defendants."  SAC ¶ 129.  The Balboa Defendants' passive role as described in the SAC distinguish this case from *United States v. McDonnell*, Nos. SACV 10-1123 DOC, SACR 04-0309 DOC,  2011 WL 2463194 (C.D. Cal. June 20, 2011) and *United States v. Rybicki*, 354 F.3d 124, 146-47 (2d Cir. 2003), where the defendants paying the bribes were the parties attempting to influence others.

alleged overcharges.  And Plaintiffs' efforts to equate the even-handed statements in their LPI

notices with a statement that one of the most notorious mob leaders in history would be "pissed

off" if payments were late is ludicrous.  *See* Pls. Mem. 25 (citing *United States v. Gotti*, 459 F.3d

296, 333 (2d Cir. 2006)).[12]

## III.    THE SAC FAILS TO STATE A RICO CONSPIRACY CLAIM.

Plaintiffs' cursory attempt to salvage their RICO conspiracy claim ignores the important

distinction between an agreement to form a business relationship and an agreement to commit

RICO predicate acts.  Only the former is alleged in the SAC (¶ 67), or supported by the language

of the press release attached as Exhibit G to the Strauss Declaration.  Plaintiffs' conspiracy claim

therefore fails.

## IV.    THE SAC FAILS TO STATE A CLAIM UNDER RESPA.

In their opposition, Plaintiffs fail to distinguish the unanimous body of case law

dismissing RESPA claims asserted against LPI providers that are essentially identical to

Plaintiffs' RESPA claim against the Balboa Defendants.  *See* Mem. 23 (citing cases); *see also*

---

[12]  Plaintiffs' RICO claim also fails because the SAC's factual allegations do not establish that the Balboa
Defendants participated in the operation or management of the RICO enterprise as required by 18 U.S.C.
§ 1962(c). Mem. 20-21.  The cases Plaintiffs reference to suggest that the SAC's allegations are
sufficient all involve defendants that paid kickbacks in order to influence or direct the overall scheme or
direction of the enterprise.  *See* Pls. Mem. 26-27 (citing cases).  The SAC, in contrast, alleges that the
payment of commissions was part of the original scheme that was "organized" and "primarily managed"
by GMACM.  SAC ¶ 254.  The SAC does not allege that the commission payments were conceived by
the Balboa Defendants or that they altered the existing relationship between the alleged RICO
participants.  Plaintiffs' new argument that Balboa actually "ran the whole show," Pls. Mem. 28, based on
the testimony of a GMAC representative before the NYDFS that GMAC wholly outsourced the insurance
business, is directly at odds with the SAC's allegations.  The Court must defer to the SAC's allegations
and ignore new "facts" raised for the first time in an opposition brief.  *See In re GeoPharma, Inc. Sec.
Litig.*, 399 F. Supp. 2d at 445.  Additionally, the alleged professional services provided by the Balboa
Defendants are not sufficient because the professional services were not  integral to the alleged
enterprise's conception and execution.  *Cf. JSC Foreign Econ. Ass'n Technostroyexport v. Weiss*, No. 06
Civ. 6095(JGK), 2007 WL 1159637, at *9 (S.D.N.Y. Apr. 18, 2007) (finding allegations that accountant
defendant was architect of money laundering scheme and received $2 million payment for real estate
transaction services with a much lower fair market worth sufficient to state RICO claim).

*Cannon v. Wells Fargo Bank, N.A.*, No. C-12-1376 EMC, 2013 WL 132450, at *18 (N.D. Cal. Jan. 9, 2013) ("Because settlement is, in essence, the closing of the loan, a number of courts have found that no RESPA claim is viable based on an allegation that the defendant force placed insurance after the closing of the loan."). As these decisions explain, RESPA's anti-kickback provision in 12 U.S.C. § 2607 (2011) does not apply to the provision of LPI, and accordingly the claim fails as a matter of law. *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 952-54 (N.D. Cal. 2012).

No court has adopted Plaintiffs' novel theory that § 2607(a) applies to any charge associated with a transaction that "regards a lien." In fact, even outside the context of LPI, courts have routinely held that "settlement" as used in § 2607, and defined in 24 C.F.R. § 3500.2 (2012), refers to the process of closing a mortgage loan. *See, e.g.*, *Snow v. First Am. Title Ins. Co.*, 332 F.3d 356, 359 (5th Cir. 2003) ("Congress directed RESPA toward the closing."). Courts in the Second Circuit have agreed with the view that settlement services are temporally limited to the period surrounding a mortgage transaction's closing. *See McAnaney v. Astoria Fin. Corp.*, 357 F. Supp.2d 578, 581-82 (E.D.N.Y. 2005) (equating settlement with closing and adopting a "bright-line rule, limiting the scope of RESPA to practices at or before settlement. . . .") (citation omitted). Plaintiffs' suggestion that the Balboa Defendants impermissibly seek to limit RESPA's application to the "extension of the federally related loan" is a blatant misstatement. Pls. Mem. 34. Although § 2607(a) can apply to services other than the loan itself, the SAC's RESPA claim fails because it does not relate to a mortgage closing.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in the Balboa Defendants' moving

papers, the claims against the Balboa Defendants should be dismissed with prejudice.

Dated:  New York, New York
       April 8, 2013

                                        Respectfully submitted,

                                        BuckleySandler LLP
                                        Counsel for the Balboa Defendants

By:    /s/ Ross E. Morrison
                                        Ross E. Morrison
1133 Avenue of the Americas
Suite 3100
New York, New York 10036
Tel:  (212) 600-2315
Fax: (212) 600-2405
rmorrison@buckleysandler.com

Robyn C. Quattrone (*pro hac vice*)
Katherine L. Halliday (*pro hac vice*)
1250 24th Street NW
Suite 700
Washington, DC 20010
Tel: (202) 349-8000
rquattrone@buckleysandler.com
khalliday@buckleysandler.com

15

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure, I hereby certify that on the 8th day of

April, 2013, I caused a true and correct copy of the foregoing to be served upon the following via

the Court's ECF Notification System.


By:  /s/ Ross E. Morrison
        Ross E. Morrison


## SERVICE LIST

| | |
|---|---|
| Mark A. Strauss<br>mstrauss@kmllp.com<br>Edward M. Varga<br>evarga@kmllp.com<br>J. Brandon Walker<br>bwalker@kmllp.com<br>**KIRBY MCINERNEY LLP**<br>825 Third Avenue<br>16th Floor<br>New York, NY 10022<br>Telephone: (212) 371-6600<br>Facsimile: (212) 751-2540<br>*Counsel for Plaintiffs* | Richard G. Haddad<br>rhaddad@oshr.com<br>**OTTERBOURG, STEINDLER, HOUSTON & ROSEN**<br>230 Park Avenue<br>New York, NY 10169<br>Telephone: (212) 661-9100<br>Facsimile:  (212) 682-6104<br>*Counsel for Defendants Ally Financial, Inc. and Ally Bank* |

16