UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

LANDON ROTHSTEIN, ET AL.,

                 Plaintiffs,

      -v-

GMAC MORTGAGE, LLC, ET AL.,

                 Defendants.

------------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: SEP 3 0 2013

12 Civ. 3412 (AJN)

OPINION AND ORDER

ALISON J. NATHAN, District Judge:

        Currently before the Court is a motion to dismiss the Second Amended Complaint

("SAC," or the "Complaint"), pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6),

filed by a group of Defendants in the above-captioned case. *See* Dkt. No. 44; *see also* Fed. R.

Civ. P. 12(b). This group of Defendants consists of Balboa Insurance Company ("BIC"),

MeritPlan Insurance Company ("MIC"), and Newport Management Company ("NMC")

(collectively, the "Balboa Defendants" or "Balboa"). The Balboa Defendants seek to dismiss

claims brought by Plaintiffs Landon Rothstein, Jennifer and Robert Davidson, and Ihor Kobryn,

on behalf of themselves and a putative class of similarly situated residential mortgage loan

borrowers who were charged for lender-placed insurance in connection with loans serviced by

GMAC Mortgage LLC ("GMACM"). Plaintiffs allege, *inter alia*,[1] violations of the Racketeer

Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO"), and the Real

Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.* ("RESPA"). The Balboa

Defendants move to dismiss Plaintiffs' claims on the basis that: (1) they are barred by the filed

rate doctrine; and (2) the allegations against the Balboa Defendants fail to state a claim upon

which relief may be granted. For the reasons discussed herein, the Balboa Defendants' Motion

---

[1] The non-listed claims, Counts IV, V, VI, and VII, are not asserted against the Balboa Defendants and, thus, not
relevant to the resolution of the Balboa Defendants' pending motion. *See* SAC ¶¶ 314-351.

to Dismiss, Dkt. No. 44, is granted in part and denied in part.

## I.     STANDARD OF REVIEW

"In resolving a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), 'the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff.'" *Guan N. v. NYC Dep't of Educ.*, No. 11 Civ. 4299 (AJN), 2013 WL 67604, at *2 (S.D.N.Y. Jan. 7, 2013) (quoting *Natural Res. Def. Council v. Johnson,* 461 F.3d 164, 171 (2d Cir. 2006)).  However, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *APWU v. Potter,* 343 F.3d 619, 623 (2d Cir. 2003); *see also Amidax Trading Grp. v. S.W.I.F.T. SCRL,* 671 F.3d 140, 145 (2d Cir. 2011) ("[Plaintiff] must allege facts that affirmatively and plausibly suggest that it has standing to sue.").

In contrast, "[w]hen deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court must accept as true all well-pleaded facts and draw all reasonable inferences in the light most favorable to the non-moving party." *Guan N.*, 2013 WL 67604, at *2 (citing *Kassner v. 2nd Ave. Delicatessen, Inc.,* 496 F.3d 229, 237 (2d Cir. 2007)).  To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  A complaint containing nothing more than "a formulaic recitation of the elements of a cause of action" is insufficient, and the Court need not assume the truth of mere conclusory statements. *Id.*

"In addition to the allegations of the pleading itself, the Court may consider documents

attached as exhibits or incorporated by reference." *TufAmerica, Inc. v. Diamond*, No. 12 Civ.

3529 (AJN), 2013 WL 4830954, at *1 (S.D.N.Y. Sept. 10, 2013) (citing *Halebian v. Berv,* 644

F.3d 122, 131 n.7 (2d Cir. 2011); and *Chapman v. N.Y. State Div. for Youth,* 546 F.3d 230, 234

(2d Cir. 2008)).  "The Court may also take judicial notice of filings with government agencies

that are a matter of public record." *Roussin v. AARP, Inc.*, 664 F. Supp. 2d 412, 415 (S.D.N.Y.

2009), *aff'd* 379 F. App'x 30 (citing *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 (2d

Cir. 1998) (noting that a "district court may rely on matters of public record in deciding a motion

to dismiss under Rule 12(b)(6)"); and *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.

1991) (documents publicly filed with the SEC may be considered on a motion to dismiss)).  "If a

document relied on in the complaint contradicts allegations in the complaint, the document, not

the allegations, control, and the court need not accept the allegations in the complaint as true."

*Poindexter v. EMI Record Grp. Inc., No.* 11 Civ. 559 (LTS), 2012 WL 1027639, at *2 (S.D.N.Y.

Mar. 27, 2012) (citing *Barnum v. Millbrook Care Ltd. P'ship,* 850 F. Supp. 1227, 1232-33

(S.D.N.Y. 1994)).

## II.    BACKGROUND

In their Complaint, Plaintiffs allege that Defendants engaged in unlawful practices

relating to the somewhat complicated lender-placed insurance process.  Because of the nature of

this process, there is some benefit to first providing a hypothetical example of how the process

generally functions before addressing Plaintiffs' allegations regarding Defendants' actions

relative to the process.

In this hypothetical example, an imaginary couple, Alex and Carol, decide to purchase a

residential home.  They go to a lender, Bank, who issues them a mortgage.  The terms of that

mortgage provide that, if Alex and Carol do not maintain hazard insurance on their home, Bank,

as the lender, can purchase hazard insurance and bill the cost to Alex and Carol. Aptly, this product is called lender-placed insurance ("LPI").

The idea behind LPI is that, although Alex and Carol live in the home, Bank maintains an interest in their home, in the amount of the unrepaid portion of the mortgage that could be lost in the event of a hazard. Bank is not, however, concerned about or required to insure Alex and Carol's principal or belongings. As is custom though, instead of Bank owning the interest in Alex and Carol's mortgage, it securitizes the mortgage and sells it to a securitization trust, Trust, which then owns the legal title to the mortgage and is the party interested in assuring that the home is insured. Trust, in turn, hires Servicer to manage day-to-day details (like insurance) regarding the mortgages. Servicer, in turn, may hire Subcontractor to undertake some of the tasks that Trust hired Servicer to perform.

Alex and Carol, meanwhile, allow their hazard insurance to lapse. Subcontractor, who is keeping tabs on their mortgage, gets wind of this and sends them a notice reminding them of their obligation to maintain hazard insurance and informing them that, if they don't rectify the situation, Servicer will purchase LPI at a specific rate and that LPI may be more expensive than private insurance and may not cover their principal, equity or belongings. Despite the warning, Alex and Carol do not remedy the situation. As a result, Servicer exercises Trust's right, pursuant to the mortgage agreement, and purchases LPI from Insurer. After Insurer bills Servicer, Servicer (through Subcontractor) tells Alex and Carol that it has purchased LPI for their property and that the amounts it paid for the LPI are now included in their mortgage.

With that general overview in mind, the Court turns to Plaintiffs' allegations here.

**III.   FACTS**[2]

---

[2] Except as otherwise noted, the following facts are derived from the Complaint and the other documents discussed above, which the Court may appropriately consider at this time. Unless otherwise noted, the Court accepts as true

In this case, Plaintiffs, and the members of their putative class (individuals like Alex and Carol, in the above hypothetical), allege that, since at least March 2003, GMACM (Servicer) and BIC/MIC (Insurer), engaged in fraudulent activity related to the above-described system, and that, as a result, Plaintiffs were unlawfully overbilled for LPI. Specifically, Plaintiffs allege that GMACM -- the fifth largest residential loan servicer in the United States -- had an agreement with BIC/MIC whereby GMACM would purchase LPI for the loans it serviced from BIC/MIC and that BIC/MIC would then provide GMACM with kickbacks. According to Plaintiffs, these kickbacks came in two forms: first, GMACM hired NMC (Subcontractor), an affiliate/agent of BIC/MIC, to perform GMACM's "insurance tracking," but BIC/MIC secretly paid NMC's bills for GMACM, thus providing NMC's subcontractor services to GMACM for free; and second, BIC/MIC would funnel a portion of the LPI payments that it received from GMACM to a third party, John Doe, who would covertly return those amounts to GMACM. Notwithstanding having received these kickbacks, GMACM would then bill Plaintiffs for the full cost of the LPI it had originally paid to BIC/MIC, rather than billing them for the post-kickback cost that GMACM had effectively paid for that LPI.

Plaintiffs allege that Defendants and GMACM constituted a RICO "enterprise," the purpose of which was to defraud borrowers, like Plaintiffs, by inducing them to pay overpriced LPI with respect to GMACM-serviced loans. SAC ¶¶ 253-55. Plaintiffs recognize that the original cost for the LPI that GMACM purchased from BIC/MIC was calculated using rates that had been filed with, and approved by, the relevant state insurance regulator. Plaintiffs claim, however, that Defendants fraudulently misrepresented the fact that the costs billed did not, in fact, reflect the costs that GMACM had actually paid for the LPI. Specifically, they claim that

the facts as alleged in the Complaint.

statements in the letters -- describing the LPI charges as "[t]he cost of the insurance" that was "advanced," and calling the relevant payments "reimburs[ments]" -- were materially false and intended to trick the borrower into believing that they were billed the same amount as BIC/MIC paid.  In relevant part, Plaintiffs claim that Defendants' actions were in violation of the RICO and RESPA statutes.  Additional facts will be discussed within the body of this opinion as they become relevant.

## IV.   DISMISSAL UNDER THE FILED RATE DOCTRINE

As noted, the Balboa Defendants argue that Plaintiffs' claims should be dismissed pursuant to what is called the "filed rate doctrine," which bars claims of unreasonable rates against utilities whose rates are regulated.  Defendants argue that dismissal is not just appropriate, but mandatory, because the filed rate doctrine bars any claims challenging the LPI premiums that Plaintiffs were billed for, which were based on insurance rates that applicable state regulators approved.  Br. 6.  As such, they argue, Plaintiffs are prohibited under the filed rate doctrine from "challenging those approved rates, any specific component of the rates, or the premiums calculated from the rates in a private civil action."  Br. 8.  Plaintiffs argue that the filed rate doctrine does not apply because the rates at issue were not filed and approved, as required for that doctrine to bar suit.  For the reasons discussed below, the Court concludes that Defendants have not demonstrated that dismissal is appropriate at this point in litigation pursuant to the filed rate doctrine.

### A.   Filed Rate Doctrine Background

"The filed rate doctrine bars suits against regulated utilities grounded on the allegation that the rates charged by the utility are unreasonable." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).  This doctrine, "sometimes referred to as the filed tariff doctrine, protects

6

both the utility and the customer." *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F. Supp. 2d

565, 573 (S.D.N.Y. 1999) (Chin, *J.*). "Simply stated, the doctrine holds that any "filed rate" --

that is, one approved by the governing regulatory agency -- is per se reasonable and unassailable

in judicial proceedings brought by ratepayers." *Wegoland Ltd.*, 27 F.3d at 18.

Since recognizing the doctrine in *Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S.

156 (1922), the Supreme Court's filed rate doctrine precedent has focused on "two

corresponding interests, one concerned with potential 'discrimination' in rates as between

ratepayers, and the other concerned with the 'justiciability' of determining reasonable rates." *Id.*

(*comparing Maislin Indus., U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 126-28 (1990)

(emphasizing "nondiscrimination strand"), *and Arkansas Louisiana Gas Co. v. Hall*, 453 U.S.

571, 579 (1981) (focus on "uniform rate regulation"), *with Montana-Dakota Utils. Co. v.

Northwestern Pub. Serv. Co.*, 341 U.S. 246, 261 (1951) (reasonableness of rate is best left to the

agency), *and Square D. Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409 (1986)).

As the Second Circuit has recognized, "two companion principles lie at the core of the

filed rate doctrine: first, that legislative bodies design agencies for the specific purpose of setting

uniform rates, and second, that courts are not institutionally well suited to engage in retroactive

rate setting." *Wegoland, Ltd.*, 27 F.3d at 19 (quoting *Wegoland, Ltd. v. NYNEX Corp.*, 806 F.

Supp. 1112, 1115 (S.D.N.Y. 1992)). "When the filed rate doctrine applies, it is rigid and

unforgiving. Indeed, some have argued that it is unjust." *Simon v. KeySpan Corp.*, 694 F.3d

196, 205 (2d Cir. 2012) (citing, *inter alia*, *Fax Telecommunicaciones Inc. v. AT & T,* 138 F.3d

479, 491 (2d Cir. 1998)). "It does not depend on 'the culpability of the defendant's conduct or

the possibility of inequitable results,' nor is it affected by 'the nature of the cause of action the

plaintiff seeks to bring.'" *Simon*, 694 F.3d at 205 (quoting *Marcus v. AT&T Corp.,* 138 F.3d 46,

58 (2d Cir. 1998)).  And when the doctrine applies, it bars both state and federal claims.  *Hall*, 453 U.S. at 584-85.

### B.     Parties' Arguments

Defendants argue that Plaintiffs' allegations "clearly implicate" both the "nondiscrimination and nonjusticiability strands of the filed rate doctrine."  Br. 8.  First, they argue, the claims implicate the nonjusticiability strand of the doctrine because the Court will need to review "Plaintiffs' filed and approved LPI rates, because the alleged overcharges were a portion of Plaintiffs' insurance premiums, which themselves are set based on the rates."  Br. 8.  And second, the claims implicate the nondiscrimination aspect of the doctrine because "if Plaintiffs were able to recover as damages the portions of their LPI premiums that allegedly included the 'rebates/kickbacks,'" they would effectively be paying less than the filed and approved LPI rate.  Br. 9.

Plaintiffs contest the purported effect of the filed rate doctrine on their claims.  They argue that the filed rate doctrine does not apply to their claims because the "precise charges at issue -- LPI cost reimbursements purportedly due under mortgage loan agreements -- were not so filed or approved."  Opp. 8.  Plaintiffs argue that Defendants' "unilateral choice to 'base' an unfiled, unapproved charge on a filed rate" does not "somehow render[] the unfiled charge also a filed rate."  Opp. 8.  They argue that, pursuant to Second Circuit precedent, the filed and approved tariff or rate must cover "the actual service rendered to users of [Defendants'] billing system," and that Defendants have failed to "identify any filed tariff 'actually' covering LPI cost reimbursements purportedly due under mortgage loan agreements."  Br. 9 (quoting *F.T.C. v. Verity Int'l Ltd.*, 443 F.3d 48, 62 (2d Cir. 2006)).  Plaintiffs contend that the arguments regarding nonjusticiability have "no merit," because they are in no way challenging the reasonableness of

8

the rates themselves, but instead are challenging Defendants' ability or entitlement to

"overcharge[] them for 'reimbursement' of GMACM's LPI 'costs.'"  Opp. 11.

### C.    Analysis

The facts at issue with regard to the application of the filed rate doctrine are as follows.

Each Plaintiff signed a mortgage loan agreement with GMACM, pursuant to which they were

required to purchase and maintain hazard insurance on their properties.  In relevant part, this

portion of the mortgage loan agreement provided as follows:

> If Borrower fails to maintain [hazard insurance] Lender may obtain insurance
> coverage at Lender's option and Borrower's expense.  Lender is under no
> obligation to purchase any particular type of coverage.  Therefore, such coverage
> shall cover Lender, but might or might not protect Borrower, Borrower's equity in
> the Property, or the contents of the Property, against any risk, hazard or liability
> and might provide greater or lesser coverage than was previously in effect . . . .
> Any amounts disbursed by Lender under this Section 5 shall become additional
> debt of Borrower secured by this Security Instrument.

SAC ¶ 48.

As to each Plaintiff, after sending warning letters regarding the fact that they had not

submitted proof of hazard insurance, Cahen Decl. Exs. 1-9, GMACM exercised its rights under

the above quoted provision of the mortgage loan agreement and force-purchased hazard

insurance through either BIC or MIC.  Subsequently, and also pursuant to the mortgage loan

agreement, the amounts GMACM paid to BIC/MIC for purchasing the hazard insurance were

added to the overall debt that each Plaintiff owed to GMACM.

There is no dispute that the relevant rate charged by BIC/MIC for the insurance was filed

and approved.  Opp. 9 ("To be sure, the filed rate doctrine governs the premiums that Balboa

charged GMACM.").  There is also no dispute that had Plaintiff purchased hazard insurance

from BIC/MIC at these same rates, the filed rate doctrine would bar them from challenging those

rates.  The question, rather, is whether GMACM's purchase and forced-imposition of the rates

that BIC/MIC filed and had approved is functionally equivalent to Plaintiffs purchasing hazard insurance from BIC/MIC directly. On the one hand, Defendants argue that there is no difference between these two scenarios, as the end result in each is Plaintiffs being charged a filed and approved rate for hazard insurance. On the other hand, Plaintiffs argue that the scenarios are different, because the amounts that they were charged was a cost reimbursement based on BIC/MIC's filed and approved rate, it was not itself a filed and approved rate. Pl. Br. 8.

Although no court in this district has directly addressed it, a number of courts in districts across the country have recently confronted this same question and been asked to address this same distinction. Most recently, in *Simpkins v. Wells Fargo Bank, N.A*, No. 12 Civ. 0768, 2013 WL 4510166 (S.D. Ill. Aug. 26, 2013), as in the current case, the court was asked to address allegations of kickbacks relative to force-placed insurance. On the question of the applicability of the filed rate doctrine, Chief Judge Herndon noted that "recently, some courts have begun to view cases such as the one before the Court, not so much as a challenge to the legal rates charged, but rather as a challenge to the manner in which the defendants select the insurers, the manipulation of the force-place insurance policy process, and the impermissible kickbacks included in the premiums." *Id.* at *14 (citing *Kunzelmann v. Wells Fargo Bank, N.A.,* No. 9:11-cv-81373, 2012 WL 2003337, at *3 (S.D. Fla. June 4, 2012); *Gallo v. PHH Mortg. Corp.,* 916 F. Supp. 2d 537, 545-46 (D.N.J. 2012); *Abels v. JPMorgan Chase Bank, N.A.,* 678 F. Supp. 2d 1273, 1277 (S.D. Fla.2009); *Alexander v. Washington Mut., Inc.,* No. CIV.A. 07-4426, 2008 WL 2600323, at *2 (E.D. Pa. June 30, 2008); and *Stevens v. Citigroup,* No. CIV.A. 00-3815, 2000 WL 1848593, at *1 (E.D. Pa. Dec.15, 2000)); *see also Leghorn v. Wells Fargo Bank, N.A.* No. C-13-00708, 2013 WL 3064548, at *6 (N.D. Cal. Jun. 19, 2013).

Also as in this case, the defendants in *Simpkins* urged the Court to instead look to *Roberts*

*v. Wells Fargo Bank, N.A.*, No. 12 Civ. 200, 2013 WL 1233268 (S.D. Ga. Mar. 27, 2013); *see also* Reply 4-6.  In *Roberts*, the court questioned the holding in *Kunzelmann* and *Abels*, as well as the overall distinction between challenges to "the method of choosing an insurer" versus challenges to the filed rates themselves.  *Roberts*, 2013 WL 1233268, at *12-13.  The court found the distinction that the other courts had drawn "dubious," particularly because calculating damages in cases like the one before it would require the Court to impermissibly make "a judicial determination of the reasonableness of the rate," which it argued would bring challenges of that type within the nonjusticiability front of the filed rate doctrine.  *Id.* at *13 (quoting *Hill v. BellSouth Telecomm., Inc.*, 364 F.3d 1308, 1317 (11th Cir. 2004)) (citing *Hall*, 453 U.S. at 577).

In *Simpkins*, Judge Herndon rejected the defendants' offer to follow *Roberts*.  *Simpkins*, 2013 WL 4510166, at *14 n.1 ("[T]his Court does not agree that the filed rate doctrine was intended to sanction the duplicative coverage, back dated policies, and kickbacks that are alleged in the complaint.").  Instead, that court joined with the earlier-cited cases, concluding that payments made to the lender "pursuant to . . . side agreements are not subject to regulatory scheme in the same way that insurance rates are," and that, as a result, the plaintiffs were not "barred under the filed rate doctrine from challenging conduct which [was] not otherwise addressed by a governing regulatory agency, particularly where defendants bear the burden on the issue of dismissal."  *Id.; see also Gallo*, 916 F. Supp. 2d at 546 (denying motion to dismiss where defendants had not demonstrated that the "pre-arranged side agreements [we]re similarly filed with, approved by, or regulated and monitored in some way by a governing regulatory agency, such as the Department of Insurance, much like the filed rates fort hazard insurance policies themselves").

Defendants in this case maintain that the Court should follow *Roberts* and argue that the

11

cases discussed above "are contrary to . . . Second Circuit authority . . . which holds that the filed rate doctrine bars claims where a damages award would cause plaintiffs to pay different rates for the same insurance coverage."  Reply at 5 n.4 (citing *Marcus v. AT&T Corp.*, 138 F.3d 46, 60 (2d Cir. 1998); and *Wegoland*, 27 F.3d at 21-22).  Defendants' argument fails both legally and factually.

As a legal matter, the cases Defendants cite do not support the conclusion that the line of cases discussed in *Simpkins* are "contrary" to Second Circuit precedent or demonstrate that precedent in this Circuit is distinguishable from that of other circuits.  In *Wegoland*, where the plaintiffs sought a fraud-on-the-regulators exception to the filed rate doctrine, the Circuit Court drew directly from Supreme Court precedent regarding nonjusticiability and nondiscrimination in holding that there was no fraud exception to the filed rate doctrine.  In *Marcus*, where AT&T customers challenged a filed but unpublicized tariff that allowed AT&T to round call-lengths up to the nearest minute, the Circuit Court concluded that the damages claim was barred because the calculation of damages "would implicate the nondiscrimination and nonjusticiability strands of the filed rate doctrine."  *Marcus*, 138 F.3d at 60.  What these cases show is that, rather than establishing a unique Second Circuit approach to the application of the filed rate doctrine, the Second Circuit instead strictly adheres to and applies Supreme Court precedent regarding nonjusticiabiility and nondiscrimination.  Defendants do not show how these decisions are uniquely applicable to the current discussion or what separates Second Circuit precedent from the relevant precedent in the other circuits.  Nor do Defendants provide any case law from those Circuits to support such an argument or distinction.

Defendants' argument also fails because it does not address the critical factual distinctions -- which are the heart of the question before the Court -- between the current case

and cases like *Wegoland* and *Marcus*. In both of those cases, the plaintiffs alleged that the filed rates, which the plaintiffs themselves were being charged, were artificially inflated. Here, on the other hand, "Plaintiffs do not allege that Balboa's rates were unreasonable," Opp. 11, but instead challenge the imposition of those rates on them by a third party, GMACM. That is, whereas *Wegoland* and *Marcus* involved a simple A-to-B transaction -- in which A, the insurer, approved a rate and charged it to B -- the current case is less simple. Here, A (BIC or MIC) received approval from the state regulators to charge a certain rate to insurers, after which B (GMACM) billed C (Plaintiffs) for the insurance it had purchased from A.

Defendants, who bear the burden of demonstrating that dismissal is justified under the filed rate doctrine, have not provided the Court with any authority to demonstrate that amounts billed in this second scenario are "similarly filed with, approved by, or regulated and monitored in some way by a governing agency, such as the Department of Insurance, much like the filed rates for hazard insurance policies themselves." *Gallo*, 916 F. Supp. 2d at 546; *accord Simpkins*, 2013 WL 451066, at *14. As in *Gallo* and *Simpkins*, without such authority, the Court cannot conclude that the amounts billed to Plaintiffs for the cost of an insurance agreement between GMACM and BIC/MIC are "subject to the regulatory scheme in the same way that insurance rates are." *Gallo*, 916 F. Supp. 2d at 546; *Simpkins*, 2013 WL 451066, at *14.

If anything, the documents Defendants submitted in support of their argument work against their making the necessary showing.[3] First, the relevant documents show that the rates that BIC/MIC filed and that were reviewed by the relevant regulatory agencies were rates set for lenders purchasing insurance and were designed to protect the lenders interest in the property. *See* Petersen Decl. Ex. B., Dkt. No. 45-2 at 51 ("[T]he insurance purchased is intended for the benefit and protection of the NAMED INSURED, insures against LOSS only to the

---

[3] As Defendants note, these documents are incorporated by reference into the Complaint.

COMMERCIAL PROPERTY on the DESCRIBED LOCATION, and may not sufficiently protect the BORROWER'S interest in the COMMERCIAL PROPERTY.") (emphasis in original); *id.* at 104 (describing the insurance program as "a commercial fire and allied lines program that is *sold to large financial institutions* (lenders), to cover *their* interest in property on which they have issued mortgages.") (emphasis added); *id.* ("[T]he lender is the policyholder and the coverage amount is the mortgage on each covered property."). Second, as the letter they submitted to the New Hampshire Insurance Department specifically notes, in at least that instance, Defendants had been granted approval for the rate based in part on their assertion that only "allow[able]" portions of the amounts that the lender paid to the insurer would be charged to the borrower. Pettersen Decl. Ex. C., Dkt. No. 45-3 at 2 ("Th[e] program is designed so that the lender pays the insurer for all premium and charges back only those parts of the premium which are allowed to be charged to the borrower.").

Drawing all reasonable inferences in the light most favorable to Plaintiffs, it would be fair to infer from these facts that the filed and approved rates were not meant to be directly applicable to individual residential mortgage loan borrowers, like Plaintiffs, and that these rates were not approved for the direct application to such individuals. Defendants have provided no authority to support the contention that the Court can, should, or must grant "per se reasonable" status to rates designed and approved for lenders when those rates are secondarily billed by the lenders to borrowers instead. Accordingly, here, as in *Simpkins*, "Plaintiffs should not be barred under the filed rate doctrine from challenging conduct which is not otherwise addressed by a governing regulatory agency, particularly where defendants bear the burden on the issue of dismissal." *See Simpkins*, 2013 WL 4510166, at *14. As such, Defendants are not entitled to dismissal of Plaintiffs claims against them on this basis and the Court will now turn to

14

Defendants' arguments for why Plaintiffs' alleged RICO and RESPA violations should be dismissed, pursuant to Rule 12(b)(6), for failure to state a claim.

## V.   PLAINTIFFS' RICO CLAIMS

Defendants argue that the alleged RICO and RICO conspiracy claims (Counts One and Two) SAC ¶¶ 251-298, should be dismissed for failure to state a claim upon which relief can be granted.

### A.   Plaintiffs' Allegations

Count One of the Complaint alleges, against all Defendants, a violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.  SAC ¶¶ 251-283.  As Plaintiffs describe it, at base, the RICO claim alleges that Defendants engaged in a scheme to overcharge in the course of a contract, in violation of 18 U.S.C. § 1962(c).  Opp. 2. Specifically Plaintiffs allege that the Balboa Defendants directly participated in the racketeering enterprise by "pa[ying] kickbacks to GMACM, disguise[ing] those kickbacks by funneling them through an affiliate, and prepar[ing] and issu[ing] fraudulent and extortionate mailings."  Opp 1. To satisfy the RICO requirement that there be at least two predicate offenses committed in the previous ten years, *see* 18 U.S.C. § 1961(5), Plaintiffs allege that Defendants engaged in mail fraud and wire fraud, including honest services fraud, in violation of 18 U.S.C. §§ 1341 and 1343, and extortion, attempted extortion, and conspiracy to commit extortion, in violation of 18 U.S.C. § 1951(a).

The overall scheme is described above, in the background section, and specific details will be added as they become relevant.  Generally, however, in this claim Plaintiffs allege that, in violation of 18 U.S.C. § 1962(c), Defendants and GMACM engaged in a pattern of racketeering activity, whereby:

(1) GMACM entered into servicing agreements with owners/holders of whole loans, pursuant to which GMACM was required to maintain continuous hazard insurance on the secured properties;

(2) As necessary, GMACM bought LPI for the loans it serviced from BIC and MIC and paid the filed rate for that product;

(3) GMACM hired NMC, an affiliate and agent of BIC/MIC, to serve as GMACM's subcontractor, performing "loan tracking" services;

(4) Defendants and GMACM concealed from the public borrowers and loan owners the fact that GMACM was not required to pay NMC for the "loan tracking" services;

(5) Additionally, BIC/MIC would rebate/kickback a percentage of the GMACM's purchase price for the LPI as "commissions," and do so by routing the payments through "John Doe," who then forwards these amounts on to GMACM;

(6) GMACM retains the "bogus commissions," and benefits from the free tracking service, but bills the borrower for the full, original amount GMACM paid to BIC/MIC for the LPI, and these amounts are added to the "top of borrowers' mortgage payment," meaning that borrowers' payments would go to paying off the LPI before any of the payment would be applied to the principal/interest on the underlying mortgage; and

(7) NMC computes the amount purportedly due and issues notices stating the amount due as GMACM's pre-rebate amount due.  These notices "falsely describe the balances as reflecting the 'cost of coverage' and the amounts necessary to 'reimburse' GMACM for moneys 'advanced,'" SAC ¶ 263; *see also* Cahen Decl. Ex. 8 ("You are responsible for reimbursing us for the cost of this coverage in the amount of

$\_\_\_\_$.00. ('insurance charges').").

## B.   RICO Requirements

The RICO statute provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c).  "Congress enacted RICO in 1970 as part of the Organized Crime Control Act 'to seek the eradication of organized crime in the United States.'" *Am. Fed. Of State, Cnty. And Mun. Emps. Dist. Council 37 v. Bristol-Myers Squibb Co.*, No. 12 Civ. 2238 (JPO), 2013 WL 2391999, at *3 (S.D.N.Y. Jun. 3, 2013) (quoting Pub. L. No. 91-452 (1970)).  Pursuant to the statute, it is "unlawful for any person employed or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

To state a plausible civil claim for violation of RICO § 1962(c), Plaintiffs' pleadings "must demonstrate, as to each defendant, that while employed by or associated with an enterprise engaged in interstate or foreign commerce, and through the commission of at least two predicate acts constituting a 'pattern of racketeering,' the defendant directly or indirectly conducted or participated in the conduct of the affairs of such enterprise." *Gross v. Waywell,* 628 F. Supp. 2d 475, 485 (S.D.N.Y. 2009) (citing 18 U.S.C. § 1962(c); *Spool v. World Child Int'l Adoption Ag., 520* F.3d 178, 183 (2d Cir. 2008)).  "To establish a civil RICO claim, a plaintiff must allege '(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity,' as well as 'injury to business or property as a result of the RICO violation.'" *Lundy v. Catholic Health Sys. of Long Island Inc.,* 711 F.3d 106, 119 (2d Cir. 2013) (citations omitted); *see also Cruz v. FXDirect Dealer LLC,* 720 F.3d 115, 120 (2d Cir. 2013) ("To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property;

and (3) that the injury was caused by the violation of Section 1962."). "The pattern of racketeering activity must consist of two or more predicate acts of racketeering." *Cruz*, 270 F.3d at 119. (citing 18 U.S.C. § 1961(5)).

Pursuant to Supreme Court precedent, "the RICO statute provides that its terms are to be 'liberally construed to effectuate its remedial purposes.'" *Boyle v. United States,* 556 U.S. 938, 944 (2009) (citation omitted). The true civil RICO plaintiff may well provide a laudatory societal service, supplementing the government's efforts "to protect the general public and the common good from felonious conduct." *Gross,* 628 F. Supp. 2d at 481 (citing *Agency Holdg. Corp. v. Malley-Duff & Assocs.,* 483 U.S. 143, 151 (1987)). "Yet it is well known that the federal courts are flooded with cases molded to the RICO form, even though they are truly little more than garden variety claims for fraud." *Bristol-Myers Squibb Co.*, 2013 WL 2391999, at *4 (citing *Rosenson v. Mordowitz,* No. 11 Civ. 6145, 2012 WL 3631308, at *4 (S.D.N.Y. Aug. 23, 2012)). "Consequently, courts have an obligation to scrutinize civil RICO claims early in the litigation [to] separate the rare complaint that actually states a claim for civil RICO from that more obviously alleging common law fraud." *Rosenson,* 2012 WL 3631308, at *4.

Although Defendants' specific arguments will be discussed below, generally, they argue that Plaintiffs have failed to state a RICO claim, under 18 U.S.C. § 1962(c), because they have failed to allege: (1) that the Balboa Defendants committed any RICO predicate offense; (2) that the Balboa Defendants participated in the operation or management of the RICO empire; and (3) that the purported RICO violations caused an injury to Plaintiffs' business or property. For the following reasons, and accepting all well-pleaded facts as true, the Court concludes: first, that Plaintiffs have sufficiently pleaded the facts and predicate acts necessary to allege a RICO violation, pursuant to 18 U.S.C. § 1962(c); and second, that Plaintiffs have also pleaded the facts

necessary to establish a RICO conspiracy violation, pursuant to 18 U.S.C. § 1962(d).

### C.   Predicate Act:  Mail Fraud/Wire Fraud

"To prove a violation of the mail fraud statute, plaintiffs must establish the existence of a fraudulent scheme and a mailing in furtherance of the scheme." *Lundy*, 711 F.3d at 119 (quoting *McLaughlin v. Anderson*, 962 F.2d 187, 190-91 (2d Cir. 1992)).  "If a party intends to allege that communications constitute predicate acts of mail or wire fraud, it must allege the following elements of those offenses:  (1) the existence of a scheme to defraud, (2) defendants' knowing participation in such a scheme, and (3) the use of wire or mail communications in interstate commerce in furtherance of that scheme." *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 737 F. Supp. 2d 137, 142 (S.D.N.Y. 2010) (quotation marks and citations omitted).  The existence of a scheme to defraud, itself, consists of three sub-elements:  "(1) the existence of a scheme to defraud; (2) fraudulent intent on the part of the defendant; and (3) the materiality of the representations." *Boritzer v. Calloway*, No. 10 Civ. 6264 (JPO), 2013 WL 311013, at *6 (S.D.N.Y. Jan. 24, 2013) (internal citations and quotation marks omitted); *see also Bristol-Myers*, 2013 WL 2391999, at *4 (same)

Courts have noted that RICO allegations "merit particular scrutiny [if], as here, the predicate acts are mail and wire fraud, and [if] the use of mail or wires to communicate is not in and of itself illegal, unlike other predicate acts such as murder or extortion." *Rosenson*, 2012 WL 3631308, at *4 n.3; *accord Bristol-Myers*, 2013 WL 2391999, at *4.  Moreover, "RICO claims based on mail and wire fraud are subject to the heightened pleading standard established by Rule 9(b), which provides that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *Bristol-Myers*, 2013 WL 2391999, at *5 (quoting Fed. R. Civ. P. 9(b)) (citing *McLaughlin*, 962 F.2d at 191 (noting that

Rule 9(b)'s heightened pleading standard applies where mail fraud is alleged as a RICO

predicate offense)).  To satisfy the Rule 9(b) particularity requirement, a complaint alleging

fraud must:  "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify

the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent.'"  *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir. 1999)

(quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir. 1993)); *see also Bristol-*

*Myers*, 2013 WL 2391999, at *5 (applying Rule 9(b) to mail and wire fraud charges in the RICO

context); *Lundy*, 711 F.3d at 119 ("Bare-bones allegations do not satisfy Rule 9(b).").

   Defendants argue that Plaintiffs have failed to adequately allege a fraudulent scheme with

the required particularity, as they "have not set forth specific details about the who, what, when,

where, and how of the alleged fraudulent scheme."  Def. Br. 12 (citing *Fresh Meadow Food*

*Servs., LLC v. RB 175 Corp.,* 282 F. App'x 94, 97 (2d Cir. 2008); and *In re Sumitomo Copper*

*Litig.,* 995 F. Supp. 451, 456 (S.D.N.Y. 1998)).  They argue that Defendants' scheme-to-defraud

allegations are insufficient because:  (1) the allegations regarding NMC's alleged misstatements

and omissions "do not meet the materiality threshold for mail and wire fraud," Br. 13 (citing

*Moore*, 189 F.3d 165); (2) even if the misstatements or omissions were material, "the SAC does

not allege that the Balboa Defendants had an independent legal duty to disclose arising from a

statutory or fiduciary relationship," and (3) the allegations are insufficient to establish that the

Balboa Defendants had the requisite intent to deceive or defraud.  Br. 16.  For the reasons

discussed below, the Court disagrees.

   1.   Materiality

   Defendants argue that the allegations in the Complaint fail to meet the materiality

requirement necessary to establish a violation of mail or wire fraud:  first, if they contained

20

misrepresentations, it is not plausible "to conclude that the letters were likely to deceive or that Plaintiffs would have responded to the notice letters differently," Br. 15; and second, if they contained omissions, the Complaint fails to allege that there was any duty to disclose. The Court concludes otherwise; it determines that, under the relevant standard, the Complaint adequately alleges that the letters sent to Plaintiffs contained misstatements and that those misstatements were material. Having determined that the Complaint has sufficiently alleged that the mailings contained material misrepresentations, the Court need not reach the question whether Defendants had a duty to disclose.

Although Defendants describe the Complaint as only alleging that "[NMC] issued materially false and misleading notices relating to LPI to borrowers via mail," SAC ¶ 263(a); Br. 14, the Complaint as a whole contains more extensive allegations regarding the materiality of the alleged misstatements. *See* SAC ¶¶ 108-114. As discussed above, and accepting as true all well-pleaded facts, Plaintiffs allege that NMC computed, prepared, and sent out the warnings and the LPI purchase notices to Plaintiffs. *See* SAC ¶¶ 108-114; Cahen Decl. Ex. 1-9. The Complaint also alleges that these letters misrepresent the nature of the amounts that would be billed -- stating that the amounts represent the "cost of the insurance" and that Plaintiffs are required to "reimburse" GMACM for having "advanced" these purported costs. The Complaint, as well as Exhibits 1 through 9 of the Cahen declaration, which the Court deems as necessarily incorporated into the Complaint, also provides specific examples of the warning letters and notices of force-placed LPI that were sent to Plaintiffs by NMC, on behalf of GMACM. These letters contain the specific statements, list the precise dates on which the letters were sent, and show to which Plaintiff the letters were addressed. Cahen Decl. Exs. 1-9.

At this stage, these allegations are sufficient to allow for a reasonable inference that the

letters purported to represent the amount that GMACM had actually paid, i.e., the actual cost it had incurred in purchasing LPI, that the price listed in the letters to Plaintiffs did not represent the actual cost of the LPI to GMACM, that the listed cost was higher than the cost they purported to be, and that, as a result, Plaintiffs were billed amounts in excess of what they would have been billed had the listed cost actually been what it purported to be.  The allegations specify the relevant statements in the letters, identify the speaker (NMC on behalf of GMACM), explain why Plaintiffs contend that the statements were fraudulent, and contain the date that the mailings were sent as well as the addresses of the recipients and senders, Cahen Decl. Ex. 1-9, as required under Rule 9(b).  *See DLJ Mortg. Capital, Inc. v. Kontogiannis*, 726 F. Supp.2d 225, 234-35 (E.D.N.Y 2010) (collecting cases in which RICO claims were sufficient under Rule 9(b) and noting, among other things, that these sufficient complaints listed the specific "different mailings said to contain fraudulent representations, along with the dates of these mailing" (citing, *inter alia*, *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999))).

Contrary to Defendants' assertion, this case is distinguishable from *Gustafson v. BAC Home Loans Servicing, LP,* No. SACV 11-915, 2012 WL 7071488, at *6-7 (C.D. Cal. Dec. 26, 2012), and *Weinberger v. Melon Mortg. Co.*, No. CIV.A. 98-240, 1998 WL 599192, at *4-5 (E.D. Pa. Sept. 10, 1998).  In *Gustafson*, the court concluded that the plaintiffs had not satisfied Rule 9(b) because their "neutral" and "sweeping allegations" did not allege with any specificity "*when* these frauds occurred," *which* "Defendants committed the alleged predicate acts," or "*what* the false statements were."  2012 WL 7071488, at *2-3, *6-7 (quoted italics in original).  Here, on the other hand, Plaintiffs' claims are alleged with particularly, specifying the dates the letters were sent, what role each Defendant played, and what the specific misstatement in the letter was (the actual cost Defendants had incurred in purchasing LPI).  In *Weinberger*, the court

22

concluded that none of the acts in the alleged scheme to "deceive plaintiffs into allowing their insurance to lapse so that [Servicer] could charge [Insurer's] higher rates," could be reasonably calculated to deceive, as the warning letters and notices had specifically stated that the force-placed insurance was a more expensive product that would not protect the plaintiffs' interests and urged plaintiffs to purchase their own hazard insurance. 1998 WL 599192, at *5-6.  In the current case, on the other hand, Plaintiffs do not allege that the fraudulent scheme was intended to misrepresent the nature of LPI or trick them into lapsing on their payments.  Rather, the alleged scheme here is more simple: that "costs" and "reimbursements" listed in the letter as legitimately owed were materially overstated.

Finally, to the extent that Defendants argue that Plaintiffs cannot show materiality because they would not have altered their behavior, Br. 14-15, such argument runs contrary to the Supreme Court's decision in *Bridge v. Phoenix Bond & Indem. Co.*, which held that "RICO's text provides no basis for imposing a first party reliance requirement."  553 U.S. 639, 666 (2008).  Moreover, although a jury may ultimately determine that the statements were, in fact, immaterial to Plaintiffs, the Court cannot make this speculative determination at this point in the proceedings or conclude that the statements were immaterial as a matter of law.  *C.f., Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 235 (2d Cir. 1987).

## 2.    Intent

Defendants next argue that Plaintiffs' Complaint does not allege the existence of a scheme to defraud because it fails to demonstrate that the Balboa Defendants had the intent to deceive.  Although Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," *see* Fed. R. Civ. P. 9(b), the Second Circuit has cautioned that courts "must not mistake the relaxation of Rule 9(b)'s specificity requirement

regarding condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations.'" *Acito v. IMCERA Grp. Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (quoting *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir. 1990)); *accord In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009). Accordingly, a plaintiff must allege facts that give rise to a strong inference of fraudulent intent. *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994); *accord Mills,* 12 F.3d at 1176; *O'Brien v. Nat'l Prop. Analysts Partners,* 936 F.2d 674, 676 (2d Cir. 1991); *Ouaknine v. MacFarlane,* 897 F.2d 75, 80 (2d Cir. 1990). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields,* 25 F.3d at 1128; *Acito,* 47 F.3d at 52.

Accepting Plaintiffs' well-pleaded allegations as true, the Court concludes that they have adequately established that Defendants had the requisite intent to deceive or defraud. Plaintiffs allege that the Balboa Defendants, and particularly NMC, as the agent for BIC/MIC issued Plaintiffs materially false and misleading notices relating to LPI so that GMACM could incorporate that data into its monthly statements, remittance reports, servicing reports, and annual certifications, which were, in turn, sent to Plaintiffs by mail and electronic wire. Moreover, Plaintiffs allege that: (1) BIC/MIC received LPI payments from GMACM; (2) BIC/MIC transmitted portions (or percentages) of these LPI payments, termed "commissions," to the third-party, John Doe, who then sent these funds back to GMACM; and (3) BIC/MIC transmitted money to NMC via "intercompany expense allocations," to covertly pay the costs of NMC's services to GMACM.

Taken together, these allegations provide a sufficient basis upon which to infer that the

Balboa Defendants had a motive for committing fraud and a clear opportunity to do so.  As alleged, GMACM was the fifth largest mortgage servicer in the nation -- servicing over 2.4 million mortgage loans with an unpaid principal balance of approximately $374 billion -- and chose to purchase its LPI exclusively from BIC/MIC.  Plaintiffs plausibly allege that this was as a result of the companies' "*quid pro quo*" relationship:  in exchange for GMACM purchasing its LPI from BIC/MIC, BIC/MIC would covertly pay for NMC to act as a subcontractor for GMACM and would return a portion of GMACM's LPI cost to GMACM as a kickback.  It is fair to infer from the facts alleged that Defendants had a strong financial interest in maintaining their relationship with GMACM, that they knew that the actual costs of LPI for GMACM were lower than the amounts that were being asserted in the letters sent to Plaintiffs, and that they sent the notices containing the material misrepresentations.  *See Allstate Ins. Co. v. Rozenberg*, 771 F. Supp. 2d 254, 267 (E.D.N.Y. 2011) (collecting cases where courts concluded that fraudulent intent had been sufficiently pleaded based on a "motive shared by all defendants to induce" the injured party to pay inflated bills).  Additionally, the manner in which the Balboa Defendants expensed and paid for the alleged kickbacks "constitute[s] strong circumstantial evidence of conscious misbehavior or recklessness."  *Shields,* 25 F.3d at 1128; *Acito,* 47 F.3d at 52.

Accordingly, the Court concludes that Plaintiffs' allegations adequately give rise to a strong inference of intent, as required, and that Plaintiffs have sufficiently alleged the existence of a scheme to defraud.  As such, the Court moves on to the second element, "[D]efendants' knowing participation in such a scheme."  *MLSMK Inv. Co.,* 737 F. Supp. 2d at 142 (quotation marks and citations omitted).

### 3.   Participation

Defendants' final argument with regard to the mail and wire fraud predicate acts is that

Plaintiffs have failed to allege adequate specific facts showing that BIC/MIC or NMC directly participated in the allegedly fraudulent transmissions. Br. 17. Specifically, Defendants argue that the Complaint does not allege that BIC/MIC was responsible for sending or determining the content of the LPI notices or billing statements, or for determining the rate GMACM would charge borrowers for LPI, and it does not allege that NMC was the party responsible for the content of the notices that were sent out. Br. 17.

The Second Circuit has "construed [the mail fraud statute's] causation requirement liberally." *Abramovich v. Oliva*, No. 11 Civ. 1755, 2012 WL 3597444, at *10 (E.D.N.Y. Aug. 20, 2012) (quoting *U.S. v. Tocco*, 135 F.3d 116, 124 (2d Cir. 1998)) (alteration in original). "In order to show that the defendant 'caused' the mailing, it need only be shown that he acted 'with knowledge that the use of the mails will follow in the ordinary course of business,' or that 'such use can reasonably be foreseen, even though not actually intended.'" *Tocco,* 135 F.3d at 124 (citation omitted) (quoting *Pereira v. U.S.,* 347 U.S. 1, 8-9 (1954)). "[I]t is not significant for purposes of the mail fraud statute that a third-party, rather than defendant, wrote and sent the letter at issue, provid[ed] . . . the defendants could reasonably have foreseen that the third-party would use the mail in the ordinary course of business as a result of defendants' act." *U.S. v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir. 1989); *see also Abramovich,* 2012 WL 3597444, at *10.

The Court has already detailed the alleged scheme to defraud and will not repeat the allegations here. The Court concludes from those allegations that Plaintiffs have sufficiently pleaded that NMC knowingly and directly participated in the scheme and actually sent the mailings at issue. *See In re Sumitomo Copper Litig*, 995 F. Supp. at 456 (noting that in complex RICO cases "a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)"). The allegations are also

26

sufficient to demonstrate that, even if BIC/MIC did not send any of the mailings, it directly

participated in the scheme and could reasonably foresee that the mails would be used in

furtherance of the same. *See Bortnovsky*, 879 F.2d at 36. Accordingly, Plaintiffs sufficiently

pleaded this element of the mail fraud violation with the particularity required under Rule 9(b).

> 4.    Predicate Acts Conclusion

Having concluded that Plaintiffs have adequately alleged the predicate offense of mail

and wire fraud, and have established at least two predicate acts, the Court need not reach the

question whether Plaintiffs have also adequately pled the remaining predicate acts -- honest

services mail and wire fraud and extortion, attempted extortion, and conspiracy to commit

extortion. *See Fischbein v. Sayers*, No. 04 Civ. 6589 (LTS), 2009 WL 2170349, at *4 (S.D.N.Y.

July 15, 2009) ("[T]he Court need not reach the sufficiency of Plaintiff's allegations that

Defendant's racketeering activity included predicate acts of money laundering . . . on this Rule

12(b)(6) motion, in light of the Court's conclusion as to the sufficiency of the pleading of

predicate acts of mail and wire fraud."). Rather, the Court now turns to Defendants' remaining

two arguments for why Defendants' RICO claim should be dismissed.

> **D.    Participation in Operation or Management of the Enterprise**

Defendants' penultimate argument for dismissal is that Plaintiffs have not adequately

alleged that Defendants participated in the operation or management of the enterprise. To

establish liability under 18 U.S.C. § 1962(c), a plaintiff must demonstrate that the defendant

"conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprises

affairs . . . ." Interpreting this statutory provision, the Supreme Court has held that "the word

'participate' makes clear that RICO liability is not limited to those with primary responsibility

for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO

liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (emphasis in original). The Supreme Court determined that "[t]he 'operation or management' test expresse[d] this requirement in a formulation that is easy to apply." *Id.*

"Simply put," under that test, "one is liable under RICO only if he 'participated in the operation or management of the enterprise itself.'" *First Capital Asset Mgmt, Inc. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004) (quoting *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 521 (2d Cir. 1994)). "In this Circuit, the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear," *id.* (citing *Baisch v. Gallina,* 346 F.3d 366, 377 (2d Cir. 2003); *DeFalco v. Bernas,* 244 F.3d 286, 309 (2d Cir. 2001)), "especially at the pleading stage," *id.* (citing *U.S. v. Allen,* 155 F.3d 35, 42-43 (2d Cir. 1998) (holding that the question whether defendant "operated or managed" the affairs of an enterprise to be essentially one of fact)). "Ultimately, however, it is clear that the RICO defendant must have played '*some* part in directing [the enterprise's] affairs.'" *Satinwood, Inc.*, 385 F.3d at 176 (quoting *DeFalco,* 244 F.3d at 310) (citing *Reves,* 507 U.S. at 178-79). As such, courts in this district have consistently held that it is "'not enough to merely take directions and perform tasks that are necessary and helpful to the enterprise . . . or provide goods and services that ultimately benefit the enterprise;' it is required that the 'provision of these services allow[ ] the defendant to direct the affairs of the enterprise.'" *Aiu Ins. Co. v. Olmecs Med. Supply,* No. CV-04-2934, 2005 WL 3710370, at *8 (E.D.N.Y. Feb. 22, 2005) (quoting *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.,* 303 F. Supp. 2d 432, 451-52 (S.D.N.Y. 2004)).

Defendants' arguments as to participation in the enterprise are unavailing and the cases they cite inapposite. The facts in the Complaint, accepted as true, demonstrate that the Balboa

28

Defendants participated in the operation or management of the enterprise itself. *See Satinwood, Inc.*, 385 F.3d at 176. Courts, including the Supreme Court in *Reves*, have consistently recognized that "[a]n enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Reves*, 507 U.S. at 184; *see also Eastman v. Kodak Co. v. Camarata*, No. 05 Civ. 6384L, 2006 WL 3538944, at *4 (W.D.N.Y. Dec. 6, 2006) (concluding that allegation that defendant paid kickbacks to others in the enterprise, if true, "could certainly be found to constitute conducting or participating in the affairs of the enterprise," and collecting cases reaching the same conclusion); *In re Sumitomo Copper Litig.*, 104 F. Supp. 2d 314, 318 (S.D.N.Y. 2000). Plaintiffs' claims against BIC/MIC easily satisfy this standard based on the kickback allegations discussed throughout this opinion.

Likewise, the allegations with regard to NMC sufficiently establish that it participated in the operation or management of the enterprise. Accepting the allegations as true, here, as in *Aiu Ins. Co.*, NMC was not a passive participant providing "services which [we]re helpful to an enterprise," *see* Br. 20, but was instead a "vital actor[] who enabled the scheme." *Aiu Ins. Co.*, 2005 WL 3710370, at *9; *compare Azrielli*, 21 F.3d at 521-22 (dismissing RICO claim against attorneys on the ground that the provision of legal services related to fraudulent transactions did not amount to management of the enterprise), *with U.S. Fire Ins. Co.*, 303 F. Supp. 2d at 453 (concluding that *Reves* was satisfied by pleadings alleging that defendants "were key participants, by making critical misrepresentations, creating false documents and, . . . serving as the point of communication"). For the reasons discussed above with regard to NMC's overall participation in the scheme, the Court concludes that the allegations regarding NMC's role in the fraudulent scheme sufficiently demonstrate that NMC was an integral part of the overall scheme and enabled the scheme to function; it was not simply an "outside purveyor[]" who was

"providing services as part of its routine and legitimate business operation." *U.S. Fire Ins. Co.*, 303 F. Supp. 2d at 453 (citing *Hottinger v. Amcoal Energy Corp.,* 89 Civ. 6391 (LMM), 1994 WL 652499, at *2 (S.D.N.Y. Nov. 17, 1994) (noting that the failure to describe the role that a defendant played in the 1962(c) enterprise with "further specificity in the pleadings does not render [the pleadings] inadequate")).

### E.    Injury

As a final ground for dismissal, Defendants argue that Plaintiffs have not alleged that the purported RICO violations were a proximate cause of an injury to Plaintiffs' business or property, as required pursuant to 18 U.S.C. § 1964(c), and that Plaintiffs therefore lack RICO standing.  Pursuant to Second Circuit precedent, among other things, "[t]o demonstrate RICO standing, a plaintiff must plead, at a minimum . . . causation of the injury by the defendant's violation." *Baisch*, 346 F.3d at 373.  The Second Circuit has developed a two-part test for making this determination:  first, the plaintiff must show that the injury was "proximately caused by a pattern of activity violating 18 U.S.C. § 1962 or by individual RICO predicate acts," *Baisch,* 346 F.3d at 373; and second, "the plaintiff must have suffered a direct injury that was foreseeable." *Id.; see also Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992) (proximate cause showing in RICO context requires "some direct relation between the injury asserted  and the injurious conduct alleged"); *accord Hemi Grp. LLC v. N.Y.C.*, 130 S. Ct. 983, 991 (2010) (plaintiff must demonstrate "'some direct relation between the injury asserted and the injurious conduct alleged.'  A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient.") (quoting *Holmes,* 503 U.S. at 271, 274).  Defendants argue that, here, the only proximate cause of the asserted injury -- Plaintiffs payment of "falsely inflated, unauthorized LPI charges," SAC ¶ 279 -- was Plaintiffs' own failure to maintain proper hazard insurance coverage

for their properties.  Br. 21.  The Court concludes that, accepted as true, Plaintiffs have

sufficiently alleged proximate cause for RICO standing purposes.

First, the facts in the Complaint regarding overbilling plausibly assert that the alleged

RICO violation was the proximate cause of Plaintiffs' injury.  Plaintiffs have shown a direct link

between the alleged pattern of "racketeering activity" (as well as the predicate acts of fraud) and

their having been billed for the inflated LPI charges.  *See Staub v. Proctor Hosp.*, 131 S.Ct.

1186, 1192 (2011) ("[I]t is common for injuries to have multiple proximate causes.").  Plaintiffs

do not claim that they were injured by Defendants having purchased LPI, but rather by

Defendants having overbilled them for that LPI; and Plaintiffs' failure to maintain insurance,

though certainly the cause of their being billed for LPI in the first place, does not render moot

any claim they may have with regard to the manner in which they were billed for that product.

Second, Plaintiffs have plausibly alleged that the injury they suffered was a direct and

foreseeable harm, as they were at least one of the intended victims, and as the successful

execution of the allegedly fraudulently scheme depended on Plaintiffs being charged for the

inflated LPI, i.e., suffering the precise injury for which they are seeking redress.  *See Baisch*, 346

F.3d at 374.  These allegations are, at a minimum, sufficient to satisfy the pleading requirements

to establish RICO standing.  *See Zito v. Leasecomm Corp.*, No. 02 Civ. 8074 (GEL), 2003 WL

22251352, at *19 (S.D.N.Y. 2003) (addressing a motion to dismiss in a RICO claim and noting

that the question whether plaintiff could ultimately prove the alleged causal link did not factor

into the question whether they had sufficiently alleged that link in the complaint).

### F.     Plaintiffs Have Alleged a RICO Violation, Pursuant to 18 U.S.C. § 1962(c)

For the reasons discussed above, the Court concludes that Plaintiffs' RICO claim is

sufficient to survive Defendants' Motion to Dismiss, as they have alleged with the requisite

31

particularity a violation of 18 U.S.C. § 1962(c).  In addition, because the only remaining element

to be pleaded in support of Plaintiffs' claim under 18 U.S.C. § 1962(d) is the existence of an

agreement, and because the allegations described above plausibly allege such an agreement,

Defendants are likewise not entitled to dismissal of Plaintiffs' RICO conspiracy claim.  *See*

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990); *see also U.S. Fire Ins.*

*Co.*, 303 F. Supp. 2d at 454; *In re Sumitomo Copper Litig.*, 104 F. Supp. 2d at 322.

## VI.    PLAINTIFFS' RESPA CLAIM

Plaintiffs final claim alleges that Defendants' actions also violated the anti-kickback

provisions of RESPA, in violation 12 U.S.C. § 2607(a).  The RESPA prohibition against

kickbacks and unearned fees relating to business referrals, 12 U.S.C. § 2607(a), makes it

unlawful "to accept any fee, kickback, or thing of value pursuant to any agreement . . . that

business incident to or a part of a real estate settlement service involving a federally related

mortgage loan shall be referred to any person."  The term "settlement" is defined in the relevant

regulatory provision as:  "the process of executing legally binding documents regarding a lien on

property that is subject to a federally related mortgage loan.  This process may also be called

'closing' or 'escrow' in different jurisdictions."  24 C.F.R. § 3500.2.

Plaintiffs argue that "transactions relating to LPI 'regard[] a lien on property.'"  Opp. 33.

As Defendants point out, this same argument has been made in, and rejected by, district courts

across the country.  *See Arnett v. Bank of America, N.A.*, 874 F. Supp. 2d 1021, 1040 n.16 (D.

Or. 2012) (noting that if the first "sentence of the definition of settlement were the entirety of the

definition, [the plaintiffs] might have advanced a meritorious argument," but that the second

sentence "makes clear that 'settlement' refers to the a specific event commonly understood, in

this jurisdiction, as the 'closing'"); *Morris v. Wells Fargo Bank N.A.*, No. 2:11cv474, 2012 WL

3929805, at *15 (W.D. Pa. Sept. 7, 2012) (noting that the "[p]laintiff's contention that the force-placed insurance was regulated by RESPA is misplaced," "RESPA regulates the receipt of fees in connection with a real estate settlement," and "[t]he weight of authority holds that services that are not provided as part of the settlement or closing are beyond the scope of the statute") (citing *McNeary-Calloway v. JP Morgan Chase Bank, N.A.,* 863 F. Supp. 2d 928 (N.D. Cal. 2012) (defendants force-placing insurance upon the lapse of the borrower's coverage after the loans had been closed did not constitute the provision of services "in connection with" the closing of the loans); and *Lass v. Bank of America,* No. 11-10570, 2011 WL 3567280, *5-6 (D. Mass. Aug. 11, 2011) (same) (collecting cases in support), *vacated on other grounds by* 695 F.3d 129 (1st Cir. 2012)); *Guebara v. Saxon Mortg.,* No. CIV 2:11-cv-0427, 2011 WL 1670762, *4 (E.D. Cal. May 3, 2011) ("Where the fees or charges at issue are imposed after settlement, RESPA is inapplicable.") (collecting cases); *see also McAnaney v. Astoria Fin. Corp.*, 357 F. Supp. 2d 578, 590 (E.D.N.Y. 2005) (allegations relating to actions that occur after the property transfer from buyer to seller fall outside the scope of RESPA, which "was enacted to protect consumers from unnecessary fees while purchasing a home") (citing *Flagg v. Yonkers Sav. & Loan Ass'n, FA,* 307 F. Supp. 2d 565, 580 (S.D.N.Y. 2004)). Defendants have provided no authority or compelling argument to suggest that the Court should not follow what appears to be the consensus position in district courts across the nation, and the Court sees no such reason. Accordingly, Plaintiffs' RESPA violation, Count Three, is dismissed for failure to state a claim.

## VII.   CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss, Dkt. No. 43, is GRANTED insofar as Plaintiffs' RESPA claim, pursuant to 12 U.S.C. § 1607(a), is dismissed for failure to state a claim, under Federal Rule of Civil Procedure 12(b)(6). The remainder of Defendants'

Motion to Dismiss is DENIED.  The parties are to appear for a status conference on October 18,

2013, at 11:45 AM, in Courtroom 906 of the Thurgood Marshall U.S. Courthouse at 40 Foley

Square, New York, New York.  By October 11, 2013, the parties are to submit an updated case

management plan, to replace Dkt. No. 37.  This Opinion and Order resolves Docket Number 43.

       SO ORDERED.

Dated: September **30**, 2013
     New York, New York

                                   ALISON J. NATHAN
                                United States District Judge

34